UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:21-CV-21416-DPG

PNI LITIGATION TRUST,
the duly authorized successor to
PATRIOT NATIONAL, INC.,

    Plaintiff,

vs.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,
RSUI INDEMNITY COMPANY, and
ARGONAUT INSURANCE COMPANY,

    Defendants.
_____/

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, PNI Litigation Trust (the "Trust"), by and through undersigned counsel and pursuant to S.D. Fla. L.R. 56.1, submits its Local Rule 56.1 Statement of Material Facts in support of Plaintiff's Motion for Partial Summary Judgment against Defendants, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and RSUI Indemnity Company ("RSUI") (collectively, "Defendants"). All exhibits appended hereto are cited to as "EX. ___."

A. **The Insurance Coverage for PNI's Directors and Officers**

1. In 2016, National Union issued a primary policy, Policy No. 06-185-94-19 (the "2016 Primary Policy"), and its excess policies (collectively, the "2016 Policies"), which provided $60 million in aggregate coverage for claims made against the directors and officers of Patriot National, Inc. ("PNI"). (Defendant RSUI Indemnity Company's Responses and Objections to Plaintiff's First Requests for Admissions ("RSUI RFA Resp."), Nos. 1 and 2, EX. 1; Defendant National Union Fire Insurance Company of Pittsburgh, Pa.'s Response to Plaintiff PNI Litigation Trust's First Set of Requests for Admission ("National Union RFA Resp."), No. 2, EX. 2.) The 2016 Primary Policy provided the first $10 million in coverage, and each of the remaining 2016 Policies provided $10 million in excess coverage. (RSUI RFA Resp. at No. 2, EX. 1.)[1] The policy period for the 2016 Policies began on January 16, 2016 and ended on January 16, 2017 (the "2016 Policy Period"). (RSUI RFA Resp. No. 3, EX. 1; National Union RFA Resp. No. 3, EX. 2.)

2. In 2017, National Union issued a primary policy, Policy No. 06-680-86-39 (the "2017 Primary Policy"), and its excess policies (collectively, the "2017 Policies"), which provided $70 million in aggregate coverage for claims made against PNI's directors and officers. (RSUI RFA Resp. Nos. 4, 5, EX. 1; National Union RFA Resp. Nos. 4, 5, EX. 2; 2017 Primary Policy, EX. 3; Deposition of Steven Kammann ("Kammann Dep.") at 28:22-29:6, 30:1-4, EX 5.)[2] The 2017 Primary Policy provided the first $10 million in coverage, and each of the remaining 2017 Policies provided $10 million in excess coverage, with RSUI issuing the first excess policy (the

---

[1] The excess policies in the 2016 tower were issued by RSUI, Argonaut Insurance Company, Endurance Reinsurance Corporation of America, Everest National Insurance Company, and Illinois National Insurance Company, respectively (together with National Union, the "2016 Insurers"). (RSUI RFA Resp. No. 2, EX. 1.)

[2] Mr. Kammann testified as a Rule 30(b)(6) corporate representative of National Union. (Kammann Dep. at 8:10-15, EX. 5.)

1

"2017 RSUI Policy"). (RSUI RFA Resp. No. 5, EX. 1; 2017 Primary Policy, at Declarations, p. 1, EX. 3; RSUI RFA Resp. Nos. 4, 5, EX. 1; 2017 RSUI Policy at Declarations, p. 1, EX. 4.)[3] The 2017 Policies had an initial policy period of January 16, 2017 to January 16, 2018, but was extended until May 16, 2018 (the "2017 Policy Period"). (RSUI RFA Resp. No. 6, EX. 1; National Union RFA Resp. No. 6, EX. 2; Kammann Dep. at 75:13-76:19, EX. 5.)

### B. The Operative Policy Provisions

3.  The 2017 Primary Policy provides coverage for **Loss** with respect to (i) **Claims** first made against an **Insured** . . . during the **Policy Period** . . . and reported to the **Insurer** as required by this policy." (2017 Primary Policy at Insuring Agreements, p. 8, EX. 3; Kammann Dep. at 78:13-25, EX. 5). Insuring Agreement 1.A. provides coverage for "the **Loss** of any **Insured Person** that no **Organization** has indemnified or paid, and that arises from any: (1) **Claim** (including any **Insured Person Investigation**) made against such **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**." (2017 Primary Policy at Insuring Agreements, p. 8, EX. 3; Kammann Dep. at 81:15-25, EX. 5.)

4.  The 2017 Primary Policy defines the term "**Loss**" to include "damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), **Defense Costs**, **Crisis Loss**, **Derivative Investigation Costs**, **Liberty Protection Costs** and **Pre-Claim Inquiry Costs**." (2017 Primary Policy at Definitions, p. 28, EX. 3.)

5.  The term "**Claim**" is defined to include, without limitation, (1) "a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for

---

[3] The excess policies in the 2017 tower were issued by RSUI, Argonaut Insurance Company, XL Specialty Insurance Company, Westchester Fire Insurance Company, Illinois National Insurance Company, and RLI Insurance Company, respectively (together with National Union, the "2017 Insurers"). (RSUI RFA Resp. No. 5, EX. 1.)

2

mediation, arbitration or any other alternative dispute resolution process" or (2) "a civil, criminal, administrative, regulatory or arbitration or other alternative dispute resolution proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading." (2017 Primary Policy at Definitions, p. 24, as amended by Endorsement No. 43, EX. 3.)

6. The term "**Insured Person**" is defined in the 2017 Primary Policy to include any "**Executive** of an **Organization**." (2017 Primary Policy at Definitions, p. 28, EX. 3.) "**Executive**," in turn, means any "past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position)." (*Id.* at Definitions, p. 27.)

7. The use of the term "such **Insured Person**" in Insuring Agreement 1.A. is intended to link the **Claim** and **Loss** that is payable under the Insuring Agreement to the **Insured Person** who is the subject of the **Claim** because there may be more than one **Insured Person** that has coverage under the policy. (Kammann Dep. at 82:17-83:16, EX. 5.) Coverage for any **Claim** must be evaluated against each **Insured Person** who is the subject of the **Claim** for any **Wrongful Act** of that particular **Insured Person**. (Kammann Dep. at 83:17-84:6, EX. 5.)

8. The term "**Wrongful Act**" includes "(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged **Employment Practices Violation** or **Third-Party EPL Violation**: (i) with respect to any **Executive** of an **Organization**, (a) by such **Executive** in his or her capacity as such, (b) by such **Executive** in his or her capacity as a **Controlling Person**, or (c) any matter claimed against such

**Executive** solely by reason of his or her status as such." (2017 Primary Policy at Definitions, p. 33, as amended by Endorsement No. 64, EX. 3.)

9. Section 7(b) of the 2017 Primary Policy (Relation Bank to the First Reported Claim or Pre-Claim Inquiry) provides, in relevant part, as follows:

> Solely for the purpose of establishing whether any subsequent **Related Claim** was first made or a **Related Pre-Claim Inquiry** was first received during the **Policy Period** or **Discovery Period** (if applicable), if during any such period:
>
> (1) A **Claim** was first made and reported in accordance with Clause 7(a) above, then any **Related Claim** that is subsequently made against an **Insured** and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time that such previously reported **Claim** was first made. . . .

(2017 Primary Policy at Notice and Reporting, pp. 13-14, EX. 3.)

10. Under Section 7(b), a **Claim** made against an **Insured** after the 2017 Policy Period can still trigger coverage under the 2017 Primary Policy if it is a **Related Claim** to a **Claim** first made and noticed under the 2017 Primary Policy:

> Q: So long as that Claim made in 2019, is a, quote, "Related Claim" to one that was made during the 2017 policy, than that subsequent Claim could still trigger coverage under this 2017 policy, correct?
>
> A: As long as the Claim that it was related to was first made and reported in the 2017 policy period, yes.

(Kammann Dep. at 92:19-93:3, EX. 5.)

11. The term "**Related Claim**" is defined to mean "a **Claim** alleging, arising out of, based upon or attributable to any facts of **Wrongful Acts** that are the same as or related to those that were either: (i) alleged in another **Claim** made against an **Insured**; or (ii) the subject of a **Pre-Claim Inquiry** received by an **Insured Person**." (2017 Primary Policy at Definitions, p. 31, EX. 3.)

4

12. The 2017 Primary Policy includes a Pending and Prior Litigation Exclusion that excludes coverage for a **Claim** made against an **Insured**:

> alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior **D&O Litigation** or **EPL Litigation** of which an **Insured** had notice, or alleging any **Related Wrongful Act(s)** to that alleged in such pending or prior **D&O Litigation** or **EPL Litigation**.

(2017 Primary Policy at Exclusions, p. 11, as amended by Endorsement No. 35, EX. 3; Kammann Dep. at 95:18-97:3, EX. 5.) The "**Continuity Date**" for the 2017 Primary Policy is June 24, 2011. (2017 Primary Policy at Declarations, p. 4, EX. 3; Kammann Dep. at 98:3-6, EX. 5.)

13. When it issued the 2017 Primary Policy, National Union had available a specific event exclusion endorsement that very broadly excludes coverage for any events connected to a specific pending **Claim** or its future variations. (Kammann Dep. at 146:17-24, 148:14-150:4, 160:15-161:11, EX. 5.) National Union had issued policies with a specific event exclusion on prior occasions, but elected not to do so for the 2017 Primary Policy. (Kammann Dep. at 148:7-11, EX. 5; 2017 Primary Policy, EX. 3.)

14. The 2017 RSUI Policy includes a Prior and/or Pending Litigation Exclusion that provides as follows:

> The **Insurer** shall not be liable to make any payment for loss in connection with any claim made against any **Insured** alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or pending as of 01/16/2015, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation.

(2017 RSUI Policy, p. 6, EX. 4.)

5

### C. The 2017 Directors

15. Terry Coleman ("Coleman") served as a member of PNI's Board of Directors (the "Board") from April 23, 2017 until January 30, 2018. (RSUI RFA Resp. No. 7, EX. 1; National Union RFA Resp. No. 7, EX. 2.)

16. Ernst Csiszar ("Csiszar") served as a member of the Board from April 26, 2017 until January 30, 2018. (RSUI RFA Resp. No. 9, EX. 1; National Union RFA Resp. No. 9, EX. 2.)

17. Glenn Hibler ("Hibler") served as a member of the Board from April 23, 2017 until January 30, 2018. (RSUI RFA Resp. No. 11, EX. 1; National Union RFA Resp. No. 11, EX. 2.)

18. Michael Purcell ("Purcell") served as a member of the Board from January 4, 2017 until April 23, 2017. (RSUI RFA Resp. No. 13, EX. 1; National Union RFA Resp. No. 13, EX. 2.)

19. Jeffrey Rohr ("Rohr") served as a member of the Board from January 4, 2017 until April 26, 2017. (RSUI RFA Resp. No. 15, EX. 1; National Union RFA Resp. No. 15, EX. 2.)[4]

### D. The Wasik Lawsuit Against PNI's Directors and Officers

20. On November 30, 2016, Henry Wasik, one of PNI's stockholders, filed a class action lawsuit against certain directors and officers of PNI in the Delaware Court of Chancery (the "Chancery Court"), captioned as *Wasik v. Mariano*, C.A. 12953-VCL (Del. Ch.) (the "Wasik Lawsuit"). (RSUI RFA Resp. No. 17, EX. 1; National Union RFA Resp. No. 17, EX. 2; Verified

---

[4] Coleman, Csiszar, Hibler, Purcell, and Rohr are collectively referred to herein as the "2017 Directors."

Stockholder Class Action Complaint (the "Original Wasik Complaint"), EX. 6; Deposition of James DiSilva ("DiSilva Dep.") at 55:15-19, 56:14-23, EX. 7.)[5]

21. None of the 2017 Directors was serving on PNI's Board at the time the Wasik Lawsuit was filed. (RSUI RFA Resp., No. 20, EX. 1; National Union RFA Resp., No. 20, EX. 2.)

22. None of the 2017 Directors was named as a defendant in the Original Wasik Complaint filed in the Wasik Lawsuit, and no causes of action were asserted against the 2017 Directors in the Original Wasik Complaint. (Kammann Dep. at 120:16-24, EX. 5; Original Wasik Complaint, EX. 6; DiSilva Dep. at 89:22-90:9, EX. 7.)

23. On March 1, 2017, Wasik filed an amended complaint in the Wasik Lawsuit alleging derivative claims against certain directors and officers of PNI. (RSUI RFA Resp. No. 18, EX. 1; National Union RFA Resp. No. 18, EX. 2; Amended Verified Stockholder Class Action and Derivative Complaint (the "First Amended Wasik Complaint"), EX. 8.)

24. None of the 2017 Directors was named as a defendant in the First Amended Wasik Complaint, and no causes of action were asserted against the 2017 Directors in the First Amended Wasik Complaint. (RSUI RFA Resp. No. 19, EX. 1; National Union RFA Resp. No. 19, EX. 2; DiSilva Dep. at 89:6-21, EX. 7; First Amended Wasik Complaint, EX. 8.)

25. National Union, as the primary insurer under the 2016 Policies, accepted coverage of the claims asserted against PNI's directors and officers in the Wasik Lawsuit under the 2016 Policies and agreed to advance the defense costs for the Wasik Lawsuit. (RSUI RFA Resp. No. 24, EX. 1; National Union RFA Resp. No. 24, EX. 2.)

---

[5] Mr. DiSilva testified as a Rule 30(b)(6) corporate representative of National Union. (DiSilva Dep. at 7:8-12, EX. 7.)

26. On August 21, 2017, a second amended complaint (the "Second Amended Wasik Complaint") was filed in the Wasik Lawsuit. (RSUI RFA Resp. No. 25, EX. 1; National Union RFA Resp. No. 25, EX. 2; Second Amended Wasik Complaint, EX. 9; DiSilva Dep. at 67:18-68:5, EX. 7.)

27. The Second Amended Wasik Complaint, for the first time in the Wasik Lawsuit, sought damages against certain of the 2017 Directors arising out of events and wrongdoing that occurred while the 2017 Directors were serving on the Board. (DiSilva Dep. at 90:10-91:2, EX. 7; Second Amended Wasik Complaint ¶¶ 19-21, EX. 9.)

28. The Second Amended Wasik Complaint asserted claims against three of the 2017 Directors—Coleman, Csiszar, and Hibler—for breaching their fiduciary duties to PNI by authorizing a new employment agreement for PNI's CEO, Steven Mariano ("Mariano"), and then approving a severance agreement for Mariano when he resigned. (DiSilva Dep. at 90:10-91:2, EX. 7; RSUI RFA Resp. No. 27, EX. 1; National Union RFA Resp. No. 27, EX. 2; Second Amended Wasik Complaint ¶¶ 659-62, 665, 669-71, 675, 682-83, EX. 9.) The Second Amended Wasik Complaint also referenced a March 10, 2017 severance agreement that PNI entered into with its general counsel, Christopher Pesch ("Pesch"). (Second Amended Wasik Complaint at p. 187, n.28 & ¶ 696, EX. 9.)

29. Rohr and Purcell were not named as defendants in the Second Amended Wasik Complaint. (RSUI RFA Resp. No. 28, EX. 1; National Union RFA Resp. No. 28, EX. 2; DiSilva Dep. at 91:25-92:10, EX. 7; Second Amended Wasik Complaint, EX. 9.) Nevertheless, Rohr and Purcell were referenced in the Second Amended Wasik Complaint in connection with their involvement in a 2017 transaction involving Guarantee Insurance Company (the "GIC

Transaction"). (DiSilva Dep. at 91:3-24, EX. 7; Second Amended Wasik Complaint ¶¶ 470-91, EX. 9).

30. On September 28, 2017, Coleman, Csiszar, and Hibler tendered a demand (the "September 2017 Demand") to National Union for coverage under the 2017 Policies for the claims asserted against them in the Second Amended Wasik Complaint. (September 2017 Demand, EX. 10; DiSilva Dep. at 75:6-76:6, EX. 7.)

31. On October 13, 2017, National Union, in response to the September 2017 Demand, issued a letter denying coverage under the 2017 Policies. (RSUI RFA Resp. No. 30, EX. 1; October 13, 2017 Letter, EX. 11.)

### E. The Trust Lawsuit Against PNI's Directors and Officers

32. On January 30, 2018, PNI filed a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). (*In re Patriot National, Inc.*, Case No. 18-10189 (Bankr. D. Del.) at ECF No. 1; RSUI RFA Resp. No. 31, EX. 1; National Union RFA Resp. No. 31, EX. 2.)

33. On May 4, 2018, the Bankruptcy Court entered an order confirming PNI's chapter 11 plan (the "Plan"). (*In re Patriot National, Inc.*, Case No. 18-10189 (Bankr. D. Del.) at ECF No. 705.) Pursuant to the Plan, the derivative claims alleged in the Wasik Lawsuit were assigned to the Trust, and Peter Kravitz was approved as the Litigation Trustee (the "Trustee") of the Trust. (*Id.*)

34. On April 30, 2019, the Trust made a settlement demand on the 2016 Insurers and the 2017 Insurers regarding the claims asserted in the Wasik Lawsuit. (RSUI RFA Resp. No. 33; EX. 1; April 30, 2019 Letter, EX. 12; Deposition of Peter Kravitz ("Kravitz Dep.") at 185:9-18, EX. 17.)

9

35. On May 17, 2019, ten former directors and officers of PNI demanded that National Union, RSUI, and the other insurers fund the settlement offer set forth in the Trust's April 30, 2019 letter (the "May 2019 Demand"). (RSUI RFA Resp. No. 34, EX. 1; National Union RFA Resp. No. 34, EX. 2; May 2019 Demand, EX. 13.)

36. On June 28, 2019, National Union, in response to the May 2019 Demand, issued a letter denying coverage under the 2017 Policies. (June 28, 2019 Letter, EX. 14.) RSUI issued its response to the May 2019 Demand denying coverage under the 2017 Policies on July 11, 2019. (RSUI RFA Resp. No. 35, EX. 1; July 11, 2019 Letter, EX. 15.)

37. On November 19, 2019, the Chancery Court entered an order severing the Trustee's claims from the Wasik Lawsuit, creating a new civil action for the claims, and granting the Trustee leave to file a Verified Complaint in the new civil action. (RSUI RFA Resp. No. 36, EX. 1; National Union RFA Resp. No. 36, EX. 2.)

38. On November 20, 2019, the Trustee, on behalf of the Trust, filed a Verified Complaint in the Delaware Court of Chancery (the "Trust Complaint") asserting claims for breach of fiduciary duty and corporate waste against the former directors and officers of PNI and seeking over $100 million in damages (the "Trust Lawsuit"). (RSUI RFA Resp. No. 37, EX. 1; National Union RFA Resp. No. 37, EX. 2; Trust Complaint, EX. 16; Kravitz Dep. at 201:21-202:5, EX. 17.)

39. The Trust Complaint named all of the 2017 Directors as defendants. (Trust Complaint ¶¶ 19-21, 23-24, EX. 16.) The 2017 Directors all were sued in their capacity as directors of PNI and for wrongful acts committed as directors in 2017. (DiSilva Dep. at 109:2-10, 109:11-13, 110-8:18, EX. 7; Trust Complaint ¶¶ 19-21, 23-24 & Counts 4-6, 10-12, EX. 16.)

10

40. The Trust Complaint included claims against Coleman, Csiszar, and Hibler for breach of fiduciary duty and corporate waste for authorizing a new employment agreement for Mariano and for approving a severance package for Mariano. (Trust Complaint at Counts 5-6, 11-12, EX. 16.) The Trust Complaint also included claims against Rohr and Purcell for breach of fiduciary duty and corporate waste for authorizing the GIC Transaction and for approving a severance package for Pesch. (Trust Complaint at Counts 4, 6, 10, 12, EX. 16; DiSilva Dep. at 91:25-92:15, EX. 7.)

41. On June 23, 2020, the Trustee filed an amended complaint (the "Amended Trust Complaint") in the Trust Lawsuit. (RSUI RFA Resp. No. 40, EX. 1; National Union RFA Resp. No. 40, EX. 2; Amended Trust Complaint, EX. 18; DiSilva Dep. at 87:6-24, EX. 7.)

42. The claims alleged against the 2017 Directors in the Trust Lawsuit involved acts of misconduct that occurred exclusively in 2017 after the inception of the 2017 Policies. (DiSilva Dep. at 110:11-18, 112:8-16, EX. 7.)

     F.     **The Trust's Settlements with PNI's Directors and Officers**

43. On May 6, 2020, the Trustee and three PNI directors and officers named in the Trust Complaint entered into a settlement agreement, which required a $2.95 million settlement payment to be paid on behalf of the settling directors and officers from the 2016 Policies (the "May 2020 Settlement Agreement"). (RSUI RFA Resp. No. 39, EX. 1; National Union RFA Resp. No. 39, EX. 2; Kravitz Dep. at 46:16-47:6, EX. 17.)

44. On June 18, 2020, the Trustee and the 2017 Directors entered into an Agreement Not to Objection (the "Non-Objection Agreement"). Among other things, the Non-Objection Agreement provided that: (1) the 2017 Directors would not object to the payment of any settlement amounts to the Trustee from the 2016 Policies; (2) the 2017 Directors would make a demand upon

the 2017 Insurers to provide coverage under the 2017 Policies either to settle or defend against the Trustee's claims against the 2017 Directors in the Trust Lawsuit; and (3) if the 2017 Insurers did not provide coverage under the 2017 Policies and refused to defend, the 2017 Directors would file a coverage action regarding the 2017 Policies, participate in a good-faith mediation with the Trustee to negotiate the settlement amount of the *Coblentz* agreement and, if necessary, an arbitration to determine the settlement amount if the mediation proved unsuccessful. (Non-Objection Agreement ¶¶ 2(a), 2(c)-(d), 2(f), 6, EX. 19.) The Non-Objection Agreement further provided that the proposed *Coblentz* agreement would be void *ab initio* if any of the 2017 Insurers agreed to advance defense costs to the 2017 Directors for the Trustee's claims in the Trust Lawsuit. (Non-Objection Agreement ¶ 3, EX. 19; Kravitz Dep. at 178:24-179:6, EX. 17.)

45. On June 29, 2020, the Trustee entered into a settlement agreement with ten of the directors and officers of PNI named in the Amended Trust Complaint, which required an $11 million settlement payment to be paid to the Trust on behalf of the settling directors and officers from the 2016 Policies (the "June 2020 Settlement Agreement"). (RSUI RFA Resp. No. 45, EX. 1; National Union RFA Resp. No. 45, EX. 2; Kravitz Dep. at 55:20-57:1, EX. 17.)

46. On October 16, 2020, the Bankruptcy Court approved the May 2020 Settlement Agreement and the June 2020 Settlement Agreement. (RSUI RFA Resp. Nos. 49, 51, EX. 1; National Union RFA Resp. Nos. 49, 51, EX. 2.)

47. The 2016 Policies were exhausted after the Bankruptcy Court approved the May 2020 Settlement Agreement and the June 2020 Settlement Agreement. (RSUI RFA Resp. No. 46, EX. 1; National Union RFA Resp. No. 46, EX. 2.)

48. On September 24, 2020, the Trustee made a settlement demand for the remaining policy limits of the 2017 Policies for the claims asserted against the 2017 Directors. (DiSilva Dep. at 92:22-93:4, 93:19-94:15, EX. 7.)

49. On September 25, 2020, the 2017 Directors tendered a demand for a defense and coverage from National Union under the 2017 Policies for the claims asserted against them in the Amended Trust Complaint. (DiSilva Dep. at 94:25-95:6, 95:14-24, 98:7-18, EX. 7; RSUI RFA Resp. No. 47, EX. 1; National Union RFA Resp. No. 47, EX. 2.)

50. In letters dated October 5, 2020 and October 6, 2020, the 2017 Insurers denied coverage under the 2017 Policies and refused to advance defense costs to the 2017 Directors. (RSUI RFA Resp. No. 50, EX. 1; National Union RFA Resp. No. 50, EX. 2; DiSilva Dep. at 99:20-23, 100:23-101:12, 102:12-18, EX. 7; National Union October 5, 2020 Letter, EX. 20; RSUI October 6, 2020 Letter, EX. 21.)

51. The 2017 Insurers never agreed to advance defense costs to the 2017 Directors under the 2017 Policies. (DiSilva Dep. at 123:4-11, 130:4-10, EX. 7.)

52. On October 26, 2020, the 2017 Insurers filed a declaratory judgment action against the 2017 Directors. (RSUI RFA Resp. No. 52, EX. 1; National Union RFA Resp. No. 52, EX. 2.)

53. Consistent with the Non-Objection Agreement, on November 2, 2020, the Trust and the 2017 Directors engaged in a full-day mediation session with Robert Meyer, who had led prior mediation sessions regarding PNI-related litigation. (Deposition of Robert Meyer ("Meyer Dep.") at 9:20-10:4, EX. 22.)

54. As a result of this mediation, including post-mediation negotiations, in December 2020, the Trustee entered into two settlement agreements: (a) a settlement agreement with Purcell and Rohr; and (b) a settlement agreement with Coleman, Csiszar, and Hibler (collectively, the

13

"Settlement Agreements"). (RSUI RFA Resp. No. 53, EX. 1; Meyer Dep. at 10:5-7, EX. 22; Settlement Agreements, EX. 23.)

55. Pursuant to the Settlement Agreements, the parties settled the claims asserted against the 2017 Directors in the Amended Trust Complaint for $30 million (the "Settlement Amount"). (Settlement Agreements ¶ 4, EX. 23; RSUI RFA Resp. No. 54, EX. 1; National Union RFA Resp. No. 54, EX. 2.)

56. The Settlement Agreements included a covenant not to execute, whereby subject to the satisfaction of certain terms and conditions, the Trust agreed to seek recovery of the Settlement Amount only from the 2017 Insurers. (Settlement Agreements ¶ 5, EX. 23; RSUI RFA Resp. No. 55, EX. 1; Kravitz Dep. 62:17-63:18, EX. 17.)

57. In consideration for the Trust's covenant not to execute on the Settlement Amount, the 2017 Directors assigned to the Trust all of their rights, claims, and causes of action they have under the 2017 Policies against Defendants, including, but not limited to, any and all claims against Defendants for breach of contract, statutory bad faith pursuant to Florida Statute § 624.155, and common law bad faith as a result of Defendants' refusal to acknowledge their defense and coverage obligations, adequately investigate or evaluate the claims against the 2017 Directors, and consent to a reasonable settlement within the respective policy limits of the 2017 Policies. (Settlement Agreements ¶ 6, EX. 23; RSUI RFA Resp. Nos. 56, 57, EX. 1.)

58. On January 14, 2021, the Bankruptcy Court entered an order approving the Settlement Agreements, finding that these settlements "have been entered into in good faith and as the result of arms-length negotiations" and were "fair," "equitable," and "within the reasonable range of litigation possibilities in the [Trust Lawsuit]." (Order Granting Motion by the Litigation Trustee to Approve Settlement with Five Former Directors of the Debtors Pursuant to 11 U.S.C.

105(a) and Federal Rule of Bankruptcy Procedure 9019, EX. 24; RSUI RFA Resp. No. 62, EX. 1; National Union RFA Resp. No. 62, EX. 2.)

### G.  Additional Facts

59.  National Union admitted that there were other underwriting options available to curtail coverage under the 2017 Policies for anything arising out of the pre-existing Wasik Lawsuit. (Kammann Dep. at 156:19-158:22, EX. 5.)

60.  National Union admitted that it could have changed the **Continuity Date** applicable to the Pending and Prior Litigation Exclusion from June 24, 2011 to the 2017 policy inception. (Kammann Dep. at 158:23-159:10, EX. 5.)

61.  The Original Wasik Complaint does not mention any employment agreement or separation agreement pertaining to Mariano.  (Original Wasik Complaint, EX. 6.)

Dated: August 5, 2022.

CIMO MAZER MARK PLLC

*/s/ Jason S. Mazer*
Jason S. Mazer
Florida Bar No. 0149871
jmazer@cmmlawgroup.com
Joshua R. Alhalel
jalhalel@cmmlawgroup.com
100 Southeast 2nd St.
Suite 3650
Miami, FL 33131
(305) 374-6480

*Counsel for the PNI Litigation Trust*

OF COUNSEL:

REID COLLINS & TSAI LLP
Eric D. Madden
emadden@reidcollins.com
1601 Elm Street, Suite 4200
Dallas, TX 75201
(214) 420-8900

-and-

William T. Reid IV
wreid@reidcollins.com
Gregory S. Schwegmann
gschwegmann@reidcollins.com
Jason A. Cairns
jcairns@reidcollins.com
1301 S. Capital of Texas Hwy.
Suite C300
Austin, TX 78746
(512) 647-6100

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2022, a true and correct copy of the foregoing was served on all parties listed in the Service List below via electronic mail.

<u>/s/ Jason S. Mazer</u>

**SERVICE LIST**
Case No. 1:21-cv-21416-DPG
PNI Litigation Trust v. National Union, et al.

**Steven Jeffrey Brodie, Esq.**
Carlton Fields Jorden Burt, PA
100 SE Second Street
Suite 4200
Miami, FL 33131
305-530-0050
Fax: 305-530-0055
Email: sbrodie@carltonfields.com
Email: ldelpino@carltonfields.com

**Gregory Andrew Gidus, Esq.**
Carlton Fields Jorden Burt, P.A.
4221 W. Boy Scout Boulevard
Suite 1000
Tampa, FL 33607-5780
813-223-7000
Fax: 813-229-4133
Email: ggidus@carltonfields.com
Email: dlester@carltonfields.com
Email: tpaecf@cfdom.net

*Attorneys for National Union Fire Insurance Company of Pittsburgh, Pa*

**Barry Adam Postman, Esq.**
**Patrick James Folley, Esq.**
Cole Scott & Kissane
222 Lakeview Avenue
Suite 120
West Palm Beach
West Palm Beach, FL 33417
Telephone: 561-383-9200
Fax: (561) 683-8977
Email: postman@csklegal.com
Email: barry.postman@csklegal.com
Email: sara.ghent@csklegal.com
Email: Patrick.Folley@csklegal.com
Email: ann.hart@csklegal.com
Email: jane.ford@csklegal.com
Email: cynthia.acuna-nelson@csklegal.com
Email: jessica.anderson@csklegal.com

**Thomas E. Geyer, Esq.**
Sabrina Haurin, Esq.
Jolene S. Griffith, Esq.
Bailey Cavalieri, LLC
10 W. Broad Street, Ste. 2100
Columbus, OH 43215-3422
Telephone:  (614) 221-3155
Email: tgeyer@baileycav.com
Email:  jgriffith@baileycav.com
Email:  shaurin@baileycav.com

*Attorneys for RSUI Indemnity Company*