# EXHIBIT 18

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PETER KRAVITZ, as LITIGATION TRUSTEE OF THE PNI LITIGATION TRUST, the duly authorized successor to PATRIOT NATIONAL, INC., *et al.*, | ) )<br>) )<br>) ) |
| Plaintiff, | ) ) |
| v. | ) ) C.A. No. 2019-0934-JTL |
| STEVEN M. MARIANO, CHARLES H. WALSH, JOHN R. DEL PIZZO, QUENTIN P. SMITH, JR., JAMES O'BRIEN, SEAN BIDIC, AUSTIN SHANFELTER, CHRISTOPHER PESCH, THOMAS SHIELDS, TODD WILSON, ERNEST CSISZAR, TERRY COLEMAN, GLENN HIBLER, MICHAEL COREY, MICHAEL PURCELL, JEFFRY ROHR, JOYCE PREDMESKY, DAVID QUIGLEY, JOHN REARER, and ELVIS RIVERA, | ) )<br>) (Successor Action to Severed<br>) C.A. No. 12953-VCL)<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) ) |
| Defendants. | ) |

---

## FIRST AMENDED COMPLAINT

---



EXHIBIT
99
c.l.    5/3/20

# TABLE OF CONTENTS

SUMMARY OF THE ACTION........................................................................ 1

PARTIES ................................................................................................... 5

   A.   The Plaintiff........................................................................... 5

   B.   The Defendants...................................................................... 6

   C.   Relevant Non-Parties .......................................................... 11

FACTUAL BACKGROUND .......................................................................... 13

   A.   Mariano Forms PNI to Use the Public Capital Markets to Cover GIC's Growing Losses. ........................................................ 13

   B.   Mariano Uses his Positions at the Company to Foster Director Disloyalty. ........................................................................... 15

   C.   In Complete Disregard of Their Duties to PNI, PNI's Directors Approve a Series of Acquisitions That Benefit Only Mariano and His Cronies............................................................................ 21

      1.   PNI Acquires Three Mariano-Controlled Companies for Over $12 Million Within Weeks of the IPO................................. 22

      2.   Mariano Uses PNI to Enrich Longtime Friend Edward Snow. ......... 25

      3.   PNI Purchases Global HR from Shanfelter and Later Sells It at a Substantial Loss. ....................................................... 26

      4.   PNI Pays Its Executives Nearly $2 Million in M&A Bonuses for the Related-Party Transactions. ................................... 30

   D.   Mariano Abuses PNI's Access to Capital Markets to Enrich Himself at the Company's Expense........................................................ 32

      1.   PNI Attempts a Secondary Offering as Pretext to Further Enrich Mariano and Bankroll GIC............................................... 34

      2.   PNI Pursues a Private Placement to Benefit Mariano and GIC at PNI's Expense................................................................. 35

      3.   PNI Implements an Ill-Advised Stock Repurchase Program for Mariano's Benefit. ........................................................... 39

PNI-National Union_004750

4.   PNI's Directors Approve a Leveraged Recapitalization to Pay an Imprudent Dividend and Protect Mariano's Majority Ownership........................................................................... 45

E.   PNI's Directors Approve a $30 Million Handout to GIC in Exchange for a Worthless Promise. ............................... 50

F.   PNI Wastes Tens of Millions of Dollars Providing Services for Which GIC Would Never Be Able to Pay.............................. 60

G.   PNI's Directors Needlessly Approve a New Employment Agreement for Mariano That Awarded Excessive Compensation and Benefits.......... 62

H.   PNI's Directors Approve Undeserved Severance Packages to the Officers Responsible for the Company's Demise...................................... 65

I.   Before Resigning, Mariano Loots $1.5 Million from PNI to Pay Another Company's Debt. .................................................. 67

J.   PNI Seeks Bankruptcy Protection after GIC's Inevitable Failure. ............ 69

CAUSES OF ACTION ....................................................................... 70

Count 1 Breach of Fiduciary Duty: Related-Party Transactions and the Transaction Bonuses (Against Mariano, Del Pizzo, and Shanfelter) ........ 70

Count 2 Breach of Fiduciary Duty: Stock Repurchase Program (Against Mariano, Del Pizzo, and Shanfelter) ........................................ 72

Count 3 Breach of Fiduciary Duty: Leveraged Recap (Against Mariano and Del Pizzo) ................................................................ 74

Count 4 Breach of Fiduciary Duty: GIC Transaction (Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr) ........................... 75

Count 5 Breach of Fiduciary Duty: 2017 Employment Agreement (Against Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler)........ 78

Count 6 Breach of Fiduciary Duty: Pesch Severance (Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr) ........................... 80

Count 7 Breach of Fiduciary Duty: Mariano Severance & Shields Severance (Against Bidic, Coleman, Csiszar, Del Pizzo, and Hibler) ...................... 82

Count 8 Breach of Fiduciary Duty: Promoting Mariano's Interests to PNI's Detriment (Against Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson) ................................................ 84

PNI-National Union_004751

Count 9 Corporate Waste: GIC Transaction (Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr).................................................... 88

Count 10 Corporate Waste: 2017 Employment Agreement (Against Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler) ........ 90

Count 11 Corporate Waste: Pesch Severance (Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr).................................................... 91

Count 12 Corporate Waste: Mariano Severance & Shields Severance (Against Bidic, Coleman, Csiszar, Del Pizzo, and Hibler) ........................ 92

Count 13 Corporate Waste: Promoting Mariano's Interests to PNI's Detriment (Against Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson).................................................................... 93

PRAYER FOR RELIEF.................................................................. 95

iii

PNI-National Union_004752

Plaintiff Peter Kravitz, as Litigation Trustee (the "Trustee") for the PNI Litigation Trust (the "Trust"), the duly authorized successor to Patriot National, Inc. and its subsidiaries (collectively, "PNI" or the "Company"), hereby files this First Amended Complaint against Defendants Steven M. Mariano ("Mariano"), John R. Del Pizzo ("Del Pizzo"), James O'Brien ("O'Brien"), Sean Michael Bidic ("Bidic"), Austin J. Shanfelter ("Shanfelter"), Thomas C. Shields ("Shields"), Todd E. Wilson ("Wilson"), Ernest Csiszar ("Csiszar"), Terry Coleman ("Coleman"), Glenn Hibler ("Hibler"), Michael Purcell ("Purcell"), Jeffrey Rohr ("Rohr"), Joyce Predmesky ("Predmesky"), David Quigley ("Quigley"), John Rearer ("Rearer"), and Elvis Rivera ("Rivera") (collectively, "Defendants"),[1] and alleges as follows:

## SUMMARY OF THE ACTION

1.  Through this action, the Trustee seeks to hold Defendants liable for the over $170 million in damages suffered by PNI, a public insurance outsourcing services company, as the direct and proximate result of their numerous breaches of fiduciary duty.

2.  Each Defendant, as a director or officer of PNI, owed the duty of absolute loyalty to, among other things, act in good faith to oversee the Company's

---

[1] This First Amended Complaint does not include four individuals—Charles H. Walsh, Quentin P. Smith, Jr., Christopher Pesch, and Michael Corey—who were named as defendants in the Original Complaint. As explained below, the Trustee has reached a settlement involving these individuals.

1

operations, financial affairs, and internal controls. Defendants, however, routinely abdicated these duties by failing to exercise any independent judgment, bowing to the whims of Mariano, PNI's controlling stockholder, Chairman, President, and Chief Executive Officer, and rubber-stamping any transaction that he proposed regardless of how it affected the Company. With Defendants' loyalties tied to him, rather than to PNI, Mariano was free to manipulate the Company's financial affairs to wrongfully enrich himself and his friends to PNI's detriment.

3.      Specifically, between PNI's initial public offering (the "IPO") in January 2015 and Mariano's resignation in July 2017, Defendants' rampant dereliction of their fiduciary duties allowed Mariano to effectively loot PNI through at least three avenues.

4.      First, Defendants acquiesced as Mariano caused PNI to make more than $30 million in related-party acquisitions within six months of its IPO. Each acquisition directly benefitted Mariano or his close friends and harmed PNI—yet Defendants failed to obtain any independent analyses or valuations to determine whether the acquisitions were in the best interests of PNI. As would become the theme at PNI during its short three-year existence as a public company, Defendants simply said "yes" to whatever Mariano wanted.

5.      Second, Defendants permitted Mariano to use PNI's capital and access to the capital markets to fund his own extravagant lifestyle. Between the fall of 2015

PNI-National Union_004754

and the spring of 2017, Mariano shepherded PNI through a secondary offering, a private placement, a stock repurchase program, and a leveraged recapitalization—all for the purpose of maximizing his own holdings and squeezing as much money from PNI as possible to fund his ridiculous and extravagant lifestyle.  Each of these transactions cost PNI millions, but benefited only Mariano.  Despite recognizing that these transactions were designed to benefit Mariano at PNI's expense, Defendants said "yes."

6.     Third, Defendants knowingly abdicated their fiduciary duties of loyalty and care by failing to properly oversee PNI's relationship with its largest customer—a Florida-based, Mariano-owned entity called Guarantee Insurance Company ("GIC").  GIC sold workers' compensation insurance and hired PNI to provide back office support for the policies it sold.  Throughout PNI's existence, GIC was continually in financial distress.  Thus, to maintain the minimum capital requirements established by the Florida Office of Insurance Regulation, Mariano had to contribute millions in capital to GIC every year.  And eventually, Mariano looked to PNI to make that contribution for him.  Yet again, Defendants said "yes," despite the significant harm it would cause PNI.

7.     In 2017, with Mariano unable to provide GIC with the liquidity it needed to avoid the imposition of a receivership, Mariano caused GIC to request $30 million of financial assistance from PNI.  The PNI Board of Directors obliged.

PNI-National Union_004755

Specifically, in a deal orchestrated and supported by Mariano, the PNI Board agreed to give GIC $30 million in exchange for an agreement to use PNI as its exclusive outsourcing services provider for 10 years (the "GIC Transaction").   In a pre-determined and hastily papered transaction executed at the behest of Mariano, the Board simply ignored at least two obvious problems with this deal.  First, without continuous outside financial support, GIC could not remain in business for one year, much less 10 years.  Second, the purported justification for the transaction was so that PNI could continue to provide services to GIC.  But, PNI spent millions of dollars per month to provide those services, and GIC could not afford to pay for them.  Thus, any purported benefit that PNI would receive from the deal was entirely illusory and, in fact, would cost PNI millions of dollars in the end.

8.      Not surprisingly, the Florida Office of Insurance Regulation put GIC into a receivership just nine months after the GIC Transaction.  By that time, PNI had not only paid $30 million for a worthless exclusivity agreement, but had spent more than $56 million to provide additional services to GIC without receiving any payment in return.

9.      To make matters worse, and as striking evidence of their loyalties to Mariano, PNI's directors authorized millions of dollars in bonuses and incentive payments to Mariano and PNI's management between 2015 and 2017 as a reward for facilitating the conflicted acquisitions and ill-advised capital-raising transactions

4

PNI-National Union_004756

designed to enrich Mariano at the Company's expense. In other words, not only did Defendants permit Mariano to effectively use PNI as his own personal slush fund, they gave him, and those who helped him, a hefty reward for doing so.

10.    After Mariano had already fleeced PNI of virtually all of its value and set the Company on the path to complete financial ruin, he went back to the well once again, requesting $10 million in severance payments on his way out. Without any consideration of the Company's interests, the PNI Board once again said "yes" and agreed to give Mariano his $10 million severance in the form of a $6 million upfront payment with $4 million to be paid in annual installments.

11.    In the span of less than three years, Defendants oversaw the misappropriation and waste of over $170 million dollars, almost entirely for the benefit of Mariano and his cronies. The Trustee now seeks to recover those losses.

## PARTIES

### A.    The Plaintiff

12.    Plaintiff Peter S. Kravitz is the Litigation Trustee (the "Trustee") of the PNI Litigation Trust (the "Trust"). The Trust was created, and the Trustee was appointed, pursuant to the order confirming the Chapter 11 plan of reorganization (the "Chapter 11 Plan") in PNI's bankruptcy case.[2] Under the Chapter 11 Plan, PNI retained certain potential claims, including the claims asserted in this action, for

---

[2] *See In re Patriot National, Inc., et al.*, Case No. 18-10189 (Bankr. D. Del.).

PNI-National Union_004757

prosecution by the Trustee as a representative of the bankruptcy estate pursuant to 11 U.S.C. § 1123(b)(3).

**B.   The Defendants**

13.    Defendant Steven M. Mariano ("Mariano") served as PNI's Chief Executive Officer, President, and Chairman of the Board of Directors since the Company's organization in November 2013 until July 12, 2017.  Mariano was PNI's controlling stockholder from November 2013 until January 30, 2018, when PNI filed for bankruptcy relief.  Mariano also owned or controlled several entities that were significant stockholders of PNI, including the Steven Mariano Trust, Guarantee Insurance Group, Inc., Guarantee Insurance Company, and Blue Ridge Insurance Company, LLC.

14.    Defendant John "Jack" R. Del Pizzo ("Del Pizzo"), one of Mariano's longtime friends and business associates, served as a member of PNI's Board of Directors from June 2014 until January 30, 2018, when PNI filed its bankruptcy case.  As compensation for serving as a PNI director, Del Pizzo received a combination of cash and stock totaling $145,000 in 2015, $165,000 in 2016, and $200,000 in 2017.  Del Pizzo's tax advisory firm, Del Pizzo & Associates, provided tax advisory services to PNI between 2014 and 2016.  In return for these services, PNI paid Del Pizzo & Associates $109,000 in 2014, $185,100 in 2015, and $400,000

6

PNI-National Union_004758

in 2016. Del Pizzo also received substantial additional compensation for services he provided to GIC.

15.     Defendant James O'Brien ("O'Brien"), one of Mariano's longtime friends, served as a member of PNI's Board of Directors from November 17, 2016, until May 3, 2017. As such, O'Brien served as a member of the Audit Committee and the Nominating and Corporate Governance Committee. As compensation for serving as a PNI director, O'Brien received a combination of cash and stock totaling $140,000 in 2016 on a prorated basis, and $200,000 in 2017 on a prorated basis.

16.     Defendant Sean Bidic ("Bidic"), one of Mariano's cousins, served as a member of PNI's Board of Directors from November 17, 2016, until January 30, 2018, when PNI filed its bankruptcy case. As such, Bidic served as a member of the Audit Committee, the Nominating and Corporate Governance Committee, and the Compensation Committee. As compensation for serving as a director of PNI, Bidic received a combination of cash and stock totaling $140,000 in 2016 on a prorated basis, and $200,000 in 2017.

17.     Defendant Austin Shanfelter ("Shanfelter") served as a member of PNI's Board of Directors from June 2014 until October 17, 2016. As such, Shanfelter served as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. In addition to serving on PNI's Board, Shanfelter also served with Mariano on GIC's board of directors. As

7

PNI-National Union_004759

compensation for serving as a PNI director, Shanfelter received a combination of cash and stock totaling $145,000 in 2015, and $165,000 in 2016 on a prorated basis.

18.     Defendant Thomas Shields ("Shields") served as PNI's Executive Vice President, Chief Financial Officer, and Treasurer from September 2014 until August 10, 2017.  As compensation for serving as an officer of PNI, in 2015 Shields received a combination of cash and stock totaling $3,613,768.

19.     Defendant Todd Wilson ("Wilson"), the son of Mariano's longtime personal attorney, served as PNI's Executive Vice President from July 2015 until October 17, 2017.

20.     Defendant Ernest Csiszar ("Csiszar"), one of Mariano's longtime friends and business associates, served as a member of PNI's Board of Directors from April 26, 2017, until January 30, 2018, when PNI filed its bankruptcy case.  As such, Csiszar served as Chairman of the Audit Committee and as a member of the Compensation Committee.  On February 10, 2011, Csiszar was appointed Vice Chairman of the Board of Directors of Patriot National Insurance Group, Inc., which later became GIG, and Vice Chairman of the Board of Directors of GIC, a subsidiary of GIG.  Csiszar served in these positions until October 2016, when he left to join Ashmere Insurance Co. and National Fidelity Holdings, Inc, both of which were controlled by Mariano.  As compensation for serving as a PNI director, Csiszar

8

PNI-National Union_004760

received a combination of cash and stock totaling $200,000 in 2017 on a prorated basis.

21.    Defendant Terry Coleman ("Coleman") served as a member of PNI's Board of Directors from April 23, 2017, until January 30, 2018, when PNI filed its bankruptcy case.  As such, Coleman served as Chairman of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.  As compensation for serving as a PNI director, Coleman received a combination of cash and stock totaling $200,000 in 2017 on a prorated basis.

22.    Defendant Glenn Hibler ("Hibler"), one of Mariano's longtime friends, served as a member of PNI's Board of Directors from April 23, 2017, until January 30, 2018, when PNI filed its bankruptcy case.  As such, Hibler served as Chairman of the Compensation Committee and as a member of the Audit Committee.  Hibler also served as Chairman after Mariano resigned on July 12, 2017.  As compensation for serving as a PNI director, Hibler received a combination of cash and stock totaling $200,000 in 2017 on a prorated basis.

23.    Defendant Michael Purcell ("Purcell") served as a member of PNI's Board of Directors from January 4, 2017, until April 23, 2017.  As such, Purcell served as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.  As compensation for serving as a PNI director,

9

PNI-National Union_004761

Purcell received a combination of cash and stock totaling $200,000 in 2017 on a prorated basis.

24.     Defendant Jeffrey Rohr ("Rohr") served as a member of PNI's Board of Directors from January 4, 2017, until April 26, 2017.  As such, Rohr served as a member of the Audit Committee and the Compensation Committee.  As compensation for serving as a PNI director, Rohr received a combination of cash and stock totaling $200,000 in 2017 on a prorated basis.

25.     Defendant Joyce Predmesky ("Predmesky") served as an employee of PNI, its predecessors, or its affiliates from as early as April 2007.  By at least 2017 and up to the time of PNI's bankruptcy in January 2018, Predmesky served as PNI's Senior Vice President of Financial Services.

26.     Defendant David Quigley ("Quigley") served as PNI's Vice President of Finance from November 1, 2014 through January 30, 2018, when PNI filed its bankruptcy case.

27.     Defendant John Rearer ("Rearer") served as PNI's Chief Executive Officer from July 13, 2017 until January 30, 2018, when PNI filed its bankruptcy case.  Rearer previously served in officer-level positions within various PNI subsidiaries for many years.

28.     Defendant Elvis Rivera ("Rivera") served as PNI's Controller from May 1, 2011 until January 30, 2018, when PNI filed its bankruptcy case.

PNI-National Union_004762

## C.   Relevant Non-Parties

29.   Patriot National, Inc. ("PNI" or the "Company") was a Delaware corporation with headquarters located at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida.   PNI provided comprehensive technology-enabled outsourcing solutions to insurance carriers, employers, and other clients to help them to, among other things, mitigate risk, comply with complex regulations, and generally save time and money.   On January 30, 2018, PNI filed a Chapter 11 bankruptcy case in the Bankruptcy Court.   On May 4, 2018, the Bankruptcy Court confirmed the Chapter 11 Plan.

30.   Guarantee Insurance Group, Inc. ("GIG") was a Delaware corporation with headquarters located at 401 East Las Olas Boulevard, Suite 1540, Fort Lauderdale, Florida.   GIG, formerly known as Patriot National Insurance Group, Inc., was the parent company of GIC.   Mariano owned 97% of and controlled GIG at all times relevant to this Complaint.

31.   Guarantee Insurance Company ("GIC") was a Delaware corporation with headquarters located at 401 East Las Olas Boulevard, Suite 1540, Fort Lauderdale, Florida.   GIC was a wholly owned subsidiary of GIG and was controlled by Mariano.   GIC provided workers' compensation insurance in over 31 states and the District of Columbia and offered guaranteed cost and alternative market solutions with a specific expertise in segregated portfolio captives and risk-sharing

11

PNI-National Union_004763

insurance programs. On November 17, 2017, GIC was placed into state receivership by the Florida Office of Insurance Regulation for, among other things, failing to maintain sufficient capital and falsifying financial records.

32.    Edward Snow ("Snow") is a longtime friend and business associate of Mariano. On February 23, 2016, Snow filed a Form 13-G with the SEC, disclosing that he owned 1,579,166 shares of PNI, representing 5.6% of PNI voting power. Snow has not made any public filings concerning his ownership of PNI securities since that filing.

33.    Charles H. Walsh ("Walsh") served as a member of PNI's Board of Directors from January 15, 2015, until March 30, 2017. As such, Walsh served as Chairman of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Compensation Committee.

34.    Quentin P. Smith, Jr. ("Smith") served as a member of PNI's Board of Directors from January 15, 2015, until March 30, 2017. As such, Smith served as Chairman of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

35.    Christopher Pesch ("Pesch") served as PNI's Executive Vice President, General Counsel, Chief Legal Officer, and Secretary from September 2014 until March 10, 2017, when he resigned.

12

PNI-National Union_004764

36.     Michael Corey ("Corey") served as a member of PNI's Board of Directors from January 22, 2016, until November 8, 2016.  As such, Corey served as a member of the Audit Committee, the Nominating and Corporate Governance Committee, and the Compensation Committee.

37.     The Trustee recently reached a settlement involving the following four former defendants in this action (the "Settling Defendants"): (a) Charles H. Walsh; (b) Quentin P. Smith, Jr.; (c) Christopher Pesch; and (d) Michael Corey.  That settlement is the subject of a pending motion for approval by the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 9019.  In the meantime, the Trustee has agreed not to name the Settling Defendants as defendants in this First Amended Complaint, and the Settling Defendants have agreed to toll all statutes of limitations, statutes of repose, laches periods, or other time deadlines relating to the Trustee's claims against the Settling Defendants.

## FACTUAL BACKGROUND

**A.     Mariano Forms PNI to Use the Public Capital Markets to Cover GIC's Growing Losses.**

38.     In 2003, Mariano acquired GIC, a worker compensation insurance business, though GIG (f/k/a Patriot National Insurance Group, Inc.).  As an insurer doing business in Florida, GIC was subject to the regulatory oversight of the Florida Office of Insurance Regulation (the "OIR").  Pursuant to regulation, GIC had to comply with certain solvency and capital requirements and file annual financial

13

statements with the OIR, which has standing to impose a receivership over insurance companies that fail to maintain acceptable risk-based capital ratios.

39.   Under Mariano's stewardship, GIC consistently struggled to maintain profitability.   By 2007, GIC was continuously operating at a loss.   As a result, Mariano had to pump millions of dollars in capital contributions into GIC every year to satisfy OIR's solvency and capital requirements and to avoid further regulatory action.

40.   After years of pumping money into GIC, Mariano no longer had the liquidity to keep his company afloat and out of an OIR receivership.   Thus, Mariano devised a plan to gain access to the public markets to cover his losses at GIC.

41.   To that end, Mariano reorganized his insurance-related businesses to separate the businesses that provided services to insurers—such as marketing, underwriting, policy administration, and claims administration services—from the businesses that provided insurance (i.e., sold insurance policies), like GIC.   Mariano consolidated the insurance service providers into a new entity he formed called Old Guard Risk Services, Inc.   In September 2014, Old Guard Risk Services, Inc. changed its name to Patriot National, Inc.   After this reorganization, Mariano owned substantially all of the outstanding equity of GIC and over 84% of the outstanding equity in PNI.

14

PNI-National Union_004766

42.     Following the reorganization and the spin-off of GIC, on December 16, 2014, PNI filed a registration statement for its initial public offering.   Shortly thereafter, on January 16, 2015, PNI completed its IPO, raising approximately $103 million.   According to PNI's registration statement, the Company primarily intended to use the proceeds to pay its pre-existing debt, allocating any excess funds for "working capital" and "general corporate purposes."

43.     Despite the spin-off, GIC remained functionally intertwined with PNI at all times relevant to this Complaint.   Indeed, as discussed in detail below, although GIC was unprofitable and at constant risk of becoming the subject of regulatory action, Mariano used GIC and PNI to prop each other up.   First, he wrongfully used PNI as a personal source of liquidity to make contributions to GIC that were necessary to keep the regulators at bay and GIC operating.   Then later, he caused PNI to send money directly to GIC.   He also used GIC to prop up PNI by causing GIC to rack up massive uncollectable service fees to boost PNI's financial statements with overstated revenues.

**B.     Mariano Uses his Positions at the Company to Foster Director Disloyalty.**

44.     At all times between November 2013, when PNI was formed, until January 2018, when PNI filed for bankruptcy, Mariano was PNI's majority stockholder.   Prior to the IPO in January 2015, Mariano owned 84.9% of PNI's stock.   After the IPO, he owned 60.4% of PNI's stock.   As of November 2016, he

PNI-National Union_004767

still owned 54.5% of PNI's stock.  Between November 2016 and January 2018, Mariano beneficially owned a majority of PNI's stock based upon his individual holdings (which alone constituted 46.3% of PNI's stock) and the holdings of entities that he controlled.

45.    Mariano's controlling stake in PNI gave him the right to unilaterally terminate and appoint PNI's directors.  Pursuant to a unique provision in PNI's certificate of incorporation, so long as Mariano beneficially owned at least 40% of the Company's outstanding shares, PNI's stockholders could authorize any permitted action "by written consent without a meeting, without prior notice and without a vote" if the consent was signed by stockholders owning the minimum number of outstanding shares necessary to authorize the action.  Furthermore, PNI's directors could be removed or appointed by stockholders owning a majority of PNI's shares.  As a result, Mariano had the ability to unilaterally remove and appoint PNI's directors at all times relevant to this Complaint.

46.    PNI conceded in its public filings that Mariano had the ability to control the Company's actions and that Mariano's interests may conflict with the interests of PNI's minority stockholders:

> As a result of his ownership position, Mr. Mariano may have the ability to significantly influence matters requiring stockholder approval, including, without limitation, the election or removal of directors, mergers, acquisitions, changes of control of our company and sales of all or substantially all of our assets.  In addition, because he is also our Chief Executive Officer, he has significant influence in our

16

PNI-National Union_004768

management and affairs. This control may delay, deter or prevent acts that may be favored by our other stockholders, as the interests of Mr. Mariano may not always coincide with the interests of our other stockholders.

47.     Where these conflicts of interest may lie was also no secret. PNI's public filings further disclosed that, due to Mariano owning nearly all of GIC—which accounted for over 70% of PNI's reported revenue—through his ownership of GIG, PNI's transactions with GIG might be adverse to the Company and its stockholders:

> In particular Mr. Mariano owns substantially all of the outstanding equity of Guarantee Insurance Group, the parent company of Guarantee Insurance. As such, we cannot assure you all of our transactions with Guarantee Insurance will be on the same terms as those available with unaffiliated third parties or that the affiliation will not otherwise impact our actions in a manner that is adverse to us or our stockholders.

48.     Indeed, Mariano routinely used his controlling stake in PNI to pack the Board with directors loyal to him and to exert immense influence over the Company's operations for his benefit, the benefit of his cronies, or the benefit of GIC, and all to the detriment of PNI. Specifically, as set forth below, Mariano only appointed directors that he could control, that would remain loyal only to him, and that would disregard their duties to the Company when it suited his needs. Moreover, when any director questioned his authority or displayed any inkling of the independence required of a director of a public Delaware corporation, Mariano

17

PNI-National Union_004769

would remove them.  Mariano's message to PNI's directors was clear: it was his way, or the highway.

49.     Between October 2016 and May 2017, seven directors either resigned or were removed from PNI's Board.  Mariano removed three of them: (a) Smith in March 2017; (b) Walsh in March 2017; and (c) Purcell in April 2017.  And Mariano caused two other directors to resign due to disagreements with him: (a) Corey in November 2016; and (b) O'Brien in May 2017.

50.     In short, as PNI's controlling stockholder, Mariano not only had the right to remove directors at will, but he also consistently demonstrated a willingness to take retributive action against directors who disagreed with him.

51.     In exchange for their loyalty to Mariano, which was necessary to maintain their seat on the Board, the directors received significant compensation in the form of director fees.  The Company's directors received a mix of cash and stock totaling $145,000 in 2015, $165,000 in 2016, and $200,000 in 2017 for their service on the Board—*i.e.*, their service to Mariano.  Any failure to acquiesce to Mariano's whims would result in their dismissal from the Board, thus giving up this material compensation.

52.     Some directors, however, received additional consideration for their disloyalty to PNI.  For example, two of PNI's initial directors, Del Pizzo and

PNI-National Union_004770

Shanfelter, had long histories with Mariano, as both previously served on GIC's board of directors.

53.     Del Pizzo was also a director of Patriot Risk Management, Inc., one of PNI's affiliates, and performed tax advisory services for various PNI subsidiaries prior to his appointment to the Board.  After Del Pizzo's appointment he continued to provide PNI with tax advisory services, even though PNI had hired a public accounting firm to provide these services.  PNI paid Del Pizzo's firm, Del Pizzo & Associates, $109,000, $185,100, and $400,000 in 2014, 2015, and 2016, respectively, and Del Pizzo received additional compensation for services he provided to GIC.  These amounts, along with his director compensation, were material amounts to Del Pizzo and his firm, which was a small suburban accounting firm. Due to Del Pizzo's financial interest in having his firm remain in good standing with PNI and Mariano, Del Pizzo lacked independence as a PNI director and was beholden to Mariano.

54.     Shanfelter also received additional consideration through his Board service.  As explained below, Shanfelter held a controlling interest in Global HR Research, LLC, when PNI purchased that company for approximately $39.6 million just months after PNI's IPO.  Mariano essentially used the transaction, which resulted in a personal windfall for Shanfelter, to purchase Shanfelter's loyalty.  And

PNI-National Union_004771

the investment paid off.  Throughout the remainder of his time on PNI's Board, Shanfelter dutifully pursued Mariano's best interests to the detriment of PNI.

55.    Mariano ensured that each PNI director that served the Company during all times relevant to this Complaint were highly incentivized to, and in fact did, routinely disregard the fiduciary duties they owed to PNI in favor of their loyalty to Mariano.  These incentives came in a variety of forms—compensation, exploitation of long-term personal relationships and family ties, the promise of future windfalls, etc.—but when they no longer sufficed to keep a director in lock-step with Mariano's wishes, Mariano simply removed them and brought on someone new.

56.    The Board's knowledge of the control Mariano exerted over PNI's operations through his positions as CEO, President, and Chairman, his glaring conflicts of interest related to GIC, PNI's largest customer, and PNI's interdependence with GIC should have led PNI's directors to ensure that the Company had robust internal controls and oversight procedures after the IPO to prevent Mariano from abusing his power.  Instead, as described below, rather than fulfill their duties to PNI, each director repeatedly bowed to Mariano's whims, rubber-stamped transactions with little to no independent investigation or analysis, facilitated Mariano's use of PNI as his own personal slush fund, failed to make any effort to monitor or oversee the Company's operations or Mariano's business

PNI-National Union_004772

activities, and permitted Mariano to lead PNI into financial ruin for his own personal benefit.

**C.    In Complete Disregard of Their Duties to PNI, PNI's Directors Approve a Series of Acquisitions That Benefit Only Mariano and His Cronies.**

57.    Almost immediately after the IPO, Mariano began manipulating PNI to funnel cash to himself and his cohorts.  After using all of its IPO proceeds to retire preexisting debt—unencumbering Mariano's personal shares in the process—PNI obtained a new credit facility.  On January 22, 2015, just five days after the IPO, the Company obtained a $40 million revolving credit facility and a $40 million term loan facility from BMO Harris ("BMO").  BMO later increased PNI's term loan facility by $50 million.

58.    From the beginning, Mariano used PNI's new loan facility to advance his own interests—including by causing PNI to embark on an aggressive series of acquisitions that enriched himself and his associates.

59.    First, Mariano caused PNI to acquire three of his own companies within a month of the IPO: (a) Decision UR, LLC ("Decision UR"); (b) Vikaran Solutions, LLC ("Vikaran"); and (c) Mehta and Pazol Consulting Services Private Limited ("MPCS").  Through these acquisitions (collectively, the "Mariano Transactions"), Mariano personally netted nearly $7 million at PNI's expense.

60.    Second, Mariano caused the Company to acquire two companies owned by his longtime friend and college roommate, Edward Snow: (a) Hospitality

PNI-National Union_004773

Supportive Systems, LLC ("HSS"); and (b) Selective Risk Management, LLC ("SRM"). Mariano also had PNI purchase $6 million in services from another of Snow's companies, Carman Corporation ("Carman"). As a result of these deals (collectively, the "Snow Transactions"), PNI paid out nearly $20 million to Snow and his affiliated entities during 2015.

61.   Third, the Board approved the acquisition of Global HR Research, LLC ("Global HR"), a company controlled by Shanfelter for $39.6 million (the "Global HR Transaction"). The Global HR Transaction was undisputedly disastrous. Less than two years after acquiring Global HR, PNI sold it for just $20 million.

62.   PNI completed the Mariano Transactions, the Snow Transactions, and the Global HR Transaction (together, the "Related-Party Transactions") within six months of its IPO. The Board that approved the Related-Party Transactions—comprised of Mariano, Del Pizzo, Shanfelter, Smith, and Walsh—conducted no investigation into the merits of the Related-Party Transactions, relying on Mariano and other interested parties as their sole source of information. The Board thus failed to exercise any independent oversight of management's conduct with respect to the Related-Party Transactions.

   *1.   PNI Acquires Three Mariano-Controlled Companies for Over $12 Million Within Weeks of the IPO.*

63.   On February 5, 2015, PNI acquired Decision UR for $2.2 million in cash from a Mariano-owned company called Six Points Investment Partners, LLC

22

("Six Points."). At the time of the acquisition, Six Points was wholly owned by Mariano and operated out of PNI's offices. Thus, PNI's acquisition of Decision UR was, by definition, conflicted in that Mariano—PNI's President, CEO, and Chairman—personally received all the sale proceeds.

64. The PNI Board never sought an independent analysis or a fairness opinion or took any other action to address this obvious conflict before approving the acquisition. Nor did it evaluate the transaction's merits or potential risks from PNI's perspective. Instead, the Board simply rubber-stamped the transaction at their first post-IPO Board meeting, held on February 12, 2015, at which PNI management reported that the Decision UR acquisition had occurred. Despite the obvious conflict, the Board took no action to cleanse the transaction or investigate its merits on behalf of disinterested stockholders.

65. At the same February 12, 2015 meeting, PNI's Board unanimously approved PNI's acquisition of Vikaran and MPCS—two more companies in which Mariano held a significant interest.

66. PNI purchased Vikaran for $8.5 million in cash. At the time of sale, Mariano owned 45% of Vikaran and personally stood to receive $3.8 million from the acquisition. Yet, according to PNI's records, it was Mariano himself who "update[d] the [Audit] Committee on the possible valuation of Vikaran" at a February 4, 2015 meeting. The PNI Board sought no independent analyses before

PNI-National Union_004775

approving the deal, and Mariano—who stood on both sides of the transaction—participated in deliberations and voted in favor of acquiring Vikaran.

67.   In connection with the Vikaran acquisition, PNI also entered an agreement to purchase all the outstanding stock of MPCS, an Indian company that owned Vikaran's software development center located in Pune, India. PNI agreed to purchase MPCS for approximately $1.5 million in cash. Mariano held a substantial interest in MPCS, too, and personally collected $749,850 from the transaction.

68.   PNI's decision to purchase MPCS suffered from the same procedural defects as the Vikaran acquisition. Despite Mariano's obvious conflict of interest, he participated in the Board's deliberations and voted on the acquisition. In determining whether to approve the acquisition of MPCS, the Board relied solely on Mariano's own self-serving valuation of MPCS.

69.   Ultimately, within months of PNI's IPO, the Board—comprised of Mariano, Del Pizzo, Shanfelter, Smith, and Walsh—allowed Mariano to complete three inherently-conflicted transactions that enriched Mariano at PNI's expense.

70.   Through the Mariano Transactions, Mariano personally collected just under $7 million. Yet none of PNI's directors made any effort to ensure that these transactions, which consumed a substantial amount of PNI's cash and working

24

PNI-National Union_004776

capital, were fair to the Company. And indeed, they were not.  In each instance, PNI grossly overpaid for the entities.

### 2.   Mariano Uses PNI to Enrich Longtime Friend, Edward Snow.

71.    After causing PNI to purchase his own companies, Mariano then used the Company's funds to enrich his longtime friend, former roommate, and business associate, Edward Snow, through another set of acquisitions.  On April 2, 2015, Mariano caused PNI to purchase HSS and Selective for $9.65 million and $3.846 million, respectively, from Snow (together, the "HSS and Selective Transactions"). The deal terms also provided for contingent earn-out payments to HSS and Selective of $4.045 million and $1.923 million, respectively, based on the companies' achievement of specific EBITDA thresholds for the 12-month period following the acquisitions.

72.    The Board—comprised of Mariano, Del Pizzo, Shanfelter, Smith, and Walsh—approved the HSS and Selective Transactions without ever analyzing their impact on PNI's business.  As with PNI's acquisition of Decision UR, Vikaran, and MPCS, Mariano was the Board's sole source of information concerning the HSS and Selective acquisitions, even though he displayed a clear bias given his longtime relationship with Snow.  Thus, not surprisingly, PNI grossly overpaid for the HSS and Selective Transactions.

25

PNI-National Union_004777

73.     One month later, the Board voted to accelerate Snow's earnout payments, forfeiting the Company's contractual right to withhold Snow's bonuses if HSS or Selective performed poorly after the acquisitions.  Thus, PNI paid Snow an additional $6 million, despite having no obligation to do so, bringing the total cost of the HSS and Selective Transactions to nearly $20 million.   Additionally, following the Company's acquisition of HSS, Mariano let Snow retain control over HSS's cash distributions, leading to considerable additional liabilities for PNI.

74.     Mariano also caused PNI to incur $6 million in financial obligations to Carman, another Snow-controlled company, over the next several months (the "Carman Transactions").  In June 2015, PNI entered two transactions with Carman that required PNI to pay Carman $4 million.  In October 2015, PNI entered another deal with Carman that obligated PNI to pay it another $2 million.  Consistent with its approach to the other Related-Party Transactions, the Board undertook no independent analyses of the Carman Transactions.  The directors relied solely on information provided by Mariano, rubber-stamped the Carman Transactions, and authorized them without fully analyzing the effect on PNI.

   3.     *PNI Purchases Global HR from Shanfelter and Later Sells It at a Substantial Loss.*

75.     Mariano's generosity with PNI's capital did not end there.  In July 2015, Mariano used his influence and the PNI Board's rubber stamp to cause PNI to acquire Global HR, a company controlled by Shanfelter, for nearly $41 million.

26

PNI-National Union_004778

76.     Unlike PNI, which provided insurance-related outsourcing services, Global HR offered human resources outsourcing services, such as pre-employment screening, background checks, and drug screening.  Thus, PNI had no articulable basis for purchasing Global HR.  In fact, PNI had to create a new division called "Human Capital" to account for Global HR, as it did not fit into any of PNI's then-existing divisions (*i.e.*, "Front End," "Back End," or "Technology").

77.     At the time of the Global HR Transaction, Shanfelter owned 84% of Global HR's parent, In Touch Holdings, LLC ("In Touch"), which in turn held 75.5% of Global HR.  The deal included a clawback provision for the $18 million of stock consideration requiring the return of 10% of In Touch's stock payment if Global HR failed to generate $12,800,000 in revenue during 2016.

78.     Although Shanfelter stood on both sides of the Global HR Transaction, he was personally involved with PNI's purported "due diligence" and had direct communication about Global HR's purported benefits with the PNI personnel responsible for investigating the deal.  Again, the Board conducted no independent analysis to determine the true value of Global HR before committing to the $42 million acquisition.   As with prior acquisitions, the Board relied solely on information provided by interested parties—in this case Shanfelter and other Global HR executives.  The Board did not form a special committee to investigate the merits of the transaction on behalf of the Company's disinterested stockholders.

PNI-National Union_004779

79.    Just one month after approving the Global HR Transaction, the Board agreed to further sweeten the deal for Shanfelter by amending the agreement to reduce the amount of stock consideration subject to clawback.  As amended, the Global HR sellers would receive (i) $24 million in cash and (ii) 444,096 shares of the Company, plus (iii) deferred consideration, payable to In Touch, consisting of a combination, to be determined by the Board in its discretion, of 618,478 shares of PNI common stock or $10,477,017 cash.  Although the amended agreement gave PNI the ability to pay the deferred consideration in any combination of stock or cash, Shanfelter requested that PNI pay In Touch $5.2 million in cash and the remainder in PNI stock.  On November 13, 2015, the Audit Committee summarily approved the payment, and PNI paid In Touch $5.2 million in cash and 309,239 shares of PNI stock the following week.  In total, PNI paid $39.6 million for Global HR—$28.7 million in cash and $10.9 million in stock.

80.    The Global HR acquisition turned out to be a calamity almost immediately.  As early as July 2016, Mariano began publicly seeking buyers for Global HR, which he described as a "noncore" and "underperforming" asset.  This was unsurprising considering that Global HR's human-resource-focused business differed dramatically from the insurance-related products that PNI offered.  PNI had no legitimate business purpose when it bought and substantially overpaid for Global HR, a non-core asset, for the sole purpose of enriching Shanfelter at PNI's expense.

28

PNI-National Union_004780

Making matters worse, even after Mariano publicly admitted the Global HR Transaction was a failure, the Board failed to mitigate further losses arising from the deal. Although PNI had the contractual right to clawback a portion of the purchase price if Global HR performed poorly, PNI took no action to enforce this right.

81.    Ultimately, PNI took a $17.7 million goodwill charge in connection with Global HR, and on April 24, 2017, the Company announced that it sold Global HR for just $20 million cash plus $10 million in contingent payments from the purchaser that never materialized.

82.    All told, less than two years after the Board approved the $39.6 million purchase of Global HR from Shanfelter with only scant investigation, and without any independent analysis or report regarding the fairness of the transaction, PNI sold that same company for $20 million, resulting in at least a $19.6 million loss for PNI.

83.    Despite their fiduciary obligations to PNI, the Board approved the Related-Party Transactions without conducting appropriate investigations into the fairness of the deals from PNI's perspective.  For each of the Related-Party Transactions, the parties who stood to personally gain from its completion served as the primary source of information for PNI's Board.  The Board never appointed a special committee, engaged independent counsel, or commissioned an independent valuation to determine whether any of the Related-Party Transactions would benefit PNI.  Instead, the Board breached their fiduciary obligations to PNI by blindly

29

PNI-National Union_004781

approving the Related-Party Transactions to personally enrich Mariano, Snow, and Shanfelter with no concern for the interests of PNI.

   *4. PNI Pays Its Executives Nearly $2 Million in M&A Bonuses for the Related-Party Transactions.*

  84. To make matters worse, the Board—comprised of Mariano, Del Pizzo, Shanfelter, Smith, and Walsh—also authorized bonuses for Mariano and others in conjunction with the Related-Party Transactions pursuant to PNI's Omnibus Incentive Plan (the "Incentive Plan"), which the Board purportedly approved in February 2015. The Incentive Plan created a bonus pool for each acquisition PNI completed, ranging from 1% to 5% of the deal price, which PNI would distribute at the sole discretion of Mariano or the Compensation Committee.

  85. In 2015 alone, Mariano and the Compensation Committee, consisting of Smith and Walsh, distributed approximately $1.7 million in bonuses under the Incentive Plan. Of that total amount, Mariano received $700,000, Shields received $338,983, Wilson received $200,000, and Pesch received $92,072.

  86. The Board approved these bonuses in a highly unorthodox manner. For example, to prompt payment of his $700,000 bonus, Mariano simply declared to Shanfelter, "I have decided to take a bonus for 2015 . . . . I will take it this week . . . . No stock is necessary." Just two days after Mariano's request, the Compensation Committee approved Mariano's $700,000 bonus (the "Mariano Bonus"). Additionally, at Mariano's behest, the PNI Board also authorized a

30

PNI-National Union_004782

$65,000 bonus to Snow, even though Snow was not an officer, director, or employee of PNI (the "Snow Bonus").

87.    In total, Mariano, Del Pizzo, Shanfelter, Smith, and Walsh approved nearly $2 million in bonuses under the Incentive Plan (the "Transaction Bonuses"), exacerbating the harm caused by the Related-Party Transactions.  PNI not only spent too much to acquire worthless—or, at best, grossly overvalued—assets from Mariano, Snow, and Shanfelter, but also gave Mariano, Snow, and other PNI officers a bonus for effectively looting assets from the Company.

88.    Despite owing fiduciary duties to PNI, Mariano, Del Pizzo, Shanfelter, Smith, and Walsh took no reasonable action to monitor, oversee, or scrutinize PNI's implementation of the Incentive Plan.  Instead, the directors consciously disregarded their responsibility to oversee and monitor PNI's operations, and they failed to ensure that PNI management executed the Incentive Plan in the best interests of the Company.  In approving the Transaction Bonuses, the Board rewarded Mariano, Snow, and PNI management, among others, for imprudently siphoning PNI's assets to Mariano, Snow, and Shanfelter, in violation of their duties of loyalty to the Company.

PNI-National Union_004783

**D.      Mariano Abuses PNI's Access to Capital Markets to Enrich Himself at the Company's Expense.**

89.     Besides using PNI to carry out the Related-Party Transactions, Mariano also hoped to leverage the Company's newfound connection to the capital markets to monetize his PNI holdings and enhance his own wealth.

90.     In connection with PNI's IPO, Mariano had entered a standard lock-up agreement that prohibited him from selling PNI stock for 180 days, or until July 17, 2015.  During the lock-up period, Mariano's cash requirements grew substantially as he pursued an increasingly lavish lifestyle.

91.     For example, in March 2015, just two months after PNI's IPO, Mariano purchased a $37 million, 187-foot yacht.  Unable to pay in cash, Mariano financed the majority of the purchase price with a $32.3 million loan (the "Yacht Loan") that required him to pledge $50 million of his PNI stock as collateral.  The loan covenants also required GIC to maintain a minimum risk-based capital ratio—creating further pressure for Mariano to ensure GIC's sustainability.   Mariano financed the remainder of the purchase price with a $5 million promissory note that matured on September 30, 2015, shortly after Mariano's lock-up period was set to expire.

92.     Mariano further increased his indebtedness in August 2015, when he obtained a $12.5 million personal line of credit.  Mariano agreed to maintain $10 million of liquid assets in the form of marketable securities as collateral for this loan.

32

PNI-National Union_004784

For purposes of valuing Mariano's PNI stock, the bank applied a 35% to 75% discount to the trading price.

93.    At the same time, Mariano continued to personally support GIC, providing his own assets to make sure the insurer had adequate capital to meet the OIR's requirements.    After PNI's IPO, GIC continued to operate at a loss and required millions of dollars from Mariano annually to stay afloat.

94.    By the fall of 2015, Mariano was desperate for cash to meet these increasing financial demands.  To monetize his own PNI interest, Mariano caused PNI to embark on a series of capital-market transactions from late 2015 to early 2017.  In October 2015, PNI took steps to execute a secondary offering.  The Company ultimately pulled the offering, but not before causing irreparable harm to its stock price.  Shortly thereafter, in December 2015, PNI pursued a private placement, which, as structured, had potential for significantly diluting the interests of PNI's existing stockholders.  In recognition of that dilution risk, in March 2016, Mariano caused PNI to pursue an aggressive stock repurchase plan to drive up the value of his own shares and cement his control over the Company.  And finally, in the fall of 2016, PNI pursued a leveraged recapitalization designed to fund an imprudent dividend and, once again, protect Mariano's interest in maintaining his majority ownership of PNI.

PNI-National Union_004785

95.    The purpose of each deal was to monetize the value of Mariano's holdings, ensure he retained control over the Company, or both, without regard to the significant negative consequences such transactions would have on PNI. And, as was the theme at PNI, the PNI directors (*i.e.*, Mariano's directors) either fell in line or were shown the door.

1.    *PNI Attempts a Secondary Offering as Pretext to Further Enrich Mariano and Bankroll GIC.*

96.    In his first attempt to extract additional value from PNI through the markets, Mariano caused PNI to attempt a secondary offering in October 2015, less than one year after the Company's IPO. PNI announced the offering, which included Mariano's sale of an undisclosed number of shares, on October 5, 2015. The market responded unfavorably, causing PNI's stock price to drop nearly 25% within two weeks of the announcement. On October 5, prior to the announcement, PNI opened at $16.15 per share. The next day, when the stock hit $13.09, Smith wrote to Shanfelter, "Have you seen the stock this morning???  Steve must be losing his mind." Yet Smith, Shanfelter, and the rest of the Board—Mariano, Del Pizzo, and Walsh—initially did nothing to stop the transaction, instead allowing Mariano to push through the offering to satisfy his own personal financial needs.

97.    Ignoring the market's reaction, PNI amended its offering disclosures on October 15, 2015 and announced that the Company intended to issue $55 million in new shares alongside a $20 million stock sale by Mariano. As PNI's stock price

34

continued its precipitous decline, Smith again wrote to Shanfelter, asking, "Are we going to need to have a special meeting to keep Steve from going off the deep end?"

98.    On October 19, 2015, PNI's stock closed at a low of $12.33 per share. Shortly thereafter, Mariano decided on a new strategy to extract value from PNI, and PNI withdrew the offering.   But the damage to PNI was already done.   At the November Board meeting, "Mariano noted that the stock price had not recovered following the withdrawal of the Company's secondary offering."

### 2.    *PNI Pursues a Private Placement to Benefit Mariano and GIC at PNI's Expense.*

99.    Seizing upon the fall in PNI's stock price—which he had caused by pushing for an unsuccessful secondary offering—Mariano initiated a "strategic review" process, that he initially concealed from the Board, to identify other avenues for obtaining liquidity to fund his opulent lifestyle and to shore up GIC's feeble finances.

100.   In the short term, GIC needed several million dollars of additional capital so it could satisfy the OIR's capital requirements.   Mariano had insufficient liquidity to personally provide the additional capital, as he had done in the past, so he turned to PNI for funds he needed to prop up GIC.

101.   To that end, Mariano retained JP Morgan Chase, without the Board's knowledge, to facilitate a private investment in public equity transaction (the "PIPE Transaction") with the intent to close by the end of 2015.

35

102.   Mariano's discussions with JP Morgan Chase were well underway by the time he first disclosed the PIPE Transaction to the Board—comprised of Mariano, Del Pizzo, Shanfelter, Smith, and Walsh—at its November 13, 2015 meeting.   When Mariano disclosed that he retained JP Morgan Chase during the November Board meeting, he provided little detail concerning the negotiations, the cost of capital to PNI, and other relevant factors.

103.   The Board discussed the transaction for the first time on a December 10, 2015 conference call—just three days ahead of its scheduled vote on the PIPE Transaction.   Even then, they had little information about the PIPE Transaction, as PNI's General Counsel, Pesch, failed to provide the Board with any materials until minutes before the call.   Within hours of the December 10 call, Pesch sent Del Pizzo, Shanfelter, Smith, and Walsh "indicative" terms that Mariano hoped to negotiate along with a draft resolution approving the PIPE Transaction.

104.   Under the terms of the PIPE Transaction, a group of three hedge funds—CVI Investments, Inc., Hudson Bay Master Fund Ltd., and Alto Opportunity Master Fund, SPC (together, the "PIPE Investors")—were to pay $30 million to Mariano for 2.5 million shares of PNI common stock and $20 million to PNI for (i) 666,666 shares of common stock, (ii) warrants to purchase up to an aggregate of 2,083,333 shares of the Company's common stock, and (iii) prepaid warrants for 1,000,000 shares of the Company's common stock.   Through the deal, the PIPE

36

PNI-National Union_004788

Investors paid approximately $12 per share, a discount to the then-prevailing market price of roughly $13 per share. The PIPE Transaction also required PNI to pay JP Morgan a $1.78 million success fee.

105. PNI's Board members—Mariano, Del Pizzo, Shanfelter, Smith, and Walsh—each signed a written consent approving the transaction on December 13, 2015, only three days after first reviewing incomplete details of the transaction. The Board approved the PIPE Transaction, which dramatically altered the Company's capital stack, despite having limited information about the deal and how it would affect PNI. The PNI Board did not obtain independent advice to ascertain the propriety of the PIPE Transaction for PNI, or why it was even necessary. By voting to approve the PIPE Transaction without considering its impact on PNI, the directors once again acquiesced to Mariano and displayed their loyalty to him by intentionally failing to act in the face of a known duty to act and consciously disregarding their duties to PNI.

106. PNI announced the PIPE Transaction on December 14, 2015, and its stock price immediately tanked—dropping to $7.79 after closing at $13.08 the previous trading day. In preparing a press release to announce the transaction, PNI's public relations firm accurately predicted the decline, writing to PNI management that "PIPE transactions are typically used by very small companies and are a deal of last resort;" "the market will be 'surprised' by this news;" and "investors do not like

37

PNI-National Union_004789

insider selling no matter what the story is." Had the Board considered their duties to PNI, they would have understood that PIPE financing was inappropriate for PNI because it served no justifiable business purpose and subjected the Company to significant harm and unnecessary expense. Most significantly though, it was driven solely by Mariano's desire to liquidate his holdings.

107.   Incredibly, as PNI's stock was in free fall, Mariano sought to extract even more cash from PNI for his personal use. On December 14, 2015, Mariano sent Smith and Shanfelter an email requesting a stock option grant for his "3 good quarters of stewardship" and a "second capital raise [] in 11 months." Specifically, Mariano wrote, "Please think about sending some stock options [and] [r]estricted stock my way . . . . Not a bad strike price right now."

108.   But just one week later, after assessing the market's negative response to the PIPE Transaction, Mariano pushed the Board to amend the deal in an attempt to repair the damage to PNI's stock price—not because that was in the best interest of PNI, but because it was in Mariano's interest to do so. His proposed revision required PNI to return $20 million to the PIPE Investors in exchange for a portion of the common stock they received in the original deal. Mariano, however, did not return any of the $30 million he received for his shares, leaving him with enough short-term cash to prop up GIC and support his own excessive spending. Under the revised PIPE Transaction, PNI still was required to grant warrants to the PIPE

38

PNI-National Union_004790

Investors—even though the Company had to forego all the cash consideration it was supposed to receive under the original deal.

109.   The negative effects of this transaction were apparent on its face, and the PNI directors consciously chose to ignore them. Even PNI's lender, BMO, easily identified the primary issues with the PIPE Transaction from outside the veil. BMO wrote to Shields on December 14, 2015, "Tom, I am really a bit confused on warrants . . . why is Steve's share sale larger than the PN[I] share offering . . . This does not seem to be as simple a private placement . . . It appears to me that Steve is selling more actual shares at a set price ($12) while PN is facilitating this liquidity by issuing a warrant with variable future value, am I [misunderstanding] this?"

110.   Nevertheless, neither Shields nor any other member of PNI management advised the Board concerning BMO's concerns. The Board approved the amendments to the PIPE Transaction on December 22, 2015, without holding a meeting or obtaining a fairness opinion.

3.   *PNI Implements an Ill-Advised Stock Repurchase Program for Mariano's Benefit.*

111.   In connection with the PIPE Transaction, Mariano and PNI entered into a "Stock Back-to-Back Agreement" that required PNI to purchase any shares to be issued in connection with the PIPE Investors' warrants from Mariano. The warrants entitled the PIPE Investors to purchase up to a certain dollar amount of shares, rather

PNI-National Union_004791

than a specific number of shares. Thus, as PNI's stock price decreased, the PIPE Investors could obtain more shares by exercising their warrants.

112.   At the time, PNI's certificate of incorporation allowed Mariano to unilaterally remove and appoint PNI directors by "written consent without a meeting, without prior notice and without a vote" because he owned at least 40% of the Company's outstanding shares. At the PIPE Transaction's $12 per share price, Mariano controlled enough shares to retain a 40% stake even if the PIPE Investors executed their warrants.

113.   After the PIPE Transaction closed, however, Mariano grew paranoid that the PIPE Investors were short-selling PNI stock to drive down the price, thus increasing the number of Mariano's shares they could obtain by exercising the warrants. Soon after closing, PNI's share price dropped below $7, putting Mariano's control over the Company at risk should the PIPE Investors exercise their warrants. The depressed share price also strained Mariano's personal finances because he had pledged nearly 8,000,000 PNI shares as collateral for his personal debts—a number that increased as the share price decreased.

114.   In response, Mariano caused PNI to pursue a Company-sponsored stock repurchase program, believing it would solve his problems in two ways. First, PNI's share price would increase as the Company repurchased shares, reducing the number of shares Mariano would have to pledge for his debts or relinquish to the PIPE

40

PNI-National Union_004792

Investors when they exercised their warrants. Second, the program would decrease the total number of outstanding shares, increasing Mariano's ownership percentage.

115.   Mariano took action to execute his plan before disclosing it to the Board. PNI's credit facility with BMO, who provided PNI with its initial post-IPO loans, prohibited the Company from implementing a stock buyback program. On March 1, 2016, Mariano and Shields requested that BMO waive this prohibition. BMO agreed to a waiver, but it charged PNI an additional 5 basis points, and the waiver limited the repurchase program to 1,000,000 shares per month.

116.   Mariano enlisted Shanfelter, who Mariano had already rewarded handsomely for his loyalty through the Global HR Transaction, to pitch the repurchase program to the Board. On March 1, 2016, Shanfelter emailed the Board, which then consisted of Mariano, Del Pizzo, Shanfelter, Smith, Walsh, and Corey, writing:

> Dear fellow board members. I would like to suggest the following. I believe the board and the company should consider announcing a stock buyback plan ASAP . . . . The company['s] best possible use of current capital would be a buyback program . . . . The purchases would send a clear message that we feel the stock is truly undervalued, at the same time it should offer the company a great return. Please think about the following.
>
> 1. put a $15,000,000 plan in place
>
> 2. instruct the company[] to purchase stock from 3 to 6 doll[a]rs up to 1 mil [shares per month]
>
> 3. have the special committee [serve] in an oversight rol[e]

PNI-National Union_004793

117. In response, Smith indicated his support for the idea, but observed that the Board would need "outside counsel to provide an opinion about the recommended strategy" and "[h]ave Tom [Shields] do a sources and uses analysis."

118. But rather than pursue Smith's recommended process, or establish the special committee to serve in an oversight role as Shanfelter suggested, the Board, including Smith, unanimously approved a $15 million repurchase program just two days later, on March 3, 2016 (the "Stock Repurchase Program").

119. The Stock Repurchase Program called for PNI to buy back its stock until the price reached $6 per share. While the Board and an oversight committee comprised of Smith, Corey, and Shanfelter (the "Oversight Committee") were supposed to monitor the administration of the Stock Repurchase Program, it effectively gave Mariano full autonomy to do it himself. Through a March 9, 2016 Board resolution, Mariano gained authority to "make all necessary, appropriate or advisable day to day determinations regarding the purchase of shares of Common Stock in the Repurchase Program." Mariano proceeded to personally select the number of shares PNI would repurchase in each transaction, and he even used his personal wealth-management advisors to execute the trades. The Oversight Committee did little to nothing to monitor Mariano's activities.

120. By March 14, 2016, Mariano had caused PNI to repurchase 992,182 shares of PNI stock at a cost of $5.7 million. As of March 31, 2016, PNI's stock

PNI-National Union_004794

price had climbed to $7.70 per share. The Oversight Committee then met and agreed that "[t]he Company must suspend its repurchase program immediately." Mariano, however, ignored that directive, causing PNI to continue repurchasing stock to drive the price up as much as possible.

121.  On April 1, 2016, the day after the Oversight Committee suspended the Stock Repurchase Program, Shields discovered that Mariano had not heeded the Board's directive to stop buying. Surprised, Shields wrote to Rivera and Quigley, "I had no knowledge of this today . . . . I was advised that we couldn't purchase stock today." Quigley responded, "I think I called that last week. I must be clairvoyant."

122.  Shields also immediately emailed Shanfelter, who quickly responded, "Tom [c]all me this weekend. Too much finger pointing." After speaking with Shanfelter, Shields was convinced that Mariano should continue to buy back shares, despite the Oversight Committee's decision to suspend the Stock Repurchase Program.

123.  The PNI Board finally and formally suspended the Stock Repurchase Program on April 15, 2016. By then, Mariano had caused PNI to repurchase a total of 1,360,457 shares, costing PNI $8,672,616.48.

124.  From Mariano's perspective, the Stock Repurchase Program was a success. Mariano increased his ownership stake by 2.5% and lifted PNI's stock

PNI-National Union_004795

price. But PNI received nothing for the $8.7 million it spent. Rather, it had simply wasted millions in working capital to benefit Mariano personally.

125.   The Stock Repurchase Program also increased PNI's cost of capital. PNI's credit agreements with BMO, its primary lender, prohibited PNI from using its working capital to buy back stock. Before implementing the Stock Repurchase Program, Mariano and Shields had to seek a waiver from BMO, which increased PNI's interest rate by 5 basis points.

126.   Despite Mariano's efforts to drive up PNI's stock price with the imprudent spending of millions of dollars of PNI's working capital, on April 5, 2016, two of the PIPE Investors—CVI Investments, Inc. and Hudson Bay Master Fund Ltd.—executed a portion of their warrants and requested delivery of 1,000,000 and 250,000 PNI shares, respectively.   Under the Stock Back-to-Back Agreement, Mariano's shares had to be used to satisfy the warrants.   Thus, had Mariano complied, his ownership stake in PNI—which was largely encumbered by his personal debts—would have significantly decreased, thus potentially freeing PNI from his Mariano's destructive grip.

127.   But, rather than risk losing control of PNI or defaulting on his personal loans, Mariano called a Board meeting the very same day, at which he sought authorization to deny the PIPE Investors' request. Mariano, Del Pizzo, Shanfelter, Smith, Walsh, and Corey were in attendance, but neither PNI's outside legal counsel

44

nor any other independent advisor attended the meeting. Mariano, despite having an obvious conflict of interest due to the Stock Back-to-Back Agreement, participated in all of the Board's deliberations and voted, along with the rest of the directors, to deny the PIPE Investors' request and put PNI at risk of legal action.

128.   CVI Investments, Inc. and Hudson Bay Master Fund Ltd. subsequently filed suit against PNI and Mariano to enforce their warrants in the Southern District of New York, causing additional harm to the Company and its minority stockholders.

4.   *PNI's Directors Approve a Leveraged Recapitalization to Pay an Imprudent Dividend and Protect Mariano's Majority Ownership.*

129.   Not satisfied with the money he received through the PIPE Transaction and the Stock Repurchase Program, Mariano looked for fresh sources of cash as 2016 continued in anticipation of the OIR's annual evaluation of GIC. Beginning in July 2016, Mariano and Wilson, a PNI Executive Vice President, began contemplating a leveraged recapitalization in which PNI would take on substantial debt to issue a large dividend (the "Leveraged Recap") from which Mariano would benefit greatly as PNI's largest stockholder. Mariano intended to use his dividend to prop up GIC and satisfy his other short-term liquidity needs.

130.   By September 2016, Mariano had done substantial work to pursue the Leveraged Recap, but he had yet to disclose his plan to the Board or a broader group of PNI officers because he knew the plan was self-interested, expensive, and provided no value to PNI. In a September 8, 2016 discussion with Wilson, Mariano

45

wrote, "[W]e need to make sure we can handle debt at both high and low. If so. I will sign Houlihan [Lokey] this week." Wilson replied, "Absolutely . . . we should also talk about what, if anything, to say about it internally. I don't trust certain people's ability to keep their mouth closed." Mariano then responded, "Pesch. Definitely. Question is can Tom [Shields, PNI's CFO] and Dave [Quigley, PNI's Vice President of Finance] keep qui[e]t. They need to be in on it."

131. Over the next few weeks, Mariano, Wilson, Pesch, Shields, and Quigley pursued the Leveraged Recap to near completion by the time they first presented it to the Board. With the assistance of Houlihan Lokey, Mariano solicited a proposal from Cerberus Business Finance LLC ("Cerberus") in which Cerberus would provide PNI with a $280 million credit facility "for the purposes of repaying existing indebtedness, funding a common stock buyback, [and] paying a dividend to shareholders." Mariano intended to use $100 million of the loan proceeds for a dividend, of which he would receive a substantial portion.

132. Mariano first provided the details of the Leveraged Recap to the Board on October 19, 2016—including the fact that he intended to close the transaction less than a month later, by November 10, 2016. After learning of Mariano's plans, Corey wrote to Smith, "I am dead set against giving a dividend." Smith replied that he was not sure "whether or not we can effectively execute our duties as board members with a CEO/large stockholder that may not be on the same page with his

46

board" and that "if Steve does not thoroughly and <u>honestly</u> address our issues . . . I am not sure that I will be able to continue as a board member."

133. Mariano then organized a Board call on October 21, 2016, to give the Board its first opportunity to discuss the Leveraged Recap. Prior to the call, Smith wrote to Walsh and Corey, "In my mind (unless there is something that I am totally missing), we are being asked to refi the company's debt at an interest rate that is 220% higher than the current interest rate and pay $11+ million in fees for the opportunity and then pay out $100 million. Net, net we are being asked to approve borrowing money to payout money to shareholders (i.e. to solve Steve's personal financial problems). This is lunacy!"

134. After the Board call, Corey wrote to Smith and Walsh, "I think it is BS to say that we want to make sure our shareholders love us and want to stay with us. Nobody takes on this kind of debt for that purpose." Smith responded that he was generally happy with the call but that his "only disappointment is that Steve did not 'put his cards on the table' re: his GIC capitalization challenge, which we will need to press him on the next time we all talk."

135. Smith sought further information from Mariano and again requested an "independent business practice opinion as to the rationale/limitations/disclosure requirements for issuing stockholder dividends and/or implementing stock buy-back programs."

47

136. On October 26, 2016, Mariano finally provided the Board with a synopsis of how it intended to use the $250 million term loan from Cerberus: $135 million to refinance existing debt, $100 million to pay a dividend, roughly $3.3 million in excess cash for PNI's balance sheet, and nearly $12 million in transaction fees from the Leveraged Recap itself. After reviewing these numbers, Smith wrote to Corey, "It seems clear to me after reading their 'uses of cash from capitalization' that the predominant objective is to solve Steve's $30 million GIC problem." Corey responded, "After looking at the uses of cash tab, I find this more ridiculous than I have from the very beginning. The refi is being proposed for only one reason, to put money in Steve's pocket."

137. Even though the Leveraged Recap was obviously structured to benefit Mariano to the substantial detriment of PNI, Mariano knew he could push the deal through over Smith's and Corey's objections and requests for an independent review of the transaction by a special committee. Thus, Mariano demanded an immediate vote by the full Board. Corey ultimately resigned before voting on the transaction. Smith, however, reaffirmed his loyalty to Mariano by falling in line. Thus, on November 9, 2016, each of the remaining directors, Mariano, Del Pizzo, Smith, and Walsh, voted to approve the Leveraged Recap.

138. Just days after Corey's resignation, on November 17, 2016, Mariano moved to shore up his support at the Board level by filling the vacant seats left by

48

Shanfelter, who resigned in October 2016 due to health reasons, and Corey by appointing his cousin, Sean Bidic, and one of his longtime friends, James O'Brien, to PNI's Board.

139.   Once the debt for the Leveraged Recap was secured, Mariano took immediate action to exploit PNI's new-found liquidity for his benefit.  Mariano pushed the Board to approve a special bonus package for PNI's senior management, including himself, as a "transaction bonus" for completing the debt-financing portion of the Leveraged Recap—a transaction that caused the Company millions in damages.  The Board ultimately created a $2 million bonus package for PNI's senior executives, with $500,000 of the pool earmarked for Mariano.

140.   Mariano also used PNI capital to repurchase additional PNI stock for the same reasons he pushed for a repurchasing program in early 2016.  Between November 15, 2016 and December 7, 2016, Mariano caused PNI to repurchase 191,824 shares of PNI stock for more than $1.2 million.

141.   All of this occurred while Mariano personally stood to receive approximately $37 million from PNI's planned dividend.  However, before PNI could execute the dividend, a group of PNI stockholders filed suit and successfully enjoined both the dividend and any further stock repurchases.

49

PNI-National Union_004801

E.   **PNI's Directors Approve a $30 Million Handout to GIC in Exchange for a Worthless Promise.**

142.   PNI brought on two new directors in January 2017: Jeffrey Rohr and Michael Purcell. Less than two months after joining PNI, they voted along with the rest of the Board to authorize PNI to give away $30 million of the Company's limited cash to GIC. By doing so, the Board—comprised of Mariano, Del Pizzo, Smith, Walsh, O'Brien, Bidic, Rohr, and Purcell—utterly failed PNI and consciously disregarded their fiduciary duties.

143.   GIC, as a Florida-licensed insurance company, was subject to oversight by the OIR. Part of that oversight included ensuring that GIC had sufficient adjusted-capital and risk-based-capital relative to the amount of policies it wrote. By March 1 of each year, GIC was required to provide evidence of its solvency and capital ratios to the OIR. If GIC failed to meet the OIR's requirements, it could be put into receivership and prohibited from writing any new insurance policies.

144.   By the end of 2016, it became clear that GIC would be unable to meet the required ratios without additional capital. Thus, on February 2, 2017, GIC requested financial assistance from PNI. Of course, PNI had no obligation to give any cash to GIC. In fact, PNI was already owed $29 million by GIC for prior services, nearly $17 million of which was past due by over thirty days. And PNI was spending millions of dollars per month to provide ongoing services for which GIC was struggling to pay.

50

PNI-National Union_004802

145. Immediately after joining the Board, Rohr and Purcell were appointed to a special committee (the "Special Committee") tasked with analyzing whether PNI should provide funds to GIC, and if so, how. Critically, any funds that PNI were to give to GIC had to be transferred by the end of February 2017 to meet the OIR's requirements that the capital ratios be reported by March 1. Otherwise, GIC would be put into receivership.

146. In mid-February 2017, the Special Committee, along with Todd Wilson and Mariano, decided to justify their predetermined conclusion to provide GIC with the necessary funds by causing PNI to enter into a 10-year exclusivity contract with GIC. The purported consideration that PNI would pay for the contract was a one-time payment of $30 million (the "GIC Transaction"). On February 22, 2017, Rohr admitted to Todd Wilson, a PNI Executive Vice President and close confidante of Mariano, that "this is about bailing out GIC." In other words, Rohr knew the GIC Transaction was not for the benefit of PNI, yet he, like the rest of the Board, was determined to push it through.

147. Seeking cover for their decision to bail out GIC, the Special Committee engaged Kidron Capital Advisors, LLC ("Kidron") to provide a valuation report regarding the proposed transaction. Indeed, before Kidron even completed its report, the Special Committee had already determined that they would support the GIC Transaction. Two days before the Special Committee received Kidron's report,

51

PNI-National Union_004803

Rohr emailed Wilson to let him know that "[t]he money can go in early Monday [February 28th]," so that GIC could meet its March 1 deadline.

148.  On its face, Kidron's report was "garbage in, garbage out"—and everyone on the Board knew it.  Although Kidron valued the GIC Transaction at $45 million, the report included significant disclaimers that materially limited its utility, including:

- "Kidron shall rely, without independent verification, on the accuracy and completeness of . . . all information furnished by or on behalf of PNI;"

- "[W]e have relied on and assume the accuracy and completeness of all financial and other information supplied or otherwise made available to Kidron by [PNI] . . . . With respect to the audited financial statements, unaudited financial analyses, financial forecasts, estimates, projections or other information furnished to us by the company, we have assumed without any further independent investigation and analysis, that they have been reasonably prepared in good faith;"

- "The analysis does not constitute a recommendation to the management of Patriot, the Company's board of directors, the Special Committee, or the Company's shareholders regarding any proposed transaction;" and

- "There are numerous other factors other than valuation from a financial point of view that should be taken into account by any involved party prior to determining a final value for a customer-related asset."

149.  In other words, Kidron conducted no independent investigation into the relevant factors giving rise to its valuation.  As reflected by these disclaimers,

PNI-National Union_004804

Kidron's report was only worth the quality of the information provided by the Special Committee and Wilson.

150.   Making matters worse, it appears PNI only selected Kidron based on its willingness to provide the Company with an outcome-driven valuation. Before the Special Committee was even charged with investigating the transaction, Mariano and Wilson discussed a possible transaction between PNI and GIC with at least one other advisory firm. Weeks before the Board approved the GIC Transaction, Wilson and Mariano had yet to settle on the business terms it hoped to achieve through a transaction with GIC. Instead of identifying what contractual terms would be beneficial for PNI, they instead focused on identifying the terms they had to include to obtain a favorable valuation from an outside advisor. On February 12, 2017, for example, Wilson sought input from Mariano on how to structure the transaction: "[i]n order for Evercore to opine on the value [of the GIC Transaction], they need to make sure we are all in agreement as to what we are getting from GIC that we do not have today." In other words, Wilson and Mariano outlined the terms of the GIC Transaction based on what they could convince an outside firm to validate.

151.   It was therefore no surprise that Kidron's report incorporated two flawed assumptions provided by the Special Committee, Wilson, and Mariano. First, Kidron falsely assumed that GIC would stay in business for the 10-year duration of the contract without further assistance from PNI. Second, Kidron falsely

PNI-National Union_004805

assumed that GIC would pay for the services that PNI provided. Specifically, Kidron noted under its "Discounted Cash Flow Analysis – Assumptions" that its financial projections assumed both GIC and PNI would continue operating as going concerns. Kidron also noted, "Management estimated the Company's GIC-related revenue for 2017 and assumed 0% increase or decrease over 10 years."

152. The Special Committee knew these assumptions were deeply flawed and rendered the report utterly useless. Rohr and Purcell, for example, knew that GIC: (a) persistently operated at a substantial loss; (b) required millions of dollars in capital infusions every year to satisfy OIR's requirements; and (c) faced the significant risk of receivership as GIC constantly scrambled to satisfy those requirements. Rohr and Purcell further knew that GIC could not count on any future capital infusions from Mariano, who lacked liquidity due to his personal financial problems, or from PNI, which had no obligation to make any additional payments to GIC. It was wholly unreasonable to assume that GIC would remain in business or would be able to pay for PNI's services for the next 10 years. Indeed, GIC's outside auditor issued a going concern qualification by August 2017. And GIC was placed into receivership with the OIR just months later in November 2017.

153. Having provided these flawed assumptions, the Special Committee—and the rest of PNI's Board, who had all witnessed GIC's persistent financial difficulties first-hand—knew that Kidron's report should not be used to justify the

PNI-National Union_004806

GIC Transaction.  Nevertheless, the Special Committee and the rest of the Board ignored Kidron's admonition that the report was not a "recommendation" and that "numerous other factors" should be taken into consideration before "determining a final value."  Instead, the Board used Kidron's outcome-driven report as cover to justify the inherently flawed GIC Transaction that the Special Committee had already decided to approve.

154.  Rohr also requested a self-serving analysis from PNI management to bolster the Special Committee's decision to recommend the GIC Transaction.  On February 20, 2017, Rohr requested that Wilson provide an analysis "of the consequences to [P]atriot if we were not to fund GIC" and "GIC were to go into receivership."  Rohr continued, "While it is intuitively obvious that it would be very bad, it would help quantify it for those who may inevitably question the propriety of a transaction to save GIC."  Wilson responded on February 23, 2017 that PNI projected a decrease in 2017 EBITDA to $17.8 million from $54.5 million if PNI lost GIC's business.  Having received the answer he wanted, Rohr asked no further questions.

155.  Wilson's analysis—which only considered PNI's revenue from GIC and not the cost to provide services—also was inherently flawed because it built in unrealistic assumptions.  For example, Wilson's projections unrealistically assumed that GIC would pay for PNI's services on a go-forward basis.  Of course, Rohr and

PNI-National Union_004807

the Special Committee knew that assumption was absurd given the fact that GIC already owed PNI nearly $30 million for services rendered and that GIC had operated at a loss for the previous two years. Further, the analysis ignored both the fixed and variable costs that PNI incurred to provide services to GIC in the first place. Finally, it showed just how vulnerable PNI had become due to its overreliance on GIC.

156.  Nevertheless, using the Kidron and Wilson analyses that they knew were unreliable and materially flawed as justification, the Special Committee recommended that the Board approve the GIC Transaction. At a February 26, 2017 meeting, Rohr told the Board that "Kidron Capital Partners . . . had evaluated the financial impact to the Company of the extension of the service agreements with GIC and determined the value of the extension of the service agreement to be $45 million using a conservatively high discount rate."

157.  Rohr did not, however, explain the significant caveats built into Kidron's valuation. Nor did he explain that Kidron failed to account for the risk that GIC would be put in receivership or be unable to pay for PNI's services. Rohr, in reliance on Wilson's analysis, also stated that, "[g]iven the significant amount of Company revenue derived from the GIC relationship[,] . . . the Company would be negatively impacted if GIC was unable to continue to write insurance policies or otherwise continue its operations." Rohr and Purcell then presented Kidron's $45

56

million valuation as a legitimate number and recommended that the Board approve the GIC Transaction.

158. Based on Rohr's and Purcell's recommendation, the Board—comprised of Mariano, Del Pizzo, Smith, Walsh, O'Brien, Bidic, Purcell, and Rohr—approved the GIC Transaction on February 26, 2017 and authorized PNI to transfer $30 million to GIC without negotiating a comprehensive agreement. Instead, PNI paid the funds pursuant to a hastily negotiated "Binding Term Sheet" among PNI, GIG, and Mariano that left open several material terms for further negotiation and implementation. Among other things, the term sheet required Mariano to reaffirm his obligations to GIC under a past-due promissory note (which exceeded $13 million), to enter a binding and irrevocable agreement to satisfy additional advances from GIC totaling nearly $6 million, to allow a PNI director to attend future GIC board meetings, and to cede parliamentary control over PNI's Board to a newly appointed independent lead director.

159. PNI further agreed that its Board would be comprised of a majority of independent directors and that all nominations of new directors must be approved by a majority of existing independent directors. But PNI funded the deal before certain material terms were finalized and documented. Indeed, the term sheet simply reflected Mariano's "agreement to agree" to material terms related to repaying his debts to GIC. Yet PNI's funding obligations in the term sheet were not contingent

57

PNI-National Union_004809

on Mariano actually reaching a definitive agreement with GIC concerning his repayment obligations.

160.   PNI and GIG did not document the terms until one month later, on March 17, 2017, when the two companies executed a "Master Amendment Agreement." Consistent with the Binding Term Sheet, the Master Amendment Agreement required Mariano to repay the approximately $6 million in advances that he had received from GIC and satisfy his $13 million promissory note to GIC. Further, the Master Amendment Agreement required Mariano to take all necessary steps to appoint an independent lead director, who would have independent authority to call meetings of PNI's Board. It also included numerous corporate governance changes aimed at curbing Mariano's influence over PNI. For example, as long as Mariano was PNI's majority stockholder, any program that allowed PNI's outstanding shares to be repurchased had to ensure that Mariano's percentage ownership of PNI's shares would not increase. Additionally, Mariano was required "not to complete any transaction for taking PNI private" without first obtaining approval from a special committee consisting of independent directors.

161.   Unsurprisingly, Mariano refused to sign the Master Amendment Agreement, which reaffirmed his substantial debt to GIC and sought to limit his control over PNI. But the Board, which had already approved the $30 million payment to GIC based on the incomplete Binding Term Sheet, had no recourse for

58

Mariano's refusal to sign.   Mariano only executed the Master Amendment Agreement on July 12, 2017, the same day on which he executed his severance agreement and resigned from PNI.

162.   After PNI transferred the funds to GIC, it became even clearer that Mariano had no qualms with abusing his authority to force the Board to comply with his demands.  First, on March 30, 2017, Mariano removed Smith and Walsh from the Board as they were working to implement the corporate governance changes in the Master Amendment Agreement. Second, on April 23, 2017, Mariano removed Purcell from the Board after learning that he had instructed Shields not to approve reimbursement of one of Mariano's purported business expenses—*e.g.*, $11,000 for a wine locker—without the Board's approval.  Days later, on April 27, 2017, Rohr resigned.  Thus, within two months after recommending the GIC Transaction, the entire Special Committee had resigned or been removed from the Board.

163.   The removal of Smith, Walsh, and Purcell and the resignation of Rohr further demonstrated Mariano's willingness to take retributive action against directors who threatened his control over the Company.   No doubt, directors recognized this and did Mariano's bidding to secure their lucrative board compensation.

PNI-National Union_004811

F.   **PNI Wastes Tens of Millions of Dollars Providing Services for Which GIC Would Never Be Able to Pay.**

164.   The GIC Transaction caused significant damages to PNI beyond the initial $30 million payment.   Pursuant to exclusivity provisions in the Master Amendment Agreement, PNI spent millions of dollars providing outsourcing services to GIC throughout 2017, without receiving payment for those services.

165.   By March 31, 2017, only one month after making the initial $30 million payment, PNI was owed approximately $15 million for services rendered to GIC. This apparent reduction in PNI's accounts receivables from the date of the GIC Transaction illustrates the shell game GIC and PNI were playing with funds. After placing the $30 million it received from PNI to satisfy its capital requirements, GIC used some of those same funds to pay down its amounts due to PNI to give the appearance that PNI's receivables from GIC were collectable.   But, without consistent additional capital contributions, the shell game could not last.  Indeed, by November 2017, as PNI provided ongoing services to GIC, this debt ballooned to approximately $41 million, an amount that GIC had no ability to repay.

166.   By August 2017, just months after the GIC Transaction, GIC was beyond redemption. At the August 2, 2017 Board meeting, Shields presented a bleak picture of GIC's financials, also pointing out that GIC's financial struggles made it difficult for PNI to forecast its own revenues since "there had been difficulty in getting visibility into the amount of payments that GIC would be making on a weekly

PNI-National Union_004812

basis." And just two days later, on August 4, 2017, GIC's auditors issued a qualified audit opinion finding that there was substantial doubt about GIC's ability to continue as a going concern.

167.   Shortly thereafter, the OIR entered an Administrative Supervision Order (the precursor to a state receivership) over GIC, stating that "grounds exist[ed] for [GIC] to be placed in administrative supervision for the purpose of protecting the assets of [GIC] and protecting the interests of its insureds during the implementation of a proposed corrective action plan[,]" which "could result in both significant restructuring of [GIC's] business as well as the infusion of capital."

168.   Despite GIC's significant financial and regulatory struggles, PNI continued to direct significant resources towards the GIC relationship throughout 2017. In addition to its initial $30 million outlay, PNI continued spending millions of dollars to service GIC's business, even though it was obvious GIC could not pay for those services.   The out-of-pocket costs of these services amounted to approximately $56 million.

169.   Had Rohr, Purcell, and the rest of the Board performed their duties in good faith, rather than relying on Kidron's plainly unsupported and defective valuation, the Board would have rejected the GIC Transaction and avoided wasting PNI's limited resources to provide services to GIC with little or no hope of receiving payment.

61

PNI-National Union_004813

170.    Further, several of PNI's officers could have mitigated the damages. Shields (PNI's CFO), Quigley (PNI's Vice President of Finance), Wilson (PNI's Executive Vice President), and Rivera (PNI's Controller) had complete access to PNI's accounting records, which showed growing accounts receivable from GIC and the cost of providing services to GIC.  Mariano also had full access to GIC's finances, but nonetheless caused PNI to continue providing services he knew GIC could not afford.  If PNI management provided the Board with a complete analysis of PNI's GIC-related costs and GIC's growing accounts receivable, the Board would have been forced to cut off PNI's relationship with GIC and save PNI the tens of millions of dollars it spent to provide free services to GIC.  Mariano's, Shields's, Wilson's, Quigley's, and Rivera's failure to so advise the Board constituted gross negligence—and certainly simple negligence—and breach of fiduciary duties.

**G.    PNI's Directors Needlessly Approve a New Employment Agreement for Mariano That Awarded Excessive Compensation and Benefits.**

171.    After closing the GIC Transaction, Mariano sought to negotiate a new employment agreement with PNI.  His existing employment agreement, which had been negotiated only a few years earlier, was still in effect and would automatically renew at the end of 2017.  Nonetheless, Mariano wanted a far more lucrative agreement with the Company.

172.    Before pressing for such an agreement, Mariano purged the Board over a six-week period.  Specifically, he caused five directors—including Purcell,

PNI-National Union_004814

O'Brien, Rohr, Smith, and Walsh—to be removed or to resign from the Board between March 30, 2017 and May 5, 2017.

173.   After ousting these directors, Mariano appointed friendlier directors— Coleman, Csiszar, and Hibler—to the Board.   While Coleman and Hibler were nominally independent, each was hand-selected by Mariano and appointed through a stockholder consent advanced by Mariano.  Csiszar had been working for Mariano-owned entities since early 2011.  Csiszar has previously proven his loyalty to Mariano through his service as the Vice Chairman of both GIC's Board of Directors and GIG's Board of Directors in addition to working for at least two other Mariano-controlled entities—Ashmere Insurance Co. and National Fidelity Holdings, Inc.  In other words, to Mariano, Csiszar's loyalty to him was never in doubt.

174.   After securing the appointment of his new cadre of favored directors, Mariano immediately tested their loyalty to him by having them approve a new and outrageous employment agreement for himself (the "2017 Employment Agreement").  The 2017 Employment Agreement would boost his annual salary from $600,000 to $950,000—a more than 58% raise.  This raise was particularly unwarranted given that the Company's compensation expert had advised against setting Mariano's salary at $600,000 only a few years earlier.  The 2017 Employment Agreement would also provide him with both equity and cash bonus incentives, which were prohibited under his existing employment agreement.  Finally, the 2017

63

PNI-National Union_004815

Employment Agreement included a series of outrageous perks at the Company's expense, including $25,000 for a personal club membership, $100,000 in medical expense reimbursements, $400,000 of private jet travel per year, and an unlimited expense account with no requirement that Mariano substantiate his expenses for reimbursement by the Company.

175.  On June 23, 2017, the Board—comprised of Mariano, Del Pizzo, Bidic, Coleman, Hibler, and Csiszar—approved the 2017 Employment Agreement. In doing so, Mariano's new board passed his test of loyalty by completely disregarding their duties to PNI and demonstrating their willingness to act in bad faith to serve Marino's interests at the expense of PNI's.  Indeed, Mariano, Del Pizzo, Bidic, Coleman, Hibler, and Csiszar awarded Mariano excessive and unreasonable compensation and benefits, even though PNI was under no obligation to approve a new employment agreement for Mariano.  Not only did PNI receive nothing in return for the 2017 Employment Agreement, but these Board members failed to even consider whether the 2017 Employment Agreement would benefit PNI.  The fact that Del Pizzo, Bidic, Coleman, Hibler, and Csiszar approved the 2017 Employment Agreement is unsurprising, however, given that Mariano appointed them to the Board as "yes men" who would willingly carry out his demands.

64

PNI-National Union_004816

**H.    PNI's Directors Approve Undeserved Severance Packages to the Officers Responsible for the Company's Demise.**

176.   In the spring and summer of 2017, PNI's Board again breached their fiduciary duties in granting outsized severance packages totaling nearly $15 million to Mariano, Shields, and Pesch.[3]

177.   PNI and its Board, of course, were not required to provide these severance payments, much less to the individuals who facilitated the ill-advised Related-Party Transactions, the costly and unproductive PIPE Transaction, and the disastrous GIC Transaction—all of which were designed to benefit Mariano and his cronies.

178.   On March 10, 2017, PNI's Board—comprised of Mariano, Del Pizzo, Smith, Walsh, O'Brien, Bidic, Purcell, and Rohr—approved a separation agreement with Pesch that required PNI to pay him $795,000 (the "Pesch Severance"). The substance of the separation agreement was recommended to the Board by a subcommittee consisting of Smith and O'Brien, who had been appointed by the Board to investigate the circumstances leading to Pesch's departure. PNI received

---

[3] The Trustee is seeking to avoid these severance packages as fraudulent and/or preferential transfers in the following adversary proceedings pending in the Bankruptcy Court: (a) *Kravitz v. Mariano*, Adv. No. 19-51131 (Bankr. D. Del.); (b) *Kravitz v. Shields*, Adv. No. 19-51132 (Bankr. D. Del.); and (c) *Kravitz v. Pesch*, Adv. No. 20-50442 (Bankr. D. Del.).

65

PNI-National Union_004817

nothing in exchange for this payment to one of Mariano's confidants, who had materially helped him funnel tens of millions of dollars out of the Company.

179.   On July 13, 2017, PNI announced that Mariano resigned from his officer and director positions.  The following day, PNI filed a Form 8-K disclosing that PNI's Board—comprised of Del Pizzo, Bidic, Coleman, Hibler, and Csiszar—approved a $10 million severance payment to Mariano, $6 million to be paid immediately, and the remaining $4 million to be paid in $1 million yearly installments beginning in 2018 (the "Mariano Severance").  PNI paid the $6 million, but collapsed into bankruptcy before paying any of the $4 million to Mariano.  PNI received nothing in exchange for this massive severance payment to Mariano, other than his agreement to serve as a "consultant" to the Company for the next two years at an inflated fee of $100,000 per month.

180.   Similarly, on August 11, 2017, Shields resigned.  Shields, who had served as PNI's CFO since September 2014, oversaw the consistent looting of PNI for Mariano's benefit.  But despite egregious failures and breaches of fiduciary duty by Shields, PNI's Board—comprised of Del Pizzo, Bidic, Coleman, Hibler, and Csiszar—shockingly rewarded him by providing him a $920,000 severance package (the "Shields Severance"), as announced in PNI's Form 8-K on August 17, 2017.  Yet again, PNI received nothing in exchange for this severance payment to one of

66

Mariano's confidants, who had helped him funnel tens of millions of dollars out of the Company.

181.   At the time of each of these severance packages, PNI was already in extreme financial distress and well on its way down the path to bankruptcy. Indeed, PNI had dwindling capital, substantial liabilities and debt-service obligations due to Cerberus based on the $280 million credit facility from November 2016, and a huge outstanding account receivable from its largest customer, GIC, that had no chance of being paid. Nonetheless, PNI's directors approved these severance packages, which provided no benefit to PNI, but rather further lined the pockets of the architects of PNI's demise, in violation of their fiduciary duties of loyalty to PNI.

## I.   Before Resigning, Mariano Loots $1.5 Million from PNI to Pay Another Company's Debt.

182.   As one of his final acts as PNI's Chief Executive Officer, Mariano used PNI's assets to satisfy the debt of a Mariano-owned insurance company unaffiliated with PNI.

183.   In 2016, AIG had hired PNI to collect the premiums for one of AIG's workers' compensation insurance programs. AIG paid PNI a commission for collecting the premiums. Effective December 30, 2016, AIG also entered an agreement with another of Mariano's captive insurance companies, Old Guard Re, SPC ("Old Guard"), to share the risk and potential profits associated with the

67

PNI-National Union_004819

program. Pursuant to this agreement, Old Guard owed $1.5 million in collateral to AIG.

184.   During the first quarter of 2017, PNI collected approximately $10 million in premiums for the AIG program. Under the applicable agreements, PNI should have taken its commission and then sent the remainder of the premiums to AIG. Separately, Old Guard should have paid the $1.5 million in collateral it owed to AIG.

185.   In March 2017, Mariano used PNI's and Old Guard's arrangements with AIG to loot $1.5 million more from PNI. Specifically, on March 10, 2017, John Rearer, an officer of Patriot Underwriters, Inc. ("PUI"), one of PNI's subsidiaries, wrote to Joyce Predmesky, PNI's Senior Vice President of Financial Services, "Spoke with [S]teve [Mariano] and we should proceed with using the funds in the AIG premium account." Rearer followed up later that day, "We are going to need to wire the collateral to them . . . . I believe the amount is 1.5 million."

186.   Predmesky knew, or at least should have known, that it would be improper for PNI to transfer $1.5 million to Old Guard while receiving nothing in return. At a minimum, Predmesky should have been suspicious of Rearer's request and inquired as to whether it was appropriate for PNI to transfer such a large sum of money to Old Guard. But instead, Predmesky blindly followed Rearer's request and, on March 13, authorized a $1.5 million wire transfer request from PNI, through its

68

subsidiary PUI, to AIG.  The wire was described as "AIG Captive (Old Guard) Collateral" in the request.

187.  PNI had no obligation to provide the collateral to AIG.  Nor did it benefit from the transfer.  The only beneficiary of the transfer was Mariano's company, Old Guard.  Rearer and Predmesky's approval and execution of the wire transfer was grossly negligent—and certainly negligent—and in breach of their fiduciary duties to PNI and PUI.

## J.   PNI Seeks Bankruptcy Protection after GIC's Inevitable Failure.

188.   The OIR ultimately put GIC into a state receivership on November 13, 2017 after a detailed investigation, which concluded that GIC was insolvent, had knowingly filed false financial statements with the OIR, and had "systematically transferred funds, totaling $15,7453,000 to Mr. Steve Mariano, the ultimate owner of GIC during the calendar year 2016 and through June 2017" "with no documented business purpose and no discernable benefit to GIC."

189.  Several weeks later, PNI disclosed the negative effect of GIC's receivership on PNI's business and that it intended to seek bankruptcy protection as early as December 13, 2017.  PNI, which owed its creditors hundreds of millions of dollars, ultimately filed for bankruptcy on January 30, 2018.  The Trustee now seeks to recover for Defendants' breaches, which caused the Company over $170 million in damages.

PNI-National Union_004821

## CAUSES OF ACTION

### Count 1
### Breach of Fiduciary Duty:
### Related-Party Transactions and the Transaction Bonuses
### (Against Mariano, Del Pizzo, and Shanfelter)

190.   The Trustee re-alleges the allegations set forth in the above paragraphs.

191.   Mariano, Del Pizzo, and Shanfelter, as PNI directors, owed fiduciary duties of absolute loyalty and care to PNI under Delaware law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company.  Mariano also was PNI's controlling stockholder, and, as such, he owed additional fiduciary duties to PNI and its minority stockholders.

192.   At all relevant times with respect to the Related-Party Transactions and the Transaction Bonuses, Mariano, Del Pizzo, and Shanfelter (together with Smith and Walsh) were PNI's only directors.  Del Pizzo and Shanfelter were each beholden to Mariano, who had authority to summarily remove and appoint directors by "written consent without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder, and routinely supported his interests over the interests of the Company.

193.   Mariano and Shanfelter personally benefited from the Related-Party Transactions.   Specifically, Mariano personally benefited from the Mariano Transactions, and Shanfelter personally benefited from the Global HR Transaction.  Additionally, Mariano personally benefited from the Mariano Bonus.  Accordingly,

70

PNI-National Union_004822

the Related-Party Transactions and the Transaction Bonuses are subject to entire fairness review.

194.  PNI overpaid substantially in each of the Related-Party Transactions. The Related-Party Transactions were not entirely fair to PNI. In fact, each of those transactions reflect an unfair price paid by PNI in an unfair process. Moreover, the Transaction Bonuses provided PNI with no value.

195.  Mariano, Del Pizzo, and Shanfelter breached the fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the Related-Party Transactions and the Transaction Bonuses. Their breaches included the following:

- Failing to consider whether the Related-Party Transactions would benefit PNI;
- Failing to get any independent valuations for the assets PNI purchased;
- Authorizing the Related-Party Transactions; and
- Approving the Transaction Bonuses.

196.  As a direct and proximate result of their breaches of fiduciary duty, Mariano, Del Pizzo, and Shanfelter caused PNI to suffer substantial damages totaling tens of millions of dollars.

71

197.   Accordingly, the Trustee seeks to recover these damages from Mariano, Del Pizzo, and Shanfelter.

### Count 2
### Breach of Fiduciary Duty:
### Stock Repurchase Program
### (Against Mariano, Del Pizzo, and Shanfelter)

198.   The Trustee re-alleges the allegations set forth in the above paragraphs.

199.   Mariano, Del Pizzo, and Shanfelter, as PNI directors, owed fiduciary duties of absolute loyalty and care to PNI under Delaware law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company. Mariano also was PNI's controlling stockholder, and, as such, he owed additional fiduciary duties to PNI and its minority stockholders.

200.   At all relevant times with respect to the Stock Repurchase Program, Mariano, Del Pizzo, and Shanfelter (together with Smith, Walsh, and Corey) were PNI's only directors. Del Pizzo and Shanfelter were each beholden to Mariano, who had authority to summarily remove and appoint directors "by written consent and without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder, and routinely supported his interests over the interests of the Company.

201.   The Stock Repurchase Program personally benefited Mariano, a PNI director and its controlling stockholder, to PNI's detriment. Accordingly, the Stock Repurchase Program is subject to entire fairness review.

72

PNI-National Union_004824

202.   The Stock Repurchase Program was not entirely fair.   It cost PNI approximately $8.7 million and provided PNI with no value.   Del Pizzo and Shanfelter, each of whom were beholden to Mariano, also failed to employ a fair process and received no independent advice.

203.   Mariano, Del Pizzo, and Shanfelter breached the fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the Stock Repurchase Program.   Their breaches included the following:

- Failing to consider whether the Stock Repurchase Program would benefit PNI;

- Failing to procure independent analyses to indicate whether the Stock Repurchase Program would provide any advantage to PNI; and

- Authorizing the Stock Repurchase Program that cost PNI approximately $8.7 million, and provided PNI with no value, in order to benefit Mariano.

204.   As a direct and proximate result of their breaches of fiduciary duty, Mariano, Del Pizzo, and Shanfelter caused PNI to suffer approximately $8.7 million in damages.

205.   Accordingly, the Trustee seeks to recover these damages from Mariano, Del Pizzo, and Shanfelter.

PNI-National Union_004825

## Count 3
### Breach of Fiduciary Duty:
### Leveraged Recap
### (Against Mariano and Del Pizzo)

206.   The Trustee re-alleges the allegations set forth in the above paragraphs.

207.   Mariano and Del Pizzo, as PNI directors, owed fiduciary duties of absolute loyalty and care to PNI under Delaware law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company.  Mariano also was PNI's controlling stockholder, and, as such, he owed additional fiduciary duties to PNI and its minority stockholders.

208.   At all relevant times with respect to the Leveraged Recap, Mariano and Del Pizzo (together with Smith and Walsh) were PNI's only directors.  Del Pizzo was beholden to Mariano, who had authority to summarily remove and appoint directors by "written consent without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder, and routinely supported his interests over the interests of the Company.

209.   Mariano and Del Pizzo breached the fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act,

74

PNI-National Union_004826

demonstrating a conscious disregard for their duties with respect to the Leveraged Recap. Their breaches included the following:

- Failing to consider whether the Leveraged Recap would benefit PNI;

- Failing to procure any independent analyses to indicate whether the Leveraged Recap would provide any advantage to PNI; and

- Authorizing the Leveraged Recap that cost PNI millions of dollars in fees and increased interest payments, as well as bonuses paid to management.

210. Instead of obtaining any independent analyses, Del Pizzo (together with Smith and Walsh) relied on Mariano, who was hopelessly conflicted in the transaction, to provide them with a full and accurate analysis of whether PNI should enter into the transaction. The Leveraged Recap was designed to benefit Mariano and is therefore subject to entire fairness review.

211. As a direct and proximate result of their breaches of fiduciary duty, Mariano and Del Pizzo caused PNI to suffer substantial damages totaling tens of millions of dollars.

212. Accordingly, the Trustee seeks to recover these damages from Mariano and Del Pizzo.

## Count 4
### Breach of Fiduciary Duty:
### GIC Transaction
### (Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr)

213. The Trustee re-alleges the allegations set forth in the above paragraphs.

PNI-National Union_004827

214. Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr, as PNI directors, owed fiduciary duties of absolute loyalty and care to PNI under Delaware law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company. Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr (together with Smith and Walsh) are the PNI directors that evaluated the GIC Transaction and voted to approve it. Mariano also was PNI's controlling stockholder, and, as such, he owed additional fiduciary duties to PNI and its minority stockholders.

215. At all relevant times with respect to the GIC Transaction, Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr (together with Smith and Walsh) were PNI's only directors. Bidic, Del Pizzo, O'Brien, Purcell, and Rohr were each beholden to Mariano, who had authority to summarily remove and appoint directors "by written consent and without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder, and routinely supported his interests over the interests of the Company.

216. At the time of the GIC Transaction, Mariano directly or indirectly owned 100% of GIC. The GIC Transaction was structured to benefit Mariano, PNI's controlling stockholder, and it is therefore subject to entire fairness review. The GIC Transaction was not entirely fair.

76

PNI-National Union_004828

217.  The GIC Transaction cost PNI at least $30 million.  PNI received nothing in exchange for its $30 million and actually obtained a negative value in the transaction because, as a direct result of the transaction, PNI continued to provide services to GIC that GIC would never be able to pay for.  The provision of those services from March 1, 2017 to November 13, 2017, when GIC was put into receivership, cost PNI over $56 million.

218.  The Special Committee, Purcell and Rohr, had already decided to recommend the GIC Transaction before any independent analysis was done.  And then, the Special Committee obtained a worthless valuation of the transaction that, on its face, ignored the two most relevant factors: GIC's ability to survive and pay for PNI's services for the life of the ten-year exclusivity agreement.  Rohr also obtained an internal report that similarly ignored GIC's inability to pay PNI, and the cost to PNI of providing services to GIC, in order to justify bailing out GIC with the $30 million payment.  The Special Committee unreasonably and knowingly relied on these flawed analyses, and its actions therefore failed to cleanse the GIC Transaction.

219.  Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr breached their fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act

77

PNI-National Union_004829

in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the GIC Transaction. Their breaches included the following:

- Failing to consider whether the GIC Transaction would benefit PNI;

- Deciding to recommend the GIC Transaction before any independent analysis was done;

- Obtaining a worthless valuation of the transaction that ignored critical information;

- Obtaining an internal report that similarly ignored critical information; and

- Authorizing the GIC Transaction.

220. As a direct and proximate result of their breaches of fiduciary duty, Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr caused PNI to suffer over $86 million in damages.

221. Accordingly, the Trustee seeks to recover these damages from Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr.

## Count 5
### Breach of Fiduciary Duty:
### 2017 Employment Agreement
### (Against Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler)

222. The Trustee re-alleges the allegations set forth in the above paragraphs.

223. Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler, as PNI directors, owed fiduciary duties of absolute loyalty and care to PNI under Delaware law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company. Mariano also was PNI's

78

controlling stockholder, and, as such, he owed additional fiduciary duties to PNI and its minority stockholders.

224.  At all relevant times with respect to the 2017 Employment Agreement, Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler were PNI's only directors. Bidic, Coleman, Csiszar, Del Pizzo, and Hibler were each beholden to Mariano, who had authority to summarily remove and appoint directors "by written consent and without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder, and routinely supported his interests over the interests of the Company.

225.  Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler breached the fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the 2017 Employment Agreement.  Their breaches included the following:

- Failing to consider whether the 2017 Employment Agreement would benefit PNI;

- Authorizing the 2017 Employment Agreement in June 2017 even though Mariano's prior agreement did not expire until December 31, 2017;

PNI-National Union_004831

- Authorizing a $350,000 increase in Mariano's base salary from $600,000 to $950,000;

- Authorizing both equity and bonus incentive payments for Mariano; incentives that were prohibited in his prior employment agreement;

- Authorizing unreasonable perquisites for Mariano, including reimbursement of $25,000 for a personal club membership, $100,000 for medical expenses, and up to $400,000 for private jet travel per year; and

- Approving an unlimited expense account for Mariano with no requirement that he substantiate his expenses for reimbursement.

226. PNI was under no obligation to authorize the 2017 Employment Agreement and received nothing in exchange for it. The 2017 Employment Agreement benefitted PNI's controlling stockholder, and it is therefore subject to entire fairness review.

227. As a direct and proximate result of their breaches of fiduciary duty, Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler caused PNI to suffer nearly $900,000 in damages.

228. Accordingly, the Trustee seeks to recover these damages from Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler.

**Count 6**
**Breach of Fiduciary Duty:**
**Pesch Severance**
**(Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr)**

229. The Trustee re-alleges the allegations set forth in the above paragraphs.

80

PNI-National Union_004832

230.  Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr, as PNI directors, owed fiduciary duties of absolute loyalty and care to PNI under Delaware law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company.  Mariano also was PNI's controlling stockholder, and, as such, he owed additional fiduciary duties to PNI and its minority stockholders.

231.  At all relevant times with respect to the Pesch Severance, Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr (together with Smith and Walsh) were PNI's only directors.  Bidic, Del Pizzo, O'Brien, Purcell, and Rohr were each beholden to Mariano, who had authority to summarily remove and appoint directors "by written consent and without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder, and routinely supported his interests over the interests of the Company.

232.  Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr breached the fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the Pesch Severance.  Their breaches included failing to

PNI-National Union_004833

consider whether the Pesch Severance would benefit PNI and authorizing a $795,000 severance package for Pesch in March 2017.

233.  PNI was under no obligation to authorize the Pesch Severance and received nothing in exchange for it.  By authorizing a bonus to an individual who oversaw the siphoning of PNI's cash over the previous two years, Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr consciously disregarded their duties.

234.  As a direct and proximate result of their breaches of fiduciary duty, Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr caused PNI to suffer $795,000 in damages.

235.  Accordingly, the Trustee seeks to recover these damages from Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr.

### Count 7
### Breach of Fiduciary Duty:
### Mariano Severance & Shields Severance
### (Against Bidic, Coleman, Csiszar, Del Pizzo, and Hibler)

236.  The Trustee re-alleges the allegations set forth in the above paragraphs.

237.  Bidic, Coleman, Csiszar, Del Pizzo, and Hibler, as PNI directors, owed fiduciary duties of absolute loyalty and care to PNI under Delaware law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company.

238.  At all relevant times with respect to the Mariano Severance and the Shields Severance, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler were PNI's only

PNI-National Union_004834

directors. Bidic, Coleman, Csiszar, Del Pizzo, and Hibler were each beholden to Mariano, who had authority to summarily remove and appoint directors "by written consent and without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder, and routinely supported his interests over the interests of the Company.

239. Bidic, Coleman, Csiszar, Del Pizzo, and Hibler breached the fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the Mariano Severance and the Shields Severance. Their breaches included failing to consider whether the Mariano Severance and the Shields Severance would benefit PNI, authorizing a $12.4 million severance package for Mariano in July 2017, and authorizing a $920,000 severance package for Shields in August 2017.

240. PNI was under no obligation to authorize the Mariano Severance and received nothing in exchange for them. By authorizing nearly $13 million in bonuses, approximately $6 million of which were paid, to an individual who oversaw the siphoning of PNI's cash over the previous two years, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler consciously disregarded their duties. The severance payment

PNI-National Union_004835

to Mariano benefitted PNI's controlling stockholder, and it is therefore subject to entire fairness review.

241.   Similarly, PNI was under no obligation to authorize the Shields Severance and received nothing in exchange for it. By authorizing a $920,000 bonus to an individual who oversaw the siphoning of PNI's cash over the previous two years, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler consciously disregarded their duties.

242.   As a direct and proximate result of their breaches of fiduciary duty, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler caused PNI to suffer nearly $7 million in damages.

243.   Accordingly, the Trustee seeks to recover these damages from Bidic, Coleman, Csiszar, Del Pizzo, and Hibler.

### Count 8
### Breach of Fiduciary Duty:
### Promoting Mariano's Interests to PNI's Detriment
### (Against Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson)

244.   The Trustee re-alleges the allegations set forth in the above paragraphs.

245.   Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson, as PNI officers, owed fiduciary duties of absolute loyalty and good faith to PNI under Delaware law, obligating them to refrain from acting negligently and with gross

84

PNI-National Union_004836

negligence, and to act in good faith, with candor and full disclosure of material information, and in the best interests of the Company.

246.   Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson breached the fiduciary duty of loyalty to PNI by acting in their own self-interest and with a purpose other than that of advancing PNI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties by promoting Mariano's interests to PNI's detriment.  Their breaches included the following:

- Providing Mariano and PNI's Board with skewed and outcome-determinative analyses and reports to justify the Stock Repurchase Program, and causing PNI to enter into the Stock Repurchase Program, which benefited Mariano to the detriment of PNI;[4]

- Providing Mariano and PNI's Board with skewed and outcome-determinative analyses and reports to justify the Leveraged Recap, and causing PNI to enter into the Leveraged Recap, which benefited Mariano to the detriment of PNI;[5]

- Providing Mariano and PNI's Board with skewed and outcome-determinative analyses and reports to justify the GIC Transaction, and causing PNI to enter into the GIC Transaction, which benefited Mariano to the detriment of PNI;[6] and

- Covering a debt owed by Old Guard, one of Mariano's companies, with $1.5 million of PNI's cash.[7]

---

[4] This allegation applies to Mariano and Shields.
[5] This allegation applies to Mariano, Quigley, Shields, and Wilson.
[6] This allegation applies to Mariano and Wilson.
[7] This allegation applies to Mariano, Predmesky, and Rearer.

85

PNI-National Union_004837

247.   Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson had a conflict of interest because they were personally beholden to Mariano and were willing to do, and did, whatever he asked, regardless of whether it was in PNI's best interest. PNI's officers were dependent on PNI for their livelihood and subject to removal by PNI's directors who routinely did Mariano's bidding. Mariano, as PNI's controlling stockholder, had the authority to summarily remove and appoint directors "by written consent and without a meeting, without prior notice and without a vote" while he was PNI's controlling stockholder. Because Mariano controlled PNI's directors, and PNI's directors decided whether an officer would be removed, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson were each beholden to Mariano.

248.   Mariano consistently put his own interest ahead of PNI's interests. He caused PNI to enter into a series of transactions designed to benefit himself to the detriment of PNI, including the Related-Party Transactions, the Transaction Bonuses, the Stock Repurchase Program, the Leveraged Recap, and the GIC Transaction. Each of those transactions was unfair to PNI and provided it less than fair value as a result of an unfair deal process. In each case, PNI paid far in excess of what it received in return, costing PNI over $100 million in total. Mariano's conduct was grossly negligent, or at the very least negligent, and in breach of his fiduciary duties.

86

PNI-National Union_004838

249. Wilson and Shields consistently provided Mariano and PNI's Board with the financial analyses and reports they needed to justify the conflicted transactions they authorized PNI to enter into, including the Stock Repurchase Program, the Leveraged Recap, and the GIC Transaction. Each of those analyses and reports was designed to provide Mariano with his desired outcome, rather than provide an objective view of the transactions, and was grossly negligent or, at the very least, negligent. In each case, PNI paid far in excess of what it received in return, costing PNI over $100 million in total.

250. Mariano, Shields, Quigley, Rivera, and Wilson also breached their duties by failing to report to PNI's Board the disastrous financial consequences of PNI continuing to provide services to GIC in 2017 after the GIC Transaction. At that point, it was clear that GIC had massive liquidity issues. Mariano (as CEO), Shields (as CFO), Quigley (as Vice President of Finance), Rivera (as Controller), and Wilson (as Executive Vice President) clearly understood the growing account receivable from GIC, GIC's consistent inability to make any substantial payment on the receivable, and the huge cost PNI was incurring to provide those services to GIC. Mariano's, Shield's, Quigley's, Rivera's, and Wilson's failure to report to the Board was grossly negligent or, at the very least, negligent. Had they reported to the Board the bleak financial circumstances resulting from the GIC relationship, the Board

87

PNI-National Union_004839

would have had no choice but to terminate that relationship, saving PNI tens of millions of dollars.

251. Rearer and Predmesky breached their fiduciary duties by blindly following Mariano's direction to cover a debt owed by Old Guard, one of Mariano's companies, with $1.5 million of PNI's cash. PNI received nothing in exchange for providing $1.5 million to AIG on behalf of Old Guard. Mariano, Rearer, and Predmesky were grossly negligent or, at the very least, negligent in transferring PNI's cash to AIG for Old Guard's benefit.

252. As a direct and proximate result of their breaches of fiduciary duty, Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson caused PNI to suffer over $100 million in damages.

253. Accordingly, the Trustee seeks to recover these damages from Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson.

## Count 9
### Corporate Waste:
### GIC Transaction
**(Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr)**

254. The Trustee re-alleges the allegations set forth in the above paragraphs.

255. Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr, as PNI directors, committed corporate waste in authorizing and permitting the GIC Transaction.

88

PNI-National Union_004840

256.   Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr irrationally squandered PNI's assets by causing PNI to enter into the GIC Transaction that cost PNI approximately $30 million.   PNI received nothing in exchange for its $30 million and actually obtained a negative value in the transaction because, as a direct result of the transaction, PNI continued to provide services to GIC for which GIC would never be able to pay.   The provision of those services from March 1, 2017 to November 13, 2017, when GIC was put into receivership, cost PNI over $56 million. Thus, the irrational decision to allow PNI to enter into the GIC Transaction cost PNI tens of millions of dollars and served no corporate purpose, which Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr knew or should have known.

257.   In reality, the GIC Transaction was designed, as Rohr put it, to "bail out" GIC from its OIR-related capital issue and allow PNI to continue to gift services to GIC over the next nine months.

258.   As a direct and proximate result of their corporate waste, Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr caused PNI to suffer over $86 million in damages.

259.   Accordingly, the Trustee seeks to recover these damages from Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr.

PNI-National Union_004841

**Count 10**
**Corporate Waste:**
**2017 Employment Agreement**
**(Against Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler)**

260.   The Trustee re-alleges the allegations set forth in the above paragraphs.

261.   Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler, as PNI directors, committed corporate waste in authorizing and permitting the 2017 Employment Agreement.

262.   Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler irrationally squandered PNI's assets by causing PNI to enter into the 2017 Employment Agreement that cost PNI hundreds of thousands of dollars in exchange for nothing.

263.   In particular, the directors authorized a $350,000 increase in Mariano's base salary from $600,000 to $950,000. The Board also authorized equity and cash bonus incentive payments that were prohibited in Mariano's prior employment agreement in addition to reimbursement of $25,000 for a personal club membership, $100,000 for medical expenses, and up to $400,000 for private jet travel per year. The Board authorized Mariano to have an unlimited expense account with no requirement that he substantiate his expenses for reimbursement. PNI was under no obligation to approve these perquisites, and Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler knew or should have known that these perquisites served no corporate purpose.

90

PNI-National Union_004842

264.   As a direct and proximate result of their corporate waste, Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler caused PNI to suffer hundreds of thousands in damages.  Mariano was also unjustly enriched by the same amounts.

265.   Accordingly, the Trustee seeks to recover these damages from Mariano, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler.

### Count 11
### Corporate Waste:
### Pesch Severance
### (Against Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr)

266.   The Trustee re-alleges the allegations set forth in the above paragraphs.

267.   Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr, as PNI directors, committed corporate waste in authorizing and permitting the Pesch Severance.

268.   Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr irrationally squandered PNI's assets by causing PNI to enter into the Pesch Severance in March 2017 that cost PNI $795,000 in exchange for nothing.

269.   PNI was under no obligation to provide this severance package that the Board approved.  Authorizing a bonus payment of $795,000 to an individual who oversaw the siphoning of PNI's cash over the previous two years in exchange for nothing served no corporate purpose, which Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr knew or should have known.

91

PNI-National Union_004843

270.   As a direct and proximate result of their corporate waste, Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr caused PNI to suffer $795,000 in damages.

271.   Accordingly, the Trustee seeks to recover these damages from Mariano, Bidic, Del Pizzo, O'Brien, Purcell, and Rohr.

## Count 12
### Corporate Waste:
### Mariano Severance & Shields Severance
### (Against Bidic, Coleman, Csiszar, Del Pizzo, and Hibler)

272.   The Trustee re-alleges the allegations set forth in the above paragraphs.

273.   Bidic, Coleman, Csiszar, Del Pizzo, and Hibler, as PNI directors, committed corporate waste in authorizing and permitting the Mariano Severance and the Shields Severance.

274.   Del Pizzo, Bidic, Coleman, Hibler, and Csiszar irrationally squandered PNI's assets by causing PNI to enter into the Mariano Severance and the Shields Severance in 2017 that cost PNI millions of dollars in exchange for nothing.

275.   In particular, the directors authorized a $12.4 million severance package for Mariano in July 2017, approximately $6 million of which was paid, when he resigned from his positions with PNI.   The directors also authorized a $920,000 severance package for Shields in August 2017.   PNI was under no obligation to provide these severance packages that the Board approved. Authorizing the payment of over $13 million in bonuses to two individuals who

92

oversaw the siphoning of PNI's cash over the previous two years in exchange for nothing served no corporate purpose, which Bidic, Coleman, Csiszar, Del Pizzo, and Hibler knew or should have known.

276.   As a direct and proximate result of their corporate waste, Bidic, Coleman, Csiszar, Del Pizzo, and Hibler caused PNI to suffer approximately $7 million in damages.

277.   Accordingly, the Trustee seeks to recover these damages from Bidic, Coleman, Csiszar, Del Pizzo, and Hibler.

**Count 13**
**Corporate Waste:**
**Promoting Mariano's Interests to PNI's Detriment**
**(Against Mariano, Predmesky, Quigley,**
**Rearer, Rivera, Shields, and Wilson)**

278.   The Trustee re-alleges the allegations set forth in the above paragraphs.

279.   Mariano, Shields, Rivera, Quigley, and Wilson, as PNI officers, committed corporate waste by causing PNI to continue to provide services to GIC in 2017, spending over $56 million to provide services that were never going to be paid for by GIC.  Mariano (as CEO), Shields (as CFO), Rivera (as Controller), Quigley (as Vice President of Finance), and Wilson (as Executive Vice President) clearly understood the growing account receivable from GIC and the huge cost PNI was incurring to provide those services to GIC.  Providing those services irrationally squandered PNI's resources because there was no way GIC could ever pay for them

93

given their consistent losses and capital issues, and the inevitability that the OIR was going to place GIC into receivership. Because there was no chance PNI would ever be paid for providing its services, expending PNI resources to do so had no corporate purpose and was in effect a gift to GIC, which Mariano, Shields, Rivera, Quigley, and Wilson knew or should have known.

280. Mariano, Rearer, and Predmesky, as PNI officers, committed corporate waste by using PNI's assets to cover a debt owed by Old Guard, one of Mariano's companies. In fact, Mariano, Rearer, and Predmesky's decision to cause PNI to pay $1.5 million to AIG on behalf of Old Guard to cover "collateral" that Old Guard owed to AIG irrationally squandered PNI's assets. PNI received nothing in exchange for the $1.5 million, and thus the transaction served no corporate purpose and was instead a gift to Old Guard, which Mariano, Rearer, and Predmesky knew or should have known.

281. As a direct and proximate result of their corporate waste, Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson caused PNI to suffer over $57 million in damages.

282. Accordingly, the Trustee seeks to recover these damages from Mariano, Predmesky, Quigley, Rearer, Rivera, Shields, and Wilson.

94

PNI-National Union_004846

## **PRAYER FOR RELIEF**

WHEREFORE, the Trustee respectfully prays for relief as follows:

a.   actual, compensatory, rescissory, restitutionary, consequential, and all other damages;

b.   disgorging all salaries, bonuses, and other compensation paid to Defendants at the time of their misconduct;

c.   pre-judgment and post-judgment interest at the highest rate allowed by law or equity;

d.   reasonable attorney's fees and expenses;

e.   costs of court; and

f.   all such further relief to which the Trustee is entitled at law or in equity.

ANDREWS & SPRINGER LLC

*/s/ Jessica Zeldin*

OF COUNSEL:

Jessica Zeldin (Del. Bar No. 3558)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

REID COLLINS & TSAI LLP
Eric D. Madden
Ben A. Barnes
1601 Elm Street, 42nd Floor
Dallas, TX 75201
(214) 420-8900

*Counsel for Peter Kravitz as
Litigation Trustee of the
PNI Litigation Trust*

William T. Reid IV
Craig A. Boneau
Gregory S. Schwegmann
Jason A. Cairns
1301 S. Capital of Texas Hwy.
Suite C300
Austin, TX 78746
(512) 647-6100

June 23, 2020

95

PNI-National Union_004847

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PETER KRAVITZ, as LITIGATION TRUSTEE OF THE PNI LITIGATION TRUST, the duly authorized successor to PATRIOT NATIONAL, INC., *et al.*, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| STEVEN M. MARIANO, CHARLES H. WALSH, JOHN R. DEL PIZZO, QUENTIN P. SMITH, JR., JAMES O'BRIEN, SEAN BIDIC, AUSTIN SHANFELTER, CHRISTOPHER PESCH, THOMAS SHIELDS, TODD WILSON, ERNEST CSISZAR, TERRY COLEMAN, GLENN HIBLER, MICHAEL COREY, MICHAEL PURCELL, JEFFRY ROHR, JOYCE PREDMESKY, DAVID QUIGLEY, JOHN REARER, and ELVIS RIVERA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

C.A. No. 2019-0934-JTL

(Successor Action to Severed C.A. No. 12953-VCL)

## UNSWORN DECLARATION OF PETER KRAVITZ

I, Peter Kravitz, declare under penalty of perjury under the laws of Delaware that the following is true and correct:

1.     I am the Litigation Trustee of the PNI Litigation Trust, which is the plaintiff in the above-referenced action.   I make this declaration pursuant to Administrative Order No. 3 of the Supreme Court of Delaware (entered on March 22, 2020).

PNI-National Union_004848

2.      I have reviewed and authorized the filing of the Amended Complaint on behalf of the PNI Litigation Trust against the defendants in this action.

3.      I verify that I have reviewed the foregoing Amended Complaint and to the extent the allegations in that Amended Complaint are based on my personal knowledge, they are true; to the extent the allegations in the Amended Complaint are based on information and belief, I believe them to be true.

4.      I make this Declaration under penalty of perjury under the laws of Delaware.

Executed on the 23rd day of June, 2020

Peter Kravitz
Peter Kravitz (Print Name)


Peter Kravitz (Signature)

2

PNI-National Union_004849

## CERTIFICATE OF SERVICE

I hereby certify this 23rd day of June, 2020 that I caused a true and correct of

the foregoing *First Amended Complaint* to be served via File & Serve*Xpress* upon

the following counsel of record:

C. Barr Flinn
Elisabeth S. Bradley
Lakshmi A. Muthu
Alberto E. Chávez
YOUNG CONAWAY STARGATT
   & TAYLOR LLP
1000 North King Street
Wilmington, DE 19801

Henry E. Gallagher, Jr.
Brandon R. Harper
CONNOLLY GALLAGHER, LLP
The Brandywine Building
1000 North West Street, 14th Floor
Wilmington, DE 19801

Samuel A. Nolen
Kevin M. Gallagher
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Robert J. Katzenstein
Kathleen M. Miller
Jason Z. Miller
SMITH, KATZENSTEIN
   & JENKINS LLP
Brandywine Building
1000 West Street, Suite 1501
Wilmington DE 19801

Philip Trainer, Jr
Marie M. Degnan
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

David E. Wilks
Scott B. Czerwonka
WILKS, LUKOFF
   & BRACEGIRDLE, LLC
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

Kevin G. Abrams
Matthew L. Miller
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

William D. Sullivan
William A. Hazeltine
SULLIVAN HAZELTINE
   ALLINSON LLC
901 N. Market Street, Suite 1300
Wilmington, DE 19801

*/s/ Jessica Zeldin*
Jessica Zeldin (#3558)

PNI-National Union_004850

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PATRIOT NATIONAL, INC., | Case No. 18-10189 (CSS) |
| Reorganized Debtor. | Jointly Administered |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of September, 2020, I caused a copy of the below-listed filing to be electronically filed with the Clerk of Court using CM/ECF which will electronically transmit notification of such filing to CM/ECF participants in the above referenced case in accordance with Del. Bankr. L. R. 9036-1. I also caused a copy of the filing to be served upon the parties on the attached service list via electronic mail.

**MOTION BY THE LITIGATION TRUSTEE TO APPROVE SETTLEMENT
WITH TEN FORMER DIRECTORS AND/OR OFFICERS
OF THE DEBTORS PURSUANT TO 11 U.S.C. § 105(a) AND
FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**

/s/ Carl N. Kunz, III
Carl N. Kunz, III (DE Bar No. 3201)

12086513/1

PNI-National Union_004851

<u>**VIA ELECTRONIC MAIL**</u>:

Laura Davis Jones, Esq.
James E. O'Neill, Esq.
Peter J. Keane, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
[Counsel to the Reorganized Debtors]

Julia B. Klein, Esq.
Klein LLC
919 North Market Street, Suite 600
Wilmington, DE 19801
[Counsel to James Baca]

Linda J. Casey
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

Adam G. Landis, Esq.
Matthew B. McGuire, Esq.
Jennifer L. Cree, Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
[Counsel to DIP Lender]

Adam C. Harris, Esq.
Lucy F. Kweskin, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
[Counsel to DIP Lender]

Matthew G. Summers, Esq.
Laurel D. Roglen, Esq.
Ballard Spahr LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
[Counsel to CVI Investments]

Jeffrey P. Bast, Esq.
Dana R. Quick, Esq.
Bast Amron LLP
One Southeast Third Avenue, Suite 1400
Miami, FL 33131
[Counsel to CareWorks Managed Care Services f/k/a
MCMC LLC and York Risk Services]

Bradley J. Bondi, Esq.
Cahill Gordon & Reindel LLP
1990 K Street NW, #950
Washington, DC 20006
[Counsel to Certain Members of the Board of Directors of
Patriot National]

Joel H. Levitin, Esq.
Jason M. Hall, Esq.
Richard A. Stieglitz, Jr., Esq.
Peter J. Linken, Esq.
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, NY 10005
[Counsel to Certain Members of the Board of Directors of
Patriot National]

Alexandra D. Blye, Esq.
Carlton Fields Jordan Burt P.A.
CityPlace Tower
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, FL 33401
[Counsel to Fifth Third Bank]

PNI-National Union_004852

<u>VIA ELECTRONIC MAIL</u>:

Donald R. Kirk, Esq.
Carlton Fields Jordan Burt P.A.
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, FL 33607
[Counsel to Fifth Bank]

Christopher P. Simon, Esq.
Kevin S. Mann, Esq.
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE 19801
[Counsel to CareWorks Managed Care Services f/k/a MCMC LLC and York Risk Services]

Garvan F. McDaniel, Esq.
Hogan McDaniel
1311 Delaware Avenue
Wilmington, DE 19806
[Counsel to Kasowitz Benson Torres LLP]

Shawn M. Christianson, Esq.
Buchalter, A Professional Corporation
55 Second Street, 17th Floor
San Francisco, CA 94105
[Counsel to Oracle America, Inc.]

Matthew B. Stein, Esq.
Kasowitz Benson Torres & Friedman LLP
1633 Broadway
New York, NY 10019

Neil B. Glassman, Esq.
GianClaudio Finizio, Esq.
Evan T. Miller, Esq.
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801
[Counsel to The Honorable Trinidad Navarro, Insurance Commissioner of the State of Delaware]

Peter D. Wolfson, Esq.
Dentons LLP
1221 Avenue of the Americas
New York, NY 10020
[Counsel to The Travelers Indemnity Company]

Sam J. Alberts, Esq.
Dentons LLP
1900 K Street, NW
Washington, DC 20006
[Counsel to The Travelers Indemnity Company]

Michael Busenkell, Esq.
Gellert Scali Busenkell & Brown, LLC
1201 North Orange Street, Suite 300
Wilmington, DE 19801
[Counsel to Fifth Third Bank]

Jennifer R. Hoover, Esq.
Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
[Counsel to Paul Van Cleave and IMA, Inc.]

**VIA ELECTRONIC MAIL:**

Serrin A. Turner, Esq.
Jeffrey T. Mispagel, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
[Counsel to Hudson Bay Master Fund Ltd.]

Bayard J. Snyder, Esq.
Snyder & Associates, P.A.
3801 Kennett Pike, Suite 201, Bldg. C
Wilmington, DE 19807
[Counsel to Aspen Specialty Insurance Co.]

Amy Miller, Esq.
Levi & Korsinsky LLP
30 Broad Street, 24th Floor
New York, NY 10004
[Counsel to Henry Wasik and Aric McIntire]

William F. Taylor, Jr., Esq.
Kate Roggio Buck, Esq.
McCarter & English, LLP
405 N. King Street, 8th Floor
Wilmington, DE 19801
[Counsel to MSA Administrators]

Thomas M. Horan, Esq.
Shaw Fishman Glantz & Towbin LLC
300 Delaware Avenue, Suite 1370
Wilmington, DE 19801
[Counsel to Hudson Bay Master Fund Ltd.]

John A. Moffa, Esq.
Moffa & Breuer, PLLC
1776 N. Pine Island Road, #102
Plantation, FL 33322
[Counsel to Alvin Harvard]

Ori Katz, Esq.
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center
San Francisco, CA 94111
[Counsel to Quentin P. Smith, Jr., Charles H. Walsh & Christopher A. Pesch]

Michael Stephens, Esq.
Jennifer E. Beasley, Esq.
Laura Robb, Esq.
Jenkins & Kling, P.C.
150 Meramac Avenue, Suite 400
St. Louis, MO 63105
[Counsel to MSA Administrators]

Prime Clerk LLC
Attn: Benjamin Steele
830 3rd Avenue, 9th Floor
New York, NY 10022

Angela J. Somers, Esq.
Reid Collins Tsai LLP
810 Seventh Avenue, Suite 410
New York, NY 10019
[Counsel to Mbago Kaniki]

**VIA ELECTRONIC MAIL:**

Eric D. Madden, Esq.
Reid Collins Tsai LLP
1601 Elm Street, 42nd Floor
Dallas, TX 75201
[Counsel to Mbago Kaniki]

Edward B. Rosenthal, Esq.
Norman M. Monhait, Esq.
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
[Counsel to Mbago Kaniki]

James D. Silver, Esq.
Conrad & Scherer LLP
633 South Federal Highway
Fort Lauderdale, FL 33301
[Counsel to Steven Mariano]

U. S. Securities & Exchange Commission
Attn: Alan S. Maza
200 Vesey Street, Suite 400
New York, NY 10281

Kathleen M. Miller, Esq.
Smith, Katzenstein & Jenkins LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
[Counsel to Steven Mariano]

Kandace Watson, Esq.
Sheppard, Mullin, Richter & Hampton LLP
12275 El Camino Real, Suite 200
San Diego, CA 92130
[Counsel to Quentin P. Smith, Jr., Charles H. Walsh &
Christopher A. Pesch]

Dana S. Plon, Esq.
Sirlin Lesser & Benson, P.C.
123 South Broad Street, Suite 2100
Philadelphia, PA 19109
[Counsel to Plymouth TFC, General Partnership]

James E. Sorenson, Esq.
D. Tyler Van Leuven, Esq.
J. Blair Boyd, Esq.
Sorenson Van Leuven, PLLC
P.O. Box 3637
Tallahassee, FL 32315
[Counsel to Central Florida Educators Federal Credit Union]

James L. Patton, Esq.
C. Barr Flinn, Esq.
Kara Hammond Coyle, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
[Counsel to Quentin P. Smith, Jr., Charles H. Walsh &
Christopher A. Pesch]

Charles A. Ercole, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
[Counsel to Class Plaintiffs and the Putative Class]

PNI-National Union_004855

**VIA ELECTRONIC MAIL:**

William D. Deveau, Esq.
Connell Foley LLP
Harborside 5, Suite 2510
Jersey City, NJ 07311
[Counsel to Aspen Specialty Insurance Company]

Jonathan P. McHenry, Esq.
Philip W. Allogramento III, Esq.
Robert K. Scheinbaum, Esq.; J. Christopher Henschel, Esq.
Connell Foley LLP
56 Livingston Avenue
Roseland, NJ 07311
[Counsel to Aspen Specialty Insurance Company]

Adam D. Wolper, Esq.
Trenk, DiPasquale, Della Fera & Sodono, P.C.
347 Mt. Pleasant Avenue, Suite 300
West Orange, NJ 07052
[Counsel to Cobb B., LLC d/b/a Lamb Insurance Services]

Robert R. Riggs, Esq.
Stephen G. Preonas, Esq.
Katzoff & Riggs LLP
1500 Park Avenue, Suite 300
Emeryville, CA 94608
[Counsel to Karen Rigsby, Trustee & Donald P. Steinmeyer]

Frederick B. Rosner, Esq.
Scott J. Leonhardt, Esq.
The Rosner Law Group LLC
824 N. Market Street, Suite 810
Wilmington, DE 19801
[Counsel to Florida Department of Financial Services]

James E. Huggett, Esq.
Margolis Edelstein
300 Delaware Avenue, Suite 800
Wilmington, DE 19801
[Counsel to SDNY Plaintiffs]

Christopher R. Momjian, Esq.
Senior Deputy Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
[Counsel to Commonwealth of Pennsylvania]

Samuel A. Nolan, Esq.
Michael J. Merchant, Esq.
Marcos A. Ramos, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
[Counsel to John R. Del Pizzo]

Henry E. Gallagher, Esq.
Jeffrey C. Wisler, Esq.
Connolly Gallagher LLP
1000 West Street, Suite 1400
Wilmington, DE 19801
[Counsel to Certain Members of the Board of Directors of Patriot National]

Philip Trainer, Jr., Esq.
Ricardo Palacio, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
[Counsel to Austin J. Shanfelter]

PNI-National Union_004856

**VIA ELECTRONIC MAIL:**

Marcos D. Jimenez, Esq.
Andrew Zaron, Esq.
255 Alhambra Circle, Suite 800
Coral Gables, FL 33134
[Counsel to Austin J. Shanfelter]

William D. Sullivan, Esq.
William A. Hazeltine, Esq.
Sullivan Hazeltine Allinson LLC
901 North Market Street, Suite 1300
Wilmington, DE 19801
[Counsel to James O'Brien, Michael Purcell, and Jeffrey Rohr]

Theodore J. Tacconelli, Esq.
Ferry Joseph, P.A.
824 N. Market Street, Suite 1000
Wilmington, DE 19801
[Counsel to Central Florida Educators Federal Credit Union]

Rafael X. Zahralddin-Aravena, Esq.
Eric M. Sutty, Esq.
Shelley A. Kinsella, Esq.
Elliott Greenleaf, P.C.
1105 N. Market Street, Suite 1700
Wilmington, DE 19801
[Counsel to StarStone National Insurance Company]

Joshua R. Taylor, Esq.
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
[Counsel to StarStone National Insurance Company]

Alan C. Hochheiser, Esq.
Maurice Wutscher, LLP
2000 Auburn Drive, Suite 200
One Chagrin Highlands
Beachwood, OH 44122
[Counsel to AmTrust North America, Inc.]

Joseph Corrigan, Esq.
One Federal Street
Boston, MA 02110
[Counsel to Iron Mountain Information Management, LLC]

Jeffrey S. Cianciulli, Esq.
Weir & Partners LLP
824 N. Market Street, Suite 800
Wilmington, DE 19801
[Counsel to Hospitality Supportive Systems, LLC, Edward E. Snow, The Carman Corporation, Selective Risk Management, LLC and Selective Law Group, LLC]

Courtney J. Hull, Esq.
c/o Sherri K. Simpson
Attorney General's Office
Bankruptcy & Collections Division
P.O. Box 12548
Austin, TX
[Counsel to Texas Comptroller of Public Accounts]

TN Dept of Labor- Uninsured Employers Fund
c/o TN Attorney General's Office, Bankruptcy Division
P.O. Box 20207
Nashville, TN 37202

<u>VIA ELECTRONIC MAIL</u>:

Andrew J. Meyers, Esq.
Broward County Attorney
Governmental Center
115 South Andrews Avenue, Suite 423
Fort Lauderdale, FL 33301
[Counsel to Broward County]

Michael R. Lastowski, Esq.
Jarret P. Hitchings, Esq.
Duane Morris LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
[Counsel to Brown & Brown of New Jersey, LLC and John F. Corbett]

Lucian B. Murley, Esq.
Saul Ewing Arnstein & Lehr LLP
1201 North Market Street, Suite 2300
Wilmington, DE 19801
[Counsel to Douglas J. Von Allmen]

Paul D. Turner, Esq.
Jonathan Feldman, Esq.
Perlman, Bajandas, Yevoli & Albright, P.L.
200 South Andrews Avenue, Suite 600
Fort Lauderdale, FL 33301
[Counsel to Douglas J. Von Allmen]

Steven M. Oxenhandler, Esq.
Michael J. O'Shee, Esq.
Bradley L. Drell, Esq.
Martha R. Crenshaw, Esq.
Gold, Weems, Bruser, Sües & Rundell
2001 MacArthur Drive
Alexandria, LA 71307
[Counsel to Paul Van Cleave and IMA, Inc.]

Gregory F. Fischer, Esq.
Cozen O'Connor
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
[Counsel to Brentwood Services Administrators, Inc.]

Michael J. Joyce, Esq.
O'Kelly Ernst & Joyce, LLC
901 N. Market Street, 10th Floor
Wilmington, DE 19801
[Counsel to Michelle Shaiper]

Tim K. Garrett, Esq.
Russell E. Stair, Esq.
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
[Counsel to Brentwood Services Administrators, Inc.]

Deb Secrest
Commonwealth of Pennsylvania
Department of Labor & Industry
651 Boas Street, Room 702
Harrisburg, PA 17121

Sally E. Veghte, Esq.
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
[Counsel to Class Plaintiffs and the Putative Class]

PNI-National Union_004858