# EXHIBIT E

EXHIBIT

178

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:21-cv-21416-DPG-TORRES

PNI LITIGATION TRUST,
the duly authorized successor to
PATRIOT NATIONAL, INC.,

   Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA., RSUI
INDEMNITY COMPANY, and ARGONAUT
INSURANCE COMPANY,

   Defendants.

_____/

## REPORT OF EXPERT WITNESS THOMAS D. MORGAN

**I.**  **Professional Background and Experience**

  I am a 1965 graduate of the University of Chicago Law School and a member of the Bar of Illinois. I am the S. Chesterfield Oppenheim Professor Emeritus of Antitrust and Trade Regulation Law at The George Washington University Law School, where I was on the faculty from 1989 to 1998 and from 2000 to 2013. From 1998 to 2000, I was the first Rex E. Lee Professor of Law at the J. Reuben Clark Law School, Brigham Young University. From 1980 to 1989, I was a professor at Emory University School of Law and served as its Dean from 1980 to 1985. From 1966 to 1980, less time in military service from 1967 to 1970, I was a professor at the University of Illinois College of Law.

  I have taught antitrust law and several other subjects over the course of my career, but most of my teaching and scholarly research has been in the field of lawyer professional responsibility

1

and ethics, *i.e.*, the professional obligations of lawyers. I taught courses in that subject one or more times each year from 1974 through 2013. I authored or co-authored numerous publications, and I continue to co-author a law school casebook, *Professional Responsibility: Problems and Materials* (14th ed. 2022), published by Foundation Press, along with its annual companion book, *Selected Standards on Professional Responsibility*.

I have drafted rules of professional conduct and explanatory material about the policies that underlie them. From 1986 to 2000, I served as one of the two Associate Reporters for the American Law Institute (ALI), *Restatement of the Law (Third): The Law Governing Lawyers*, hereafter the *"Restatement."* In that role, I worked on all sections of the *Restatement*.

Thereafter, I served as one of the two Associate Reporters for the American Bar Association's Commission on Revision of the Model Rules of Professional Conduct—the Ethics 2000 Commission—whose work led to the extensive revision of the American Bar Association's Model Rules (the "Model Rules") in 2002. My task was to help assure that the Model Rules were as consistent as possible with the principles found in my work on the *Restatement*. What followed was my book, *Lawyer Law*, published by the American Bar Association in 2005, that compares the Model Rules with the *Restatement* regarding over 200 legal ethics issues.

Later, I served in the Members Consultative Group for the ALI *Restatement of the Law, Liability Insurance* (2019). I was not an author of that publication, but I participated in discussions and evaluation of the substantive and policy issues it addresses.

I have received two awards for lifetime contributions to legal ethics scholarship—the American Bar Foundation's Keck Award in 2000 and the New York State Bar Association's Sanford D. Levy Award in 2008. My curriculum vitae listing my publications, presentations, and other professional activities is submitted as Exhibit 1 to this report.

Since 1984, I have rendered expert opinions on questions concerning lawyers' professional responsibilities, standard of care, and fiduciary obligations in reports, depositions, and testimony. The total number of cases in which I have testified, been deposed, or filed a report exceeds one hundred.  My testimony about professional ethics rules and the obligations they impose has consistently been admitted in cases tried to a court or jury in both state and federal courts around the country, including Florida.

Within the last four years, I have testified in a deposition or a trial in the following cases:

a.      *Green & Kim v. McGuireWoods*, United States District Court for the District of Hawaii, in which I testified at trial in May 2018.

b.      *Scott v. Nelson Mullins*, Circuit Court for Broward County, Florida, in which I was deposed in September 2021.

**II.      My Retention in This Matter**

I have been retained by the law firm of Reid Collins & Tsai, LLP to prepare and offer expert opinion in this matter in response to the opinions offered by Professor Anthony V. Alfieri. I am being compensated at my current regular rate of $750 per hour for time expended in preparing this report and time required for deposition or testimony.

I have been supplied with over 200 documents, depositions, and other materials for use in preparation of this report.  I believe that the materials I reviewed include all materials cited by Professor Alfieri as used in preparation of his report, as well as several additional items.  The materials that I reviewed in preparing this report are listed on Exhibit 2 to this report.

### III.   Facts I Have Assumed for Purposes of My Opinions

a.   In 2016, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") issued a primary insurance policy, Policy No. 06-185-94-19,[1] to Patriot National, Inc. ("Patriot"). The primary policy, along with its excess policies (collectively, the "2016 Policies"), provided $60 million in aggregate coverage for claims made against Patriot's directors and officers from January 16, 2016 to January 16, 2017.[2] The issuers of the 2016 Policies are hereafter referred to as the "2016 Insurers."

b.   In 2017, National Union issued a primary insurance policy, Policy No. 06-680-86-39,[3] to Patriot. The primary policy, along with its excess policies (collectively, the "2017 Policies"), provided $70 million in aggregate coverage for claims made against Patriot's directors and officers from January 16, 2017 to January 16, 2018.[4] The issuers of the 2017 Policies are hereafter referred to as the "2017 Insurers." The 2017 Policies insured the directors and officers who served at Patriot during 2017.[5] These directors included Michael Purcell, Jeffrey Rohr, Terry Coleman, Glenn Hibler, and Ernst Csiszar (the "2017 Directors" or the *Coblentz* Directors").[6]

---

[1] Ex. 3, National Union Policy No. 06-185-94-19.
[2] The 2016 Policies include the following excess policies: Ex. 4, RSUI Indemnity Company Policy No. NHS666236; Ex. 5, Argonaut Insurance Company Policy No. MLX 7601240-01; Ex. 6, Endurance Reinsurance Corp. of America Policy No. FIX10006316401; Ex. 7, Everest National Insurance Company Policy No. FL5DO00171-161; and Ex. 8, Illinois National Insurance Company Policy No. 06-283-95-09.
[3] Ex. 9, National Union Policy No. 06-680-86-39.
[4] The 2017 Policies include the following excess policies: Ex. 10, RSUI Indemnity Company Policy No. NHS670803; Ex. 11, Argonaut Insurance Company Policy No. MLX 7601240-02; Ex. 12, XL Specialty Insurance Company Policy No. ELU148357-17; Ex. 13, Westchester Fire Insurance Company Policy No. G28207591 001; Ex. 14, Illinois National Insurance Company Policy No. 06-680-86-43; and Ex. 15, RLI Insurance Company Policy No. EPG0018581.
[5] The policy period for the 2017 Policies is from January 16, 2017 until January 16, 2018. Ex. 9, National Union Policy No. 06-680-86-39, at 1.
[6] Michael Purcell was a member of Patriot's Board of Directors from January 4, 2017, until April 23, 2017. Jeffrey Rohr was a member of Patriot's Board of Directors from January 4, 2017, to April 26, 2017. Terry Coleman and Glenn Hibler were members of Patriot's Board of Directors from April 23, 2017, to January 30, 2018, when Patriot filed its Chapter 11 case. Ernst Csiszar was a member of Patriot's Board of Directors from April 26, 2017, until January 30, 2018.

c.      In 2016, Henry Wasik, a Patriot shareholder, filed a lawsuit asserting class claims against some of the company's directors and officers (the "Wasik Case").[7]  The 2016 Insurers accepted coverage of the claims asserted in the Wasik Case and agreed to pay defense costs from the 2016 Policies.

d.      Two amended complaints were filed in the Wasik Case. The first amended complaint was filed in March 2017.[8]  In addition to asserting class claims, the first amended complaint also asserted derivative claims against Patriot's directors and officers.[9]  The second amended complaint was filed in August 2017.[10]  The second amended complaint, for first time, alleged claims against some of the 2017 Directors—Coleman, Csiszar, and Hibler.  These 2017 Directors sought coverage under the 2017 Policies from the 2017 Insurers for the claims asserted against them in the second amended complaint.[11]  The 2017 Insurers denied coverage and refused to pay the defense costs for Coleman, Csiszar, and Hibler.[12]

e.      On January 30, 2018, Patriot sought the protection of Chapter 11 of the Bankruptcy Code.  On May 4, 2018, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") confirmed Patriot's Chapter 11 plan.  The claims in the Wasik Case became an asset of the trust established by the Chapter 11 plan (the "Trust").  Later in 2018, Peter Kravitz, a member of the restructuring firm "Province," was named the Trustee of the Trust.  Eric Madden of Reid Collins & Tsai, LLP became legal counsel to the Trustee.

f.      On December 4, 2018, the Trust notified the 2016 Insurers and the 2017 Insurers that the Trust intended to intervene in the Wasik Case and proposed mediation.[13]  In February

---

[7] Ex. 16, Complaint, *Wasik v. Mariano*, C.A. 12953-VCL (Del. Ch.).
[8] Ex. 17, First Amended Complaint, *Wasik v. Mariano*, C.A. 12953-VCL (Del. Ch.).
[9] *Id.*
[10] Ex. 18, Second Amended Complaint, *Wasik v. Mariano*, C.A. 12953-VCL (Del. Ch.).
[11] Ex. 19, Letter from Terry Coleman, Ernst Csiszar, and Glenn Hibler, September 28, 2017.
[12] Ex. 20, Letter from National Union, October 13, 2017.
[13] Ex. 21, Letter from the Trust, December 4, 2018.

2019, the Trust, the defendants in the Wasik Case, the 2016 Insurers, and the 2017 Insurers participated in a full-day mediation with Robert Meyer. The mediation did not produce a settlement.

g.    On April 30, 2019, the Trust made a settlement demand for the claims asserted in the Wasik Case, seeking payment under the 2016 Policies and the 2017 Policies.[14]  The 2017 Directors, in turn, demanded that the 2017 Insurers provide coverage and pay the Trust's settlement demand.[15]  The 2017 Insurers declined to cover liability or even to pay the defense costs of the 2017 Directors.[16]

h.    On November 19, 2019, the Trust's claims were severed from the Wasik Case.  On November 20, 2019, the Trust filed a new lawsuit against Patriot's former directors and officers (the "Trust Case").[17]  In the Trust Case, the Trust asserted claims against individuals who served as a director or officer of Patriot during 2016 (the "2016 Directors"), as well as claims against each of the 2017 Directors.

i.    Because the 2017 Insurers had denied coverage, the 2017 Directors retained Alan Wachs of Smith, Gambrell & Russell, LLP ("Smith Gambrell") to serve as their coverage counsel. On May 8, 2020, the Trust and Smith Gambrell entered into an agreement, pursuant to which the Trust agreed to pay Smith Gambrell's hourly fees on a discounted basis—at approximately 75% of Smith Gambrell's standard rates—subject to a $150,000 cap (the "Smith Gambrell Fee Agreement").[18]  Additionally, if the Trust recovered a payment from the 2017 Policies in excess

---

[14] Ex. 22, Letter from the Trust, April 30, 2019.
[15] Ex. 23, Letter from Jeffrey Rohr, Michael Purcell, Austin Shanfelter, Quentin Smith, Christopher Pesch, Charles Walsh, John Del Pizzo, Todd Wilson, Michael Corey, and James O'Brien, May 17, 2019.
[16] Ex. 24, Letter from National Union, June 28, 2019.
[17] Ex. 25, Complaint, *Kravitz v. Mariano*, C.A. 2019-0934-JTL (Del. Ch.).
[18] Ex. 26, Agreement between the Trust and Smith Gambrell, May 8, 2020.  This agreement was amended on October 15, 2020.  Ex. 27, Agreement between the Trust and Smith Gambrell, October 15, 2020.

of $1 million, the Trust agreed to make an additional payment to Smith Gambrell equal to the total amount of Smith Gambrell's compensation at the discounted hourly rates.[19]

j.      On May 6, 2020, the Trust entered into a settlement agreement with three of the 2016 Directors for $2.95 million, which was paid from the proceeds of the 2016 Policies.[20]  On June 29, 2020, the Trust entered into a settlement agreement with the remaining 2016 Directors for $11 million, which was paid from the remaining proceeds under the 2016 Policies.[21]  These settlement agreements exhausted the 2016 insurance coverage.

k.      The Trust and the 2017 Directors executed a non-objection agreement, which was deemed entered into as of June 18, 2020. (the "Non-Objection Agreement").[22]  In his report, Professor Alfieri incorrectly asserts that the Trust and the 2017 Directors executed the Non-Objection Agreement on June 18, 2020.[23]  On the contrary, the Non-Objection Agreement was not fully executed by the parties until June 21, 2020.[24]  Pursuant to the Non-Objection Agreement, the 2017 Directors agreed not to object to the Trust's settlement agreements with the 2016 Directors.[25]  Additionally, the Non-Objection Agreement required the 2017 Directors to again make a demand on the 2017 Insurers for coverage and a defense of the claims asserted against them in the Trust Case.[26]  If the 2017 Insurers again refused to provide coverage and a defense, then the Non-Objection Agreement required the 2017 Directors to file a coverage action against the 2017

[19] Ex. 26, Agreement between the Trust and Smith Gambrell, May 8, 2020; Ex. 27, Agreement between the Trust and Smith Gambrell, October 15, 2020.
[20] Ex. 28, Settlement Agreement, May 6, 2020.  The settling defendants were Michael Corey, Christopher Pesch, and Quentin Smith.
[21] Ex. 29, Settlement Agreement, June 29, 2020.  The settling defendants were Sean Bidic, John Del Pizzo, James O'Brien, Joyce Predmesky, David Quigley, John Rearer, Elvis Rivera, Austin Shanfelter, Thomas Shields, and Todd Wilson.
[22] Ex. 30, Agreement Not to Object, June 18, 2020.
[23] Ex. 31, Report of Expert Witness Anthony V. Alfieri at 9.
[24] Ex. 32, Email from Eric Madden, June 20, 2020; Ex. 33, Email from Alan Wachs, June 21, 2020; Ex. 34, Email from Alan Wachs, June 21, 2020; Ex. 35, Email from Alan Wachs, June 21, 2020; Ex. 36, Email from Alan Wachs, June 21, 2020.
[25] Ex. 30, Agreement Not to Object, June 18, 2020, at 4.
[26] Id.

Insurers and participate in a mediation with the Trust to negotiate "in good-faith to determine an appropriate and reasonable risk-weighted settlement amount."[27] This settlement amount would be included in a draft version of a *Coblentz* agreement that was attached to the Non-Objection Agreement.[28]

l.      On June 18, 2020, Joseph Smick of Skarzynski Marick & Black LLP, counsel for one of the 2016 Insurers, emailed Mr. Madden and asked: "Would the Litigation Trust agree to settle and release claims against <u>all</u> remaining Insureds (defendants, including what you define to be the 2016 Directors and 2017 Directors) as part of a global settlement of all pending matters in exchange for the balance of the 2016 insurance policy limits?"[29] In that same email, Mr. Smick also asked: "If the Litigation Trust's answer to the above question is no, would the Litigation Trust agree to settle and release claims against all remaining Insureds (defendants) in complete settlement of the Litigation Trust's claims against them?"[30]

m.      The next day, on June 19, 2020, Mr. Madden responded via email saying that the Trust's answer to both questions was "no" (the "June 19 Email").[31] Mr. Smick then emailed defense counsel for the 2016 Directors and the 2017 Directors informing them of the Trust's answer, saying: "Eric Madden has officially confirmed that his client will not accept the remaining 2016 policy limits for (1) a global settlement all pending cases [including some TBD set-aside for future Hedge Fund defense costs] or (2) a settlement on behalf of all remaining defendants in the Trustee's actions [Delaware Chancery action and remaining individual actions]."[32]

---

[27] *Id.* at 4–6.
[28] *Id.* at Ex. A.
[29] Ex. 37, Email from Eric Madden, June 19, 2020.
[30] *Id.*
[31] *Id.*
[32] Ex. 38, Email from Joseph Smick, June 19, 2020.

n.      On September 24, 2020, the Trust made a demand on the 2017 Directors for the remaining proceeds under the 2017 Policies.[33]  The 2017 Directors, in turn, demanded that the 2017 Insurers provide coverage and a defense for the Trust Case under the 2017 Policies.[34]  In October 2020, the 2017 Insurers again denied coverage and refused to provide a defense under the 2017 Policies.[35]

o.      As a result of the 2017 Insurers' denial of coverage, on November 2, 2020, the Trust and the 2017 Directors participated in a mediation with Robert Meyer, who had led prior mediation sessions regarding Patriot-related litigation.[36]  Both the Trust and the 2017 Directors submitted mediation statements prior to the mediation.  The result of the mediation was two *Coblentz* agreements (collectively, the "*Coblentz* Agreements")—one with Coleman, Csiszar, and Hibler for $5.95 million,[37] and the other with Rohr and Purcell for $24.05 million.[38]

p.      On December 18, 2020, the Trust filed a Rule 9019 motion seeking the Bankruptcy Court's approval of the *Coblentz* Agreements.[39]  Attached to that motion was a declaration from Mr. Meyer.[40]  In that declaration, Mr. Meyer declared: "The purpose of this mediation, as I understood it, was for the parties to negotiate in good faith to determine an appropriate and reasonable risk-weighted settlement amount for each of the Settling Defendants."[41]  Mr. Meyer

---

[33] Ex. 39, Letter from the Trust, September 24, 2020.
[34] Ex. 40, Letter from Terry Coleman, Ernst Csiszar, Glenn Hibler, Michael Purcell, and Jeffrey Rohr, September 25, 2020.
[35] Ex. 41, Letter from National Union and Illinois National Insurance Company, October 5, 2020; Ex. 42, Letter from Argonaut Insurance Company, October 5, 2020; Ex. 43, Letter from XL Specialty Insurance Company, October 5, 2020; Ex. 44, Letter from Westchester Fire Insurance Company and RLI Insurance Company, October 5, 2020; Ex. 45, Letter from RSUI Indemnity Company, October 6, 2020.
[36] Ex. 46, Mediation Statement of the Trust, October 28, 2020; Ex. 47, Mediation Statement of Terry Coleman, Glenn Hibler, and Ernst Csiszar, October 28, 2020; Ex. 48, Mediation Statement of Jeffery Rohr and Michael Purcell, October 28, 2020.
[37] Ex. 49, Settlement Agreement with Terry Coleman, Glenn Hibler, and Ernst Csiszar, December 8, 2020.
[38] Ex. 50, Settlement Agreement with Jeffery Rohr, and Michael Purcell, December 8, 2020.
[39] Ex. 51, Rule 9019 Motion to Approve *Coblentz* Agreements, December 18, 2020.
[40] Ex. 52, Declaration of Robert A. Meyer in Support of Rule 9019 Motion to Approve *Coblentz* Agreements, November 23, 2020.
[41] *Id.* at 3.

further declared: "Based on my experience as a former commercial litigator and full-time mediator, I believe that these settlements are the product of arms-length, good-faith negotiations between the parties and represent a fair and reasonable settlement with respect to the underlying claims."[42] On January 14, 2021, the Bankruptcy Court granted the Trust's motion and approved the *Coblentz* Agreements.[43]

## IV.   A Brief Statement of My Opinions

In my opinion, Professor Alfieri's conclusion that the *Coblentz* Agreements "were the result of bad faith conduct" is incorrect and should carry no weight with the Court. Professor Alfieri's conclusion is based entirely upon what, in my opinion, is a seriously inaccurate articulation and misapplication of the legal ethics and professional responsibility principles found in both the Model Rules and the *Restatement*. In my opinion, Professor Alfieri has not identified any violation of the Model Rules committed by any party, or any counsel to any party, during the negotiation, drafting, or execution of the *Coblentz* Agreements. Nor does Professor Alfieri identify any misrepresentation of fact or instance or any lack of truthfulness, fairness, cooperation, or honest dealing that would violate the Model Rules or the *Restatement*.

My opinions do not address the reasonableness or good faith of the *Coblentz* Agreements because those issues are completely and thoroughly covered by the Declaration of Robert A. Meyer and the Expert Report of Melanie E. Damian, with which I do not disagree. Rather, my expertise in this matter, and therefore my opinions, are limited to legal ethics, professional responsibility, and the application of the Model Rules and the *Restatement* to the facts of this case.

---

[42] *Id.* at 5.
[43] Ex. 53, Order Granting Rule 9019 Motion to Approve *Coblentz* Agreements, January 14, 2021.

## V.     Explanation of My Opinions

### A.     Professor Alfieri Omits Important Elements of the Legal Ethics and Professional Responsibility Standards Relevant to this Matter.

The central basis for Professor Alfieri's opinion is what he describes as a failure to disclose certain facts to the 2016 Insurers and the 2017 Insurers, counsel to those Insurers, the mediator, and the Bankruptcy Court. These charges are set forth in Professor Alfieri's report in a series of fifteen statements, each followed by an italicized description of one or more things that were allegedly left undisclosed.[44] Professor Alfieri then uses these examples of allegedly undisclosed facts to try to construct a violation of the law governing lawyers and the rules of professional conduct that he calls "a lack of truthfulness, fairness, cooperation, and honest dealings during all relevant time periods."[45] As discussed below, in my opinion, Professor Alfieri has failed to identify any duty to disclose the alleged facts he has identified or provide any other analysis to support his opinions.

To reach his conclusion, Professor Alfieri asserts that "[t]he law of misrepresentation applies to lawyers."[46] That proposition was true when I helped express it in *Restatement* § 98, Comment *c*, and it is true today.[47] It is also true that a "statement can also be false because [it is] only partially true."[48] And, "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation."[49]

---

[44] Ex. 31, Report of Expert Witness Anthony V. Alfieri at 8–12.
[45] *Id.* at 23.
[46] Restatement (Third) of the Law Governing Lawyers § 98 cmt. *c* (Am. Law Inst. 2000).
[47] Model Rules of Pro. Conduct r. 4.1(a) (Am. Bar Ass'n 2022) is the counterpart to *Restatement* § 98.
[48] Restatement (Third) of the Law Governing Lawyers § 98 cmt. *c* (Am. Law Inst. 2000).
[49] Model Rules of Pro. Conduct r. 8.4(c) (Am. Bar Ass'n 2022).

In my opinion, however, Professor Alfieri goes wrong – and himself tends to mislead – by omitting passages in the *Restatement* and the Model Rules that give context and meaning to the propositions he asserts. Four examples will make my point.

First, Professor Alfieri quotes *Restatement* § 98, Comment *c*, but omits *Restatement* § 98, Comment *b*, which gives substance to the concept of misrepresentation and provides the context in which to evaluate whether a statement is indeed misleading. Comment *b* makes clear:

> "The law governing misrepresentation by a lawyer includes . . . the law of misrepresentation in tort law and of mistake and fraud in contract law, and procedural law governing statements by an advocate.
>
> . . .
>
> "This Section applies equally to statements made to a sophisticated person, such as to a lawyer representing another client, as well as to an unsophisticated person. However, the sophistication in similar transactions of a person to whom a representation is made is relevant in determining such issues as the reasonableness of the person's reliance on the representation."[50]

The point of Comment *b* is that the law governing lawyer misrepresentation is rooted in other bodies of law drawn from torts, contracts and litigation ethics. It is also to say that the integrity of a lawyer's representation can only be assessed in its context. To whom was the lawyer speaking? What could the lawyer assume the listener already knew? Would the statement be considered fraudulent if it arose in a commercial setting? As my report will go on to explain, much of Professor Alfieri's report is utterly devoid of any such focus and thus tends to be misleading rather than reliable.

Second, Professor Alfieri focuses so completely on alleged obligations of disclosure that he ignores Model Rule 1.6(a), the familiar and very broad requirement that:

> "A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly

---

[50] Restatement (Third) of the Law Governing Lawyers § 98 cmt. b (Am. Law Inst. 2000).

authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)."[51]

In the case at bar, the point of Model Rule 1.6(a) is that lawyers are required to keep their clients' plans and activities confidential unless and until it is in their client's interest to have the lawyer disclose the information. To be sure, if the lawyer speaks for the client about a subject, the lawyer may not make a false statement of material fact or tell a half-truth. But the fundamental obligation of the lawyer is to protect the client's confidential information, not to become a public dispenser of information to the client's opponents.

Third, while he quotes part of Model Rule 4.1, Comment 1, Professor Alfieri has utterly failed to quote the portion relevant to this case that makes the point I have made above. The very first sentence of Comment 1 states:

> "A lawyer is required to be truthful when dealing with others on a client's behalf, **but [the lawyer] generally has no affirmative duty to inform an opposing party of relevant facts.**"[52]

Even a moment's reflection makes it obvious that Model Rule 4.1, Comment 1, is correct. A lawyer's duty to tell the truth does not stand alone. It exists alongside the lawyer's duty to protect his or her client's confidential information. In my opinion, if a lawyer speaks to a point at all, the lawyer must convey information that is not misleading. The lawyer does not, however, have a duty to speak about other matters that the lawyer's listener – frequently the lawyer's opposing counsel – might have wished the lawyer would have gone on to address.

---

[51] Model Rules of Pro. Conduct r. 1.6(a) (Am. Bar Ass'n 2022). The reference to "paragraph b" is to situations where a lawyer may make disclosure without client consent or direct benefit. Paragraphs b (2) & b (3) refer to disclosure to prevent or rectify a client's "crime or fraud" in which the lawyer's services were involved. However one sees the facts of this case, I do not believe anyone is charging a crime or fraud, so I will say no more about Model Rule 1.6(b).
[52] Model Rules of Pro. Conduct r. 4.1, cmt. 1 (Am. Bar Ass'n 2022) (emphasis added).

Fourth, while Professor Alfieri has mentioned Comment 2 to Model Rule 4.1,[53] he again has done so misleadingly. He has failed to cite the portion of Comment 2 that deals with statements made in negotiation settings such as many in this case. Comment 2 recognizes that comments constituting fraud and misrepresentation in litigation involve statements about objective facts and law, not the absence of statements about possible response to future contingencies. Thus, after quoting the first two sentences of Comment 2, Professor Alfieri misleadingly stops, failing to quote the following:

> "Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a **party's intentions as to an acceptable settlement of a claim** are ordinarily in this category . . . ."[54]

Once again, this portion of Model Rule 4.1, Comment 2, is clearly correct and is the key to avoiding endless litigation over whether statements made in the course of negotiations would justify professional discipline, setting aside a settlement, or imposing some other remedy. Professor Alfieri's failure to quote this language is yet another basis for my conclusion that his report should not be given weight by the Court.

The remainder of my report applies what I believe are the correct standards to facts that Professor Alfieri mischaracterizes as involving violations of lawyer professional standards as set out in the *Restatement* and the Model Rules.

### B.   Professor Alfieri Fails to Identify Any Misrepresentation in Eric Madden's Exchange with Joseph Smick in June 2020.

One of Professor Alfieri's principal examples of a serious "misrepresentation" involves the June 18-19, 2020, exchange between Eric Madden, counsel to the Trust, and Joseph Smick,

---

[53] Ex. 31, Report of Expert Witness Anthony V. Alfieri at 19.
[54] Model Rules of Pro. Conduct r. 4.1, cmt. 2 (Am. Bar Ass'n 2022) (emphasis added).

counsel to one of the 2016 Insurers.[55]  In his June 18 Email, Mr. Smick asked whether the Trust would be willing to release all of the 2016 Directors and the 2017 Directors for the remaining proceeds under the 2016 Policies.[56]  The Trust had repeatedly answered that question in the negative ever since the Trust asserted claims against the 2017 Directors.[57]  Mr. Smick's question required a yes-or-no answer; it did not require an essay.  Mr. Madden said that the Trust's answer was still "no."  That answer was directly responsive to Mr. Smick's question, and it was both unambiguous and completely accurate.  By saying that the Trust's answer was still "no," Mr. Madden fully and truthfully answered Mr. Smick's question.

In his attempt to characterize the June 19 Email as a "misrepresentation," Professor Alfieri claims that Mr. Madden's specific answer to Mr. Smick's specific question was "only partially true."  His logic seems to be that failing to make an express statement that the Smith Gambrell Fee Agreement, the draft Non-Objection Agreement,[58] or the draft form *Coblentz* agreement were in existence constituted a statement that they were not in existence.  To say that such an argument is preposterous is an understatement.  No one had asked about the documents in the course of the exchange, and Mr. Madden had a Rule 1.6 duty to his client and no duty at all to Mr. Smick to make any statement at all about such documents.

Furthermore, Professor Alfieri makes no attempt to explain how disclosing the existence of the Smith Gambrell Fee Agreement, the draft Non-Objection Agreement, and draft form

---

[55] Ex. 31, Report of Expert Witness Anthony V. Alfieri at 17–18.

[56] Ex. 37, Email from Eric Madden, June 19, 2020.

[57] Ex. 21, Letter from the Trust, December 4, 2018 ("But, to be clear, because of the limited amount of coverage remaining on the 2016 Policies, any resolution of this dispute will necessarily require a meaningful payment by the insurers under the 2017 Policies, or a significant contribution from the Former D&Os.").

[58] Notably, the Non-Objection Agreement had not been fully executed by the parties as of the date of Mr. Madden's answer.  Mr. Madden sent his answer on June 19, 2020, but the Non-Objection Agreement was not fully executed until June 21, 2020.  *See* Ex. 32, Email from Eric Madden, June 20, 2020; Ex. 33, Email from Alan Wachs, June 21, 2020; Ex. 34, Email from Alan Wachs, June 21, 2020; Ex. 35, Email from Alan Wachs, June 21, 2020; Ex. 36, Email from Alan Wachs, June 21, 2020.  Therefore, the Non-Objection Agreement was not even effective when Mr. Madden sent his answer.

*Coblentz* agreement would have made Mr. Madden's response of "no" any more accurate or truthful. In my opinion, if Mr. Madden had disclosed the existence of the Smith Gambrell Fee Agreement, the draft Non-Objection Agreement, or the draft form *Coblentz* agreement, it would have only confirmed and reinforced Mr. Madden's answer of "no" to Mr. Smick's question.

Similarly, Professor Alfieri does not attempt to explain how the existence of the Smith Gambrell Fee Agreement, the draft Non-Objection Agreement, and the draft form *Coblentz* agreement was in any way material to either the 2016 Insurers or the 2017 Insurers at the time. Professor Alfieri quotes section 71:201.60 of the ABA/Bloomberg Law Lawyers Manual on Professional Conduct for the proposition that "[a] statement is material if it could have significantly influenced the hearer's decision-making process – whether it did nor not."[59]

But I have not seen, and Professor Alfieri has not identified, any serious basis for saying that either the 2016 Insurers or the 2017 Insurers would have acted any differently had they been aware of the existence of those documents. To the contrary, the 2017 Insurers had already repeatedly denied coverage and defense costs to the 2017 Directors, and the 2017 Insurers had long known that the 2017 Directors had retained coverage counsel.[60] And Mr. Wachs testified that Mr. Smick (who represented the penultimate insurer in the 2016 insurance tower) acknowledged that he anticipated that there would be more litigation because the 2017 Directors had not objected to the Trust's settlements with the 2016 Directors.[61] In my opinion, there is no basis to say that Mr. Madden had a duty to disclose the existence of the documents in response to Mr. Smick's question. In my opinion, Mr. Madden's answer "no" to Mr. Smick's question was accurate and more than sufficient under both the *Restatement* and the Model Rules.

---

[59] Ex. 31, Report of Expert Witness Anthony V. Alfieri at 19.
[60] Ex. 54, Email from Eric Madden, June 5, 2019.
[61] Ex. 56, Alan S. Wachs Dep., May 18, 2022, 109:6–17.

**C.    Professor Alfieri Has Not Identified Any Lack of Truthfulness in Statements to the 2016 Insurers, the 2017 Insurers, and the Mediator.**

In my opinion, Professor Alfieri's logic does not get any more persuasive when applied to say that Mr. Wachs, coverage counsel for the 2017 Directors, breached the *Restatement* and Model Rules provisions in connection with his communications with the 2016 Insurers and the 2017 Insurers, and that the Trustee, Mr. Madden, Mr. Wachs, Mr. Bondi, and Mr. Aufses were similarly dishonest in their dealings with Mr. Meyer, the mediator trying to help settle the disputes.  Once again, Professor Alfieri's complaint is about the "deliberate omission" of the Smith Gambrell Fee Agreement in those communications.

Professor Alfieri's opinion about Mr. Wachs is based on a letter dated June 23 in which Mr. Wachs informed the 2016 Insurers that the 2017 Directors did not object to the exhaustion of the 2016 Policies (the "June 23 Letter").  As I have discussed above, the June 23 Letter must be read in context—a context entirely ignored by Professor Alfieri.  When Mr. Wachs sent the June 23 Letter to the 2016 Insurers, the remaining coverage under the 2016 Policies was rapidly dwindling, the 2017 Insurers were denying coverage of the 2017 Directors, and the June 19 Email (along with prior communications) had already informed the 2016 Insurers that the Trust was unwilling to enter into a global settlement for the amounts that remained on the 2016 Polices.  This context should have caused the 2016 Insurers (and the 2017 Insurers to the extent they received the letter) to know that the Trust was likely going to continue to seek appropriate recovery from the 2017 Insurers.  And, based upon the testimony of Mr. Wachs, as set forth above, Mr. Smick did, in fact, anticipate that litigation would proceed against the 2017 Insurers.[62]

Moreover, the June 23 Letter simply states that the 2017 Directors did not object to the exhaustion of coverage under the 2016 Policies.  That was a true statement when made and, as

---

[62]*See* text accompanying n. 61, *supra*.

with the June 19 Email, in my opinion, Professor Alfieri cannot explain how the disclosure of the Smith Gambrell Fee Agreement, the Non-Objection Agreement, or the draft form *Coblentz* agreement would have made that statement any more true.

Further, I have seen no evidence in the record, and Professor Alfieri has not identified any evidence, that either Mr. Smick or Mr. Kuffler ever asked Mr. Wachs or any counsel representing the 2017 Directors to explain why the 2017 Directors were not objecting to the exhaustion of coverage under the 2016 Policies when those directors were not getting a release. This failure to ask the natural question supports my conclusion that they should have already known the answer through context and that they did, in fact, know the answer and acted accordingly. As such, in my opinion, their knowledge of any of the agreements that Professor Alfieri claims that Mr. Wachs failed to disclose could not have been material. In my opinion, Mr. Wachs's letter should be seen as a truthful statement of his clients' position that misled no one. He was not required by any ethical standard to disclose the existence of the Smith Gambrell Fee Agreement, the Non-Objection Agreement, or the draft form *Coblentz* agreement to either the 2016 Insurers or the 2017 Insurers until it was in his clients' interest to do so. Therefore, it is my opinion that Mr. Wachs did not violate the Model Rules, or any legal ethical standards, by sending the June 23 Letter.

Finally, I disagree with Professor Alfieri when he opines that the Trustee, Mr. Madden, Mr. Wachs, Mr. Bondi, and Mr. Aufses violated Rule 4.1 of the Model Rules by not disclosing the Smith Gambrell Fee Agreement (1) in their mediation statements for the November 2020 mediation; (2) to Mr. Meyer during the November 2020 mediation; (3) in the proposed version of Mr. Meyer's declaration; or (4) in the final version of Mr. Meyer's declaration. As with his other opinions, Professor Alfieri's opinions with respect to these four alleged ethical violations are conclusory. Professor Alfieri does not even attempt to explain how Mr. Meyer was in any

18

way misled by not knowing about the Smith Gambrell Fee Agreement or how the knowledge of the Smith Gambrell Fee Agreement was in any way material to Mr. Meyer or the mediation.

Furthermore, Professor Alfieri does not attempt to identify any duty that the Trustee, Mr. Madden, Mr. Wachs, Mr. Bondi, or Mr. Aufses had to disclose the Smith Gambrell Fee Agreement. In my opinion, there is no such duty and, contrary to Professor Alfieri's opinion, the evidence in this case suggests that knowledge of the Smith Gambrell Fee Agreement was not, in fact, material to Mr. Meyer or the mediation. First, all testimony in this case suggests that Mr. Wachs did not materially participate in the mediation.[63] Second, during his deposition, Mr. Meyer could not articulate how knowledge of the Smith Gambrell Fee Agreement would have altered the outcome of the mediation or significantly influenced his decision-making process.[64]

### D.   The Smith Gambrell Fee Agreement Did Not Violate Prohibitions of the *Restatement* or the Model Rules.

Because so much of Professor Alfieri's report is ultimately based on the alleged failure of various persons to disclose the Smith Gambrell Fee Agreement,[65] it seems appropriate to ask whether there was something ethically wrong with that agreement. In my opinion, the answer is clearly "no."

The 2017 Directors had retained counsel to defend them against personal liability to the Trust, but because the 2017 Insurers had denied them expected insurance coverage, they needed separate "coverage counsel" to seek reimbursement of defense costs and the liability they might face. Alan Wachs of Smith Gambrell agreed to assume that role, and the Trust agreed to pay his fee. The Smith Gambrell Fee Agreement provided that Mr. Wachs's firm was to be paid

---

[63] *See, e.g.*, Ex. 56, Alan S. Wachs Dep., May 18, 2022, 115:21–116:7; Ex. 57, Bradley J. Bondi Dep., May 21, 2022, 104:13–105:13; Ex. 58, Robert A. Meyer Dep., May 23, 2022, 17:7–10, 19:3–20.

[64] *See* Ex. 58, Robert A. Meyer Dep., May 23, 2022, 41:24–44:20.

[65] Of the 15 charges of nondisclosure on pages 6-12 of Professor Alfieri's report, nine relate to nondisclosure of the Smith Gambrell Fee Agreement. The charges then occupy much of pages 15–21 of the Alfieri report.

significantly-reduced hourly rates for its work, subject to a $150,000 cap on its total hourly fees. If the Trust recovered at least $1 million from the 2017 Insurers, the amount paid to Mr. Wachs's firm would be doubled.

The fee arrangement involves each of the traditional approaches to fee setting.[66] The fundamental metric for determining the fee is the amount of professional time devoted to the clients' matter, but there is a cap reminiscent of a fixed fee on the Trust's total exposure. Finally, there is the incentive of an additional fee if the firm's work at discounted rates produces valuable results. One could hardly imagine a fee agreement better tailored to align the interests of the 2017 Directors, the Trust, and their respective lawyers. In my opinion, the Smith Gambrell Fee Agreement does not violate principles of either the *Restatement* or the Model Rules.

One might ask whether it is inherently unethical for one litigant to pay another party's— even an opposing party's—attorney fees. The short answer again is "no." In the Model Rules, the issue is addressed in Model Rule 1.8(f).[67] The relevant *Restatement* provision is § 134.[68] What all these provisions acknowledge is that if such arrangements were inherently improper, one would never see an insurance company providing a lawyer for an insured, for example, or an employer paying a lawyer to protect an employee from liability.

For such an arrangement to be proper, it is necessary that a lawyer compensated by a third party be guaranteed the freedom to exercise independent professional judgment on behalf of the client or clients.[69] The Smith Gambrell Fee Agreement contains a provision wherein Smith Gambrell and the Trust acknowledged and agreed that "(a) the Trustee shall not attempt to

---

[66] Methods of structuring lawyer compensation agreements have been of great interest over the last 20 years or so, focusing on ways to change exclusive reliance on hourly-rate billing and attempting to create ways to align better the interests of lawyers and clients. *See, e.g.*, American Bar Association, Commission on Billable Hours Report (2002); American Bar Association, Commission on the Future of Legal Services (2016).
[67] Model Rules of Pro. Conduct r. 1.8(f) (Am. Bar Ass'n 2022).
[68] Restatement (Third) of the Law Governing Lawyers § 134 (Am. Law Inst. 2000).
[69] Model Rules of Pro. Conduct r. 1.8(f) (Am. Bar Ass'n 2022).

interfere with [Smith Gambrell's] exercise of independent judgment in favor of its clients; and (b) [Smith Gambrell's] professional obligations shall run solely in favor of its clients regardless of who pays the fees for the representation."[70] It is also necessary that the clients understand and consent to having the Trust pay the fees of their coverage counsel. In my opinion, it is clear in this case that the 2017 Directors understood and welcomed Mr. Wachs pursuing their interest at the Trust's expense.[71]

Mr. Wachs's testimony in this case suggests that the Smith Gambrell Fee Agreement permitted him complete professional freedom to pursue his clients' interest. Mr. Wachs testified that he would not have acted any differently or advised his clients any differently had they been paying for his services out of pocket,[72] and I have seen no evidence to suggest otherwise. Similarly, Mr. Meyer and Mr. Bondi testified that they saw no evidence to suggest that Mr. Wachs was not acting in the best interests of his clients.[73]

In additional to professional independence, *Restatement* § 34 requires that a lawyer's fee be "reasonable in the circumstances," while Model Rule 1.5(a) forbids an "unreasonable fee."[74] Nothing in what I have seen suggests that the Smith Gambrell Fee Agreement was unreasonable under these standards. The initial hourly rate was discounted from rates paid by other Smith Gambrell clients, while what Professor Alfieri calls the "bonus" arrangement would almost certainly yield a fee well below rates commonly charged under contingent fee contracts. Indeed,

---

[70] Ex. 26, Agreement between the Trust and Smith Gambrell, May 8, 2020, at 2; Ex. 27, Agreement between the Trust and Smith Gambrell, October 15, 2020, at 2.

[71] Ex. 55, Alan S. Wachs Dep., March 31, 2022, 16:5–22; Ex. 60, Email from Alan Wachs, May 8, 2020.

[72] *See* Ex. 56, Alan S. Wachs Dep., May 18, 2022, 121:11–21; *see also* Fl. St. Bar Rule 4-5.4 cmt. ("Where someone other than the client pays the lawyer's fee or salary . . . that arrangement does not modify the lawyer's obligation to the client.").

[73] Ex. 58, Robert A. Meyer Dep., May 23, 2022, 39:14–22, 40:18-24, 46:2–10; Ex. 57, Bradley J. Bondi Dep., May 21, 2022, 127:1–17.

[74] Restatement (Third) of the Law Governing Lawyers § 34 (Am. Law Inst. 2000); Model Rules of Pro. Conduct r. 1.5(a) (Am. Bar Ass'n 2022).

the Smith Gambrell Fee Agreement would yield, at most, a total fee equal to about 1.5 times the firm's standard hourly rates, a figure Florida courts have previously found reasonable.[75]

In my opinion, the Smith Gambrell Fee Agreement did not create an excessive fee or improper incentives for Smith Gambrell that would be material in any of the settings in which Professor Alfieri criticizes that agreement not being disclosed.

### E.   None of the Additional So-Called "Indicators of Bad Faith" Identified by Professor Alfieri Constitutes an Ethical Violations.

So far in this report, I have addressed the core issues raised by Professor Alfieri's analysis. However, in roughly the last half of his report,[76] Professor Alfieri organizes his analysis around issues of bad faith, cooperation, honest dealing, and procedural fairness, so I now turn to issues raised under those headings, trying not to repeat issues I have addressed earlier.

Although I leave to other experts the ultimate issue of bad faith that is part of any *Coblentz* analysis, I begin with Professor Alfieri's so-called "indicators of bad faith."  I address Professor Alfieri's key charges, quoting his illustration and then responding to it.  Paragraph 9(l) of Professor Alfieri's report, for example,[77] asserts:

> "In May and June 2020, the Trustee, *Coblentz* Directors, Madden, Wachs, Bondi, and Aufses negotiated and drafted a Non-Objection Agreement with respect to the Trust, the 2016 Directors, and the 2016 Policies as well as the form of a *Coblentz* Agreement with respect to the 2017 Policies and the 2017 Insurers, relegating the settlement amount to be determined by mediation. *See* PNI Litigation Trust 0164290–0164312. *Neither the Trustee, nor Madden, nor Wachs, nor Bondi, nor Aufses disclosed the Non-Objection Agreement or the Coblentz Agreement to the 2016 Insurers or the 2017 Insurers in May and June 2020.*"

---

[75] *See Joyce v. Federated Nat'l Ins. Co.*, 228 So. 3d 1122, 1125 (Fla. 2017) (explaining that coverage counsel is entitled to a contingency fee multiplier as follows: "[i]f the trial court determines that success was more likely than not at the outset, it may apply a multiplier of 1 to 1.5; if the trial court determines that the likelihood of success was approximately even at the outset, the trial judge may apply a multiplier of 1.5 to 2.0; and if the trial court determines that success was unlikely at the outset of the case, it may apply a multiplier of 2.0 to 2.5") (quoting *Standard Guar. Ins. Co. v. Quanstrom*, 555 So. 2d 828, 834 (Fla. 1990)).

[76] Ex. 31, Report of Expert Witness Anthony V. Alfieri at 13-23.

[77] *Id.* at 15-17. The quoted language is from page 8 of the Alfieri report.  Closely related charges are found in paragraphs 9(m), 9(o) and 9(q) at pages 8-9 of the report.

Once again, in my opinion, Professor Alfieri is wrong to suggest that the Trustee, Mr. Madden, Mr. Wachs, Mr. Bondi, and Mr. Aufses violated the Model Rules by not disclosing the draft Non-Objection Agreement or the draft form *Coblentz* agreement to the 2016 Insurers or the 2017 Insurers in May and June 2020.  As I have acknowledged, a lawyer has a duty to tell the truth when he or she speaks.[78]  In my opinion, however, Professor Alfieri's effort to turn that duty into a duty to speak to persons who are not involved in a given conversation is entirely unjustified.

By his own description of the situation at the time, the drafting of the initial draft form *Coblentz* agreement was being done by persons about whom the 2017 Insurers had disclaimed any responsibility or interest.  No general obligation of legal ethics creates an affirmative duty to initiate conversations about drafting efforts with persons whose interests differ from those of a lawyer's client.  Indeed, one of the most basic lawyer fiduciary duties to a client is the Model Rule 1.6(a) obligation not to disclose information related to the client's representation to third parties unless such disclosure is part of an attempt to serve the client's interest.[79]  Here, in my opinion, there was neither actual nor implied authority to make any such disclosure.

Furthermore, the draft Non-Objection Agreement and draft form *Coblentz* agreement seem in no way material to the 2016 Insurers, and they certainly did not prejudice those Insurers.  Indeed, if anything, the Non-Objection Agreement helped to ensure that any liability of the 2016 Insurers would be capped at the coverage limits of the policies by permitting them to exhaust the coverage under the 2016 Policies without risk of a bad faith claim from the 2017 Directors.

During May and June 2020, the Trustee and the 2017 Directors, through their counsel, were negotiating the terms of the Non-Objection Agreement that contemplated the possibility of the

---

[78] Model Rules of Pro. Conduct r. 4.1 (Am. Bar Ass'n 2022); Restatement (Third) of the Law Governing Lawyers § 98 (Am. L. Inst. 2000).
[79] Model Rules of Pro. Conduct r. 1.6(a) (Am. Bar Ass'n 2022).

parties entering into a *Coblentz* agreement if certain conditions were met. In my opinion, however, counsel to the Trust and counsel to the 2017 Directors had no obligation to report the steps in their work to the 2017 Insurers during this period. Each time the 2017 Directors had asked the 2017 Insurers to provide coverage or a defense, they had been rejected. No one misled the 2017 Insurers or uttered only a half-truth; in my opinion, the 2017 Insurers had, in effect, simply withdrawn from the conversation.

Moreover, knowledge of the Non-Objection Agreement or the draft form *Coblentz* agreement was clearly not material to the 2017 Insurers. By May and June 2020, the 2017 Insurers knew, because they had repeatedly been told, that the amounts that remained under the 2016 Policies were insufficient to secure a global settlement.[80]  The 2017 Insurers also knew that the 2017 Directors had retained coverage counsel.[81]  As such, the 2017 Insurers knew that it was likely that a coverage action would be brought against them.

In my opinion, the question whether a coverage action would be brought by the 2017 Directors or by the Trust after the execution of a *Coblentz* agreement should not make a difference to the 2017 Insurers. It would tell them only what they should already have known. Right or wrong, they had made their coverage decision and gave no indication of changing it. Indeed, after the execution of the Non-Objection Agreement, but before the execution of the *Coblentz* Agreements, the 2017 Insurers were given yet other opportunity to provide defense costs to the 2017 Directors (and thereby nullify the Non-Objection Agreement), but they declined to do so. Indeed, after the exhaustion of coverage under the 2016 Policies and before the execution of the *Coblentz* Agreements, the 2017 Insurers filed an action against the 2017 Directors seeking a

---

[80] Ex. 21, Letter from the Trust, December 4, 2018.
[81] Ex. 54, Email from Eric Madden, June 5, 2019.

declaration that their coverage decision was correct.[82]   In other words, the 2017 Insurers likely knew they were facing a coverage action and attempted to get ahead of it by filing an action of their own.

Therefore, it is my opinion that none of the participants in the *Coblentz* process—including the Trustee, the Trustee's counsel, Mr. Wachs, Mr. Bondi, and Mr. Aufses—engaged in conduct "indicating bad faith" that violated any ethical standards by not disclosing the Non-Objection Agreement or the draft *Coblentz* agreement to the 2016 Insurers or the 2017 Insurers in May and June 2020.

Next, as another alleged indication of "bad faith," Paragraph 9(n) of Professor Alfieri's report continues:

> "On May 18, 2020, Wachs asked Madden to send him a draft of the Trust's forthcoming demand letter specific to the remaining non-*Coblentz* Directors for the remaining limits of the 2016 Policies. *See* PNI Litigation Trust 0164346, 0127132. *Neither the Trustee, nor Madden, nor Wachs, nor Bondi, nor Aufses disclosed the Coblentz demand letter draft to the 2016 Insurers or the 2017 Insurers in May 2020.*"

In my opinion, Professor Alfieri's report is wrong to the extent he suggests that the Trustee, Mr. Madden, Mr. Wachs, Mr. Bondi, and Mr. Aufses violated the Model Rules by not disclosing the draft demand letter to the 2016 Insurers or the 2017 Insurers in May 2020.

As a preliminary matter, I understand it to be contested whether the Trustee, or any counsel for the Trustee, ever sent Mr. Wachs, Mr. Bondi, or Mr. Aufses a draft demand letter in May or June 2020.  Although Professor Alfieri cites two emails to suggest that Mr. Wachs was provided with a draft demand letter in May or June 2020, neither of those emails attach a draft of such a letter.

---

[82] Ex. 59, Complaint for Declaratory Judgment, *National Union Fire Insurance Company of Pittsburgh, Pa. v. Purcell* (Fla. Cir. Ct.).

But even if there was such correspondence, as I have repeatedly stated in this report, both the *Restatement* and the Model Rules clearly require a lawyer to protect information relating to a client's representation. A lawyer has no general obligation to give another individual or entity, or that person's lawyer, a description of work that a lawyer is performing on behalf of his clients, even if the other person or entity might believe it would be in its interest to know it.[83]

In any event, even if Mr. Wachs had been sent a draft of a demand letter, the most that he (or Mr. Bondi and Mr. Aufses, to the extent they knew anything about the alleged draft demand letter) could be accused of is failing to inform the 2016 Insurers and the 2017 Insurers of his *belief* that the Trustee intended to send a demand letter to the 2016 defendants and, potentially what that demand *might* be. In my opinion, Mr. Wachs's (and Mr. Bondi's and Mr. Aufses's to the extent applicable) failure to disclose that information does not constitute any breach of professional or legal ethics.

Indeed, none of the counsel to the 2017 Directors made any representation to the 2016 Insurers or 2017 Insurers regarding their belief about the Trustee's intentions, so by definition, they made no misrepresentation that required curing. And it is altogether unclear how Mr. Wachs's belief would have been material to either the 2016 Insurers or 2017 Insurers, even if they were entitled to know it. It surely could not have significantly influenced the 2017 Insurers' decision-making because the alleged draft demand was not directed to them, and the 2016 Insurers could not have done anything with the information because no demand had actually been made in May 2020 to which a response was required.

---

[83] Indeed, Model Rule 1.6 was amended in 2012 to add subsection (c) and provide expressly: "(c) A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client." The amendment was adopted primarily to address issues of encryption and other special issues of data security, but the amendment assumed and reinforced the general obligation to keep client information confidential and disclose it when in the client's interest or under the limited conditions in Rule 1.6(b).

Therefore, it is my opinion that none of the participants in the *Coblentz* process—including the Trustee, the Trustee's counsel, Mr. Wachs, Mr. Bondi, and Mr. Aufses— "indicated bad faith" or violated the Model Rules, or any ethical rules, by not disclosing the alleged draft demand letter to the 2016 Insurers or the 2017 Insurers in May 2020.

Next, Paragraph 9(t) of Professor Alfieri's Report asserts:

> "In June 2020, Wachs disclosed to Madden communications labeled confidential between and among Smick, Kuffler, the *Coblentz* Directors, and other insureds related to the Trust's June 2, 2020 settlement demand to the non-*Coblentz* Directors. *See* PNI Litigation Trust 0128943–0128947. *Neither the Trustee, nor Madden, nor Wachs, nor Bondi, nor Aufses informed Smick or Kuffler of Wachs's disclosure of communications labeled confidential to Madden.*"

My understanding is that the communication to which Professor Alfieri refers was part of a series of efforts to ensure that the 2016 Directors would be released from further liability while there were still proceeds remaining under the 2016 Policies that could be devoted to that cause. As counsel for the Trustee, Mr. Madden's involvement was required in the same way that it takes at least two sides to reach a settlement in any kind of litigation.[84]

Furthermore, outside of the context of a legal privilege, a confidentiality agreement or a judicial order, the unilateral designation of a communication as "confidential" by an adverse party normally imposes no duty on a lawyer to maintain the confidentiality of that communication when disclosure could contribute to reaching a result in the lawyer's client's interest.[85]

Therefore, in my opinion Professor Alfieri inaccurately finds impropriety in the disclosure of this communication. In my opinion, there is simply no bad faith or ethical violation implicit in

---

[84] I am not aware of evidence that Mr. Wachs did not, in fact, inform Mr. Smick that he would send his e-communication to Mr. Madden. Mr. Wachs testified that he simply does not recall whether he informed Mr. Smick that he was going to pass along the communication. Ex. 55, Alan S. Wachs Dep., March 31, 2022, 205:23–206:1.

[85] A lawyer is, of course, obliged to respect and honor a valid claim that particular information is protected by a legal privilege. Model Rule 4.4(a). Model Rule 4.4(b) goes further and requires a lawyer to "promptly notify" the sender if the lawyer knows that confidential information was "inadvertently sent" to the lawyer. But neither of those sections requires disclosure of receipt under the circumstances here.

not informing Mr. Smick or Mr. Kuffler that Mr. Wachs had disclosed to Mr. Madden a non-privileged communication that an adverse party had labeled "confidential."

**F.      Professor Alfieri Has Not Identified Any Instance of Procedural Unfairness.**

As a further part of his effort to cast doubt on the settlements reached in this case, Professor Alfieri asserts that the mediation process itself was fundamentally flawed because Mr. Meyer was not informed about the Smith Gambrell Fee Agreement. Furthermore, although Professor Alfieri does not expressly argue the point, he insinuates, through his italicized representations of the facts that went undisclosed, that the Bankruptcy Court's approval of the *Coblentz* Agreements was likewise procedurally unfair or otherwise deficient. Specifically, in Paragraph 9(dd)[86] of Professor Alfieri's report, he suggests that the process was unfair because:

> On December 18, 2020, the Trustee filed its Rule 9019 motion to approve the *Coblentz* settlements in the U.S. Bankruptcy Court for the District of Delaware accompanied by the Meyer Declaration. *The Trustee's Rule 9019 Motion makes no mention of the Smith Gambrell Fee Bonus Agreement.*

I will not repeat here my earlier discussion of the Smith Gambrell Fee Agreement and the lack of any ethical obligation to disclose it in the circumstances of this case. Instead, it apparently is Professor Alfieri's opinion that Mr. Meyer's apparent lack of knowledge of the Smith Gambrell Fee Agreement prohibited him from conducting a procedurally fair mediation between the Trust and the 2017 Directors. In my opinion, such a conclusion finds no support in the facts, the *Restatement*, the Model Rules, or good sense.

Professor Alfieri's opinion regarding procedural unfairness is based entirely on his conclusory opinion that Mr. Meyer's knowledge of the Smith Gambrell Fee Agreement would have been material to the mediation process and created an undefined conflict of interest. As

---

[86] Ex. 31, Report of Expert Witness Anthony V. Alfieri at 12. The preceding provision, paragraph 9(cc), of the Alfieri report complains that the Smith Gambrell Fee Agreement was also not disclosed in the *Coblentz* Agreements themselves.

discussed above, Professor Alfieri does not explain how Mr. Meyer's knowledge of the Smith Gambrell Fee Agreement would have been material to him or the mediation, and in my opinion, based upon the testimony in this case, it would not have been. Furthermore, in my opinion, based upon the testimony in this case provided by both Mr. Wachs and Mr. Meyer, there was no conflict of interest that the disclosure of the Smith Gambrell Fee Agreement would have revealed. Mr. Wachs faithfully represented the interests of his clients throughout the entirety of the negotiations that culminated in the *Coblentz* Agreements.[87] And for all the same reasons, the Smith Gambrell Fee Agreement was also, in my opinion, completely immaterial to any aspect of the Bankruptcy Court's approval of the *Coblentz* Agreements and, outside of his italicized statement, Professor Alfieri does not attempt to argue otherwise.

### G.   Professor Alfieri Has Not Identified Any Instance of a Lack of Cooperation or Honest Dealing.

Finally, in my opinion, Professor Alfieri is also wrong when he concludes that the 2017 Directors violated the cooperation clause in the 2017 Policies by negotiating and agreeing to the *Coblentz* Agreements. The 2016 Polices and the 2017 Policies, like many other insurance contracts, required the insured parties to cooperate with their insurers and tender to them the right to manage the defense against liability. The principal reason courts uphold cooperation clauses, and the principal reason lawyers are obliged to honor them, is that when a liability insurer is the entity likely to pay the judgment and bear litigation costs, the insurer should have the ability to make many important litigation decisions.

In support of his opinion, Professor Alfieri notes that the cooperation clause under the 2017 Policies required the 2017 Directors and their counsel to tell the 2017 Insurers about anything that

---

[87] *See supra* Section V.D.

might adversely affect the 2017 Insurers and to not settle any litigation without the 2017 Insurers' prior written consent.

But this was not the usual case. When a liability insurer refuses to assume liability for any losses—or even to pay for the defense of the insured defendants—as happened here with respect to the 2017 Directors and coverage under the 2017 Policies, the cooperation requirement loses its original justification. Ultimately, I understand that to be the basis for permitting persons in the position of the 2017 Directors to invoke the *Coblentz* process to resolve questions of liability and coverage. In my opinion, because the 2017 Insurers abandoned the 2017 Directors, it was both justified and inevitable for the 2017 Directors to take action using the *Coblentz* process. Therefore, in my opinion the 2017 Directors did not improperly fail to cooperate with the 2017 Insurers.[88]

## VI.    Conclusion

Patriot's bankruptcy case and its related litigation were complex and expensive. Insurance companies which sold the company two separate towers of policies and collected two separate sets of premiums to cover liability of corporate directors and officers for two policy years have tried to provide protection for one year, but not both. As explained, I leave it to others to address the insurance issues this case presents.

I have long admired the academic and public service work of Professor Alfieri, whom I first met many years ago. In my opinion, however, Professor Alfieri's opinions in this matter are profoundly distracting and misleading. In my opinion, Professor Alfieri's report in this case incorrectly articulates the Model Rules, misapplies the Model Rules to the facts of this case, and fails to identify any real violation of the Model Rules or the *Restatement*.

---

[88] Notice that this non-cooperation is solely a matter of insurance law that I believe will be the subject of other expert opinion. The *Restatement* and Model Rules create no ethical or legal obligation of lawyer cooperation beyond the general obligations sometimes imposed by civility rules.

From what I have seen in the materials I have reviewed, the work of counsel to the Trustee and counsel to the 2017 Directors in this matter has been professional and creative. It has achieved a way to provide the accurate and fair remedies that the law strives to provide.

My opinions set forth in this report are based upon the facts and information currently known to me. I understand that discovery in this case is ongoing and, as such, I reserve the right to supplement or change any opinion expressed herein based upon the discovery of new facts or additional issues that might be raised.

JUNE 1, 2022
_____
Date

_____
Thomas D. Morgan