## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **PNI LITIGATION TRUST, the duly authorized successor to PATRIOT NATIONAL, INC., et al.** | **Civil Action No. 1:21-cv-21416-DPG** |
| **Plaintiff,** | |
| **v.** | |
| **NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, RSUI INDEMNITY COMPANY, and ARGONAUT INSURANCE COMPANY,** | |
| **Defendants.** | |

## <u>EXPERT WITNESS REPORT OF LARRY GOANOS</u>

I, Larry Goanos, report as follows:

1.     I have been retained as an expert witness for the plaintiff in the lawsuit styled as <u>PNI Litigation Trust, the duly authorized successor to Patriot National, Inc., et al. v. National Union Fire Insurance Company of Pittsburgh, PA, RSUI Indemnity Company, and Argonaut Insurance Company</u>, Civil Action No. 1:21-cv-21416-DPG, pending in the United States District Court for the Southern District of Florida (the "Captioned Lawsuit").

## **QUALIFICATIONS**

2.    A summary of my educational background, qualifications, publications, and professional experience is contained in my *curriculum vitae,* which is attached hereto as **Exhibit 1** and incorporated herein by reference as though fully set forth at length.

3.    I began in the insurance industry in 1989 as an attorney practicing insurance law. I worked at law firms in New York City (D'Amato & Lynch) and Boston (Parker, Coulter, Daley & White) for five years, handling various insurance matters, with an emphasis on coverage issues relating to professional lines insurance claims. I represented clients such as AIG, Chubb, CNA, Continental, Aetna/ERMA, Zurich, CIGNA, RLI, Western World and various Lloyd's of London syndicates, among others.

4.    In 1994, I became the Chief Underwriting Officer of the Financial Institutions Group of AIG subsidiary National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"). In that capacity, I was responsible for, among other things, drafting and editing primary and excess insurance policies, including Directors & Officers ("D&O") Liability Insurance policies and Errors & Omissions ("E&O") Insurance policies; drafting applications,

endorsements, letters of intent and warranty letters; training underwriters on various aspects of insurance underwriting and claims; negotiating coverage and pricing with insurance brokers and insureds; and working with National Union's Claims Department to help resolve complex claim issues.

5.    In 1996, I became an insurance broker with Marsh USA (as it was then called), one of the world's largest insurance brokerages, in its San Francisco, California office. In that capacity, as a licensed California insurance broker, I handled a wide variety of insurance placements. My duties included assessing client needs, soliciting quotes, negotiating terms and pricing with carriers, and structuring complex insurance programs. I worked on some of the largest accounts in the San Francisco office, including Bank of America, Wells Fargo, E*Trade, AmeriTrade, Chevron, Union Bank of California, and Stanford University. I was also a Claims Advocate at Marsh, in which capacity I worked with Marsh clients throughout the Western United States. In that role I explained the claims process, analyzed the merits of individual claims, and assisted in negotiating coverage of claims with insurers.

6.    In 1998, I returned to AIG, where I became the Executive Vice President of National Union's Financial Institutions Group, performing many of the duties that I previously had handled for the company, including drafting policy

wordings and working with the Claims Department to resolve difficult claims. I also assumed greater responsibility for strengthening client and broker relations and ensuring that the group met its financial goals. Additionally, I represented National Union at speaking engagements on various insurance topics throughout the United States.

7.    In 2002, I became a Senior Vice President of the Professional Risk Group of ACE USA (now Chubb). I supervised all management liability (D&O and related products) underwriting for ACE USA, as well as professional liability (E&O) underwriting for financial institutions. In this capacity, I was responsible for overseeing day-to-day operations, including negotiating policy wordings; drafting and editing primary and excess policies; drafting applications, endorsements, letters of intent and warranty letters; training employees on various aspects of insurance underwriting and claims; representing ACE USA at speaking engagements throughout the country; and working with ACE's Claims Department to help resolve complex claims.

8.    In 2005, I returned to Marsh at its New York City headquarters. I obtained my New York State Property and Casualty Insurance Broker's License and became a Managing Director, working with large clients nationwide on a variety of insurance matters.

9.     In 2007, I became the President of Professional Indemnity Agency, Inc. ("PIA"), a wholly owned underwriting subsidiary of HCC Insurance Holdings, Inc. (now known as Tokio Marine HCC). In this role, I oversaw the day-to-day operations of the entire subsidiary, including the Claims and Underwriting units. PIA underwrote a wide variety of insurance products.

10.    In 2008, I authored a book, "*Claims Made and Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance,*" [New York: Soho Publishing, 2008; 376 pages]. I interviewed over 400 individuals about various aspects of the insurance industry while performing research for the book. To date, approximately 3,000 copies have been sold and the book has been translated into Japanese and published in Japan. *Claims Made and Reported* has received praise from many insurance executives, including Warren Buffett.

11.    In 2010, I founded Andros Risk Services, LLC, an independent insurance consulting firm. Among other services that I perform are: 1) Drafting policies for insurance carriers; 2) Providing training to insurance company Claims and Underwriting units, insurance brokerages, other insurance consultants, and law firms; 3) Acting as an outsourced insurance risk manager; 4) Conducting audits of insurance underwriting and claims operations; 5) Conducting

benchmarking analyses to compare insurance programs for clients against their peers; 6) Critiquing and analyzing insurance programs; 7) Acting as an insurance coverage arbitrator; and 7) Serving as a litigation consultant and expert witness in insurance disputes.

12.     In my capacity as an independent consultant, I have served as an expert witness in more than 200 cases in state and federal courts nationwide and internationally. I have never been disqualified as an expert nor has my testimony ever been disallowed. I have also served as an arbitrator in an insurance coverage dispute.

13.     In 2014, I authored a book titled "*D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach,*" [San Diego: Wells Media, 2014, 214 pages]. This book discusses technical coverage aspects of Directors and Officers Liability Insurance and was praised by many insurance industry executives, including, as with my first book, Warren Buffett. It is the best-selling book in its publisher's history.

14.     I was the founding Dean of The School of Professional Lines Claims within the Claims College sponsored by The Claims and Litigation Management Alliance ("The CLM") from July of 2012 until September of 2015. The Claims College offers courses on best practices in claims handling for

insurance professionals and attorneys. I designed Claims courses with my executive committee which was comprised of senior claims executives from major carriers. I also taught, and still teach, classes to a student body consisting of Claims professionals from a wide array of carriers, as well as in-house and outside counsel. The CLM, arguably the insurance industry's leading claims-focused organization, has a membership of more than 40,000 individuals, 2,000 law firms and 800 insurance companies.

15. I was the president and chief underwriting officer of APRI Group, Inc. from May 2015 until November 2016. APRI Group, Inc. was an independent managing general underwriter (MGU) that acted as an outsourced underwriting arm of insurance carriers.

16. In 2021, I authored a book titled, "*Professional Lines Insurance: An Oral History,*" [San Diego: Wells Media, 2021, 425 pages]. This book provides a history and overview of professional lines insurance. The book's Introduction was written by Maurice R. "Hank" Greenberg.

17. In summary, I have over 30 years of insurance industry experience as: 1) An outside attorney representing a variety of carriers in claims matters; 2) An insurance company senior manager overseeing claims and underwriting units; 3) An insurance broker (formerly licensed in all 50 states) representing client

companies of all sizes; 4) The president of two companies underwriting insurance on behalf of insurers; 5) Dean of an insurance school dedicated to teaching best practices in claims handling; and 6) An independent insurance consultant providing services to insurance carriers, insurance brokerages, policyholders and other clients.

## STATEMENT OF COMPENSATION

18.   I am being compensated at a rate of $950.00 per hour ($665.00 per hour for travel time) and my compensation is not contingent in any way on the outcome of this matter.

## PUBLICATIONS AND PRIOR TESTIMONY

19.   A listing of insurance publications that I have authored during the previous ten years, as well as a listing of my testimony as an expert witness in the last four years, is attached as **Exhibit 2** of this report.

## MATERIALS REVIEWED

20.   I have reviewed the materials listed in the attached **Exhibit 3** of this report.

## FACTUAL BACKGROUND

21.   In 2016, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued its Directors and Officers Liability Insurance ("D&O") Policy No. 06-185-94-19 to Patriot National, Inc. ("PNI") for the

Policy Period[1] of January 16, 2016 to January 16, 2017 (the "2016 Primary Policy"). The 2016 Primary Policy carried a $10 million limit of liability in excess of a $1 million self-insured retention ("SIR").

22. National Union and four other insurance carriers issued Excess D&O policies over the 2016 Primary D&O Policy, each carrying a $10 million limit of liability. This created a total of $60 million in D&O coverage for PNI (collectively, the "2016 Policies").

23. In 2017, National Union issued its D&O Policy No. 06-680-86-39 to PNI for the Policy Period of January 16, 2017, to January 16, 2018, and extended to May 18, 2018, also carrying a $10 million limit of liability in excess of a $1 million SIR (the "2017 Primary Policy"). National Union and five other insurance carriers, including RSUI Indemnity Company ("RSUI") and Argonaut Insurance Company ("Argonaut") (collectively, National Union, RSUI and Argonaut are the "Defendants"), each issued an Excess D&O Policy (the "Excess D&O Policies") with a $10 million limit of liability (together with the 2017 Primary Policy, the "2017 Policies.") Thus, PNI

---

[1] Capitalized terms herein which are not ordinarily capitalized are used in accordance with their definition in the applicable insurance policy.

purchased a total of $70 million in D&O limits of liability for Claims arising during the 2017 to 2018 Policy Period.

24. On November 30, 2016, Henry Wasik, one of PNI's shareholders, filed a derivative lawsuit against certain directors and officers of PNI in the Delaware Court of Chancery ("Chancery Court"). This lawsuit was captioned <u>Wasik v. Mariano</u>, C.A. 12953-VCL (Del.Ch.) (the "2016 Wasik Claim").

25. The 2016 Wasik Claim asserted that PNI's directors and officers breached their fiduciary duties by taking ill-advised actions in 2016, including, among other things, authorizing a new credit agreement, authorizing a stockholder dividend, and authorizing a leverage capitalization. The 2016 Wasik Claim also alleged that the directors improperly rejected an acquisition offer made to PNI in 2016.

26. Michael Purcell ("Purcell") and Jeffrey Rohr ("Rohr") joined PNI's Board of Directors on January 4, 2017.

27. Terry Coleman ("Coleman"), Ernest Csiszar ("Csiszar") and Glenn Hibler ("Hibler") each joined the PNI Board of Directors in April of 2017.

28. Collectively, Messrs. Purcell, Rohr, Coleman, Csiszar and Hibler are referred to herein as the "2017 Directors".

29.   None of the 2017 Directors were serving on the PNI Board during the time of the alleged wrongdoing asserted in the 2016 Wasik Claim. Accordingly, none of the 2017 Directors were named as a defendant when the 2016 Wasik Claim was originally filed, and no Claims were asserted against them at that time.

30.   On March 1, 2017, a First Amended Complaint was filed in the Wasik Lawsuit (the "Amended 2016 Wasik Claim"). The Amended 2016 Wasik Claim added 14 new defendants to the action and alleged additional acts of misconduct by the PNI Board of Directors occurring in 2015 and 2016. All of the allegations in the Amended 2016 Wasik Claim involved actions taken before the 2017 Directors joined the PNI Board and, accordingly, none of the 2017 Directors were named as a defendant in the Amended 2016 Wasik Claim and no Claims were made against them in connection with these allegations.

31.   National Union accepted coverage for Loss arising out of the Amended 2016 Wasik Claim under the 2016 Policies and began paying Defense Costs.

32.   On August 21, 2017, a Second Amended Complaint was filed in the Wasik litigation (the "2017 Wasik Claim") and, for the first time, it sought damages for Loss arising out of alleged Wrongful Acts that did not begin occurring until 2017, while the 2017 Directors were serving on the PNI Board of Directors.

33.   More specifically, the 2017 Wasik Claim asserted, for the first time, allegations against three of the 2017 Directors, Messrs. Coleman, Csiszar and Hibler. It alleged that these three individuals breached their fiduciary duties to PNI by: (i) Authorizing a costly new employment agreement for PNI's CEO; and (ii) A few weeks later, approving a lavish severance package for that same CEO when he resigned. The two remaining 2017 Directors, Messrs. Purcell and Rohr, however, were not named as defendants in the 2017 Wasik Claim despite their participation in additional alleged wrongdoing concerning their respective roles in a related-party transaction that was described in the 2017 Wasik Claim.

34.   On September 28, 2017, Messrs. Coleman, Csiszar and Hibler tendered the 2017 Wasik Claim to the Defendants as a Notice of Claim under the 2017 Policies.

35.   By letter dated October 13, 2017, National Union, as the underwriter of the 2017 Primary Policy, advised the 2017 Directors that the 2017 Primary Policy would not provide coverage on the grounds that the 2017 Wasik Claim: (i) is part of a proceeding that constitutes "a single Claim first made during the Policy Period of [the 2016 Policies]"; and (ii) asserts "Related Claims to the

prior *Wasik* complaints and would only be eligible for coverage under the [2016 Policies] per Section 7(b) of the [2017 Primary Policy]".

36.   RSUI and Argonaut followed National Union's lead.

37.   On January 30, 2018, PNI commenced a Chapter 11 bankruptcy proceeding. As a result, all of the derivative claims alleged in the Wasik Lawsuit became property of PNI's bankruptcy estate. Those claims were subsequently assigned to the Patriot National, Inc. Litigation Trust (the "PNI Trust") pursuant to the Chapter 11 plan confirmed by the bankruptcy court.

38.   On November 19, 2019, on the PNI Trust's motion, the Chancery Court entered an order severing the PNI Trust's claims from the Wasik Lawsuit, thereby creating a new civil action for the PNI Trust's claims and granting the PNI Trust leave to file a Verified Complaint in the new civil action.

39.   On November 20, 2019, the PNI Trust filed a Verified Complaint in the Chancery Court (the "Trust Complaint") asserting claims for breach of fiduciary duty and corporate waste against the former directors and officers of PNI.

40.   The Trust Complaint asserted independent and distinct claims against each of the 2017 Directors that arose out of alleged wrongdoing that occurred exclusively during 2017 and were first alleged in the 2017 Wasik Claim.

41.   These allegations involved actions or omissions that qualified as **Wrongful Acts** under the 2017 Primary Policy and, as such, triggered coverage thereunder.

42.   On June 23, 2020, the PNI Trust filed an Amended Complaint in the Court of Chancery (the "Amended Trust Complaint").

43.   On September 25, 2020, the 2017 Directors tendered a demand for defense and indemnity coverage to National Union under the 2017 Policies. In a letter dated October 5, 2020, National Union, through its counsel, denied coverage for the Amended Trust Complaint and refused to advance defense costs to the 2017 Directors. In denying coverage and refusing to advance defense costs, National Union contended that coverage was unavailable under the 2017 Policies.

44.   More specifically, National Union's counsel stated in the October 5, 2020 letter that, "The Litigation Trust Claim includes Wrongful Acts alleged in the prior complaints in *Wasik*…Since *Wasik* was first made during the Policy Period of the 16/17 Policy, coverage is not available under the 17/18 Primary Policy."

45.   The first excess carrier above National Union, RSUI, also denied coverage for the Amended Trust Complaint by letter from its counsel dated October 6,

2020, and the second excess carrier, Argonaut, did the same by its counsel's letter dated October 5, 2020.

46.   In December 2020, the PNI Trust entered into two separate settlement agreements with the 2017 Directors. One settlement agreement was with Purcell and Rohr, and the other was with Coleman, Csiszar and Hibler (together, the "Trust Settlement Agreements"). The Trust Settlement Agreements collectively provided for settlement amounts that totaled $30 million; however, the PNI Trust agreed not to execute against the 2017 Directors but, rather, to seek recovery only from the issuers of the 2017 Policies.

47.   On January 14, 2021, the Bankruptcy Court entered an order approving the Trust Settlement Agreements. In that order, the Bankruptcy Court found that the Trust Settlement Agreements "…had been entered into in good faith and as the result of arms-length negotiations." The Court also held that the settlement amount was, "…within the reasonable range of litigation possibilities in the [Delaware Action]."

48.   The Defendants continue to maintain their position that the claims alleged against the 2017 Directors in the 2017 Wasik Claim, the Trust Complaint and

the Amended Trust Complaint (collectively, the "2017 Claims") are not covered by the 2017 Policies.

## OPINIONS AND ANALYSIS

### OPINION No. 1

**THE INSURERS FAILED TO FOLLOW STANDARD INSURANCE INDSUTRY UNDERWRITING PROTOCOLS THAT WOULD HAVE WITHHELD COVERAGE FOR THE 2017 WASIK CLAIM, THE TRUST COMPLAINT AND THE AMENDED TRUST COMPLAINT HAD IT BEEN THEIR INTENT TO EXCLUDE SUCH NEW CLAIMS.**

49.     I do not accept every expert witness assignment offered to me. Instead, I insist on a preliminary five-hour review period so that I can thoroughly analyze basic materials involved in a matter, e.g., insurance policies, pleadings and correspondence, in order to determine with certainty my positions regarding the key issues in dispute. If I do not agree with the prospective client's position(s), I will decline the assignment.

50.     From the early stages of my review of this matter, it was clear to me that this coverage dispute arose from the Defendants' failure to follow basic underwriting protocols according to insurance industry custom and practice.

51. As a senior underwriting manager at AIG, ACE (now Chubb) and Houston Casualty (now Tokio Marine HCC), I oversaw, and was intimately involved in, the underwriting of thousands of professional lines insurance accounts. One of the more challenging underwriting dilemmas I encountered involved how to handle the renewal of an account, such as PNI, that had a potentially significant Claim pending when it was time to formulate a renewal quote.

52. In my opinion and based upon my professional experience, the Defendants had five general options available to them from an underwriting perspective to deal with the potentially significant Claim pending at the time of the renewal of PNI's policy.

53. First, if the Defendants believed that PNI was in dire straits and not likely to recover, they could have simply not renewed the 2016 Policies ("Option One"). In that case, PNI could have elected to purchase an Extended Reporting Period, which would have allowed it to report new Claims for a period of time after the 2016 Policies' expiration, but coverage for such newly reported Claims would have only applied if the **Wrongful Acts** underlying the new Claims occurred before the 2016 Policies expired.

54. If the Defendants had elected Option One when the 2016 Policies were renewing, it is my opinion that there would be no coverage under the 2017

Policies because the 2017 Wasik Claim, the Trust Complaint and the Amended Trust Complaint all allege **Wrongful Acts** that took place after the expiration of the 2016 Policies. The Defendants, however, did not chose Option One.

55.    Second, the Defendants could have offered what is known in the insurance industry as an "extended aggregate" for the annual renewal ("Option Two"). Had the Defendants chosen Option Two for the full annual renewal, they would not have offered new limits of liability under the 2017 Policies. Instead, they would have offered to maintain the same aggregate limit of liability that was in force under the 2016 Policies for the entire 2017 Policy Period. [2]

56.    In other words, under Option Two, the 2016 Wasik Claim would continue to deplete the total $60 million limit of liability available under the 2016 Policies, and that same $60 million limit of liability would have applied to any new Claims noticed under the 2017 Policies.

57.    The problem with Option Two, from the carrier's perspective, is that the insurance market does not allow a carrier to charge the same amount of premium for an extended aggregate as it could get for offering a "fresh," that

---

[2] This option assumes that the 2016 Primary Policy's $10 million limit of liability had not already been exhausted.

is, new and unimpaired, aggregate limit of liability. From my experience, many carriers create significant pressure for underwriters to meet aggressive monthly premium goals and offering options such as an extended annual aggregate that produces less than maximum premium is not a preferred course of action. Regardless of their reasons, however, Defendants also did not choose Option Two.

58.     Third, the Defendants could have offered a fresh aggregate limit of liability with additional coverage limitations attached ("Option Three"). Examples of such coverage limitations might include: (i) endorsements specifying that any future amendments of the Wasik Claim, or any additional claims brought by Mr. Wasik of any type, would be classified under the 2016 Policies; (ii) a reduction in the limits of liability under the 2017 Policies; and/or (iii) significantly increasing the applicable SIR or, for the excess carriers, increasing their attachment points. The Defendants, however, did not include any of these limitations in the 2017 Policies. Alternatively, consistent with Option Three, if the Defendants wanted to avoid covering the **Claims** that were first made in 2017 and arising from acts and omissions occurring after expiration of the 2016 Policy Period that were in any way related to a prior litigation, they could have also simply revised the date appearing in

Endorsement #35 of the 2017 Primary Policy, titled PENDING AND PRIOR LITIGATION EXCLUSION AMENDED.

59.   By revising the applicable pending and prior litigation date from June 24, 2011, to January 16, 2017 (the inception date of the 2017 Policies), in my opinion, it is likely that the 2017 Wasik Claim, the Trust Complaint and the Amended Trust Complaint would not be covered under the 2017 Policies. Endorsement #35 contains a very broad definition of **Related Wrongful Act(s)** which would, in my opinion, most likely have been construed to classify all litigation involving 2017 **Wrongful Acts** as excluded, since the **Wrongful Acts** would have related to litigation pending before January 16, 2017. But, of course, this was not done either.

60.   Similar to Options One and Two discussed above, implementing Option Three would have failed to maximize the premium that the Defendants could reap from PNI. However, the use of any of the three options above would have, in my opinion, most likely prevented the dispute that is at the heart of the Captioned Lawsuit.

61.   Fourth, the Defendants could have elected to offer fresh aggregate limits of liability but only with what is known as a "retro date inception" (or "RDI") feature ("Option Four").   This is a commonly used underwriting tool in a

situation such as this and provides no coverage for any Claims arising from acts which took place prior to the policy's inception date. But this option would also not have provided the Defendants with as much premium as offering fresh limits with no such restriction would provide. Also, Option Four would not have prevented the current dispute because, as discussed below, all of the actions underlying the Claims alleged against the 2017 Directors in the 2017 Wasik Claim, the Trust Complaint, and the Amended Trust Complaint occurred after the 2017 Policies incepted on January 16, 2017.  Regardless, however, the Defendants did not choose Option Four.

62.     Ultimately, the Defendants elected to simply offer the 2017 Policies without: (i) any additional coverage restrictions applicable to the Wasik Lawsuit; (ii) a diminution in limits of liability; or (iii) an increase in the SIR and attachment points.

63.     While the 2017 Policies, as written, offered the Defendants no additional safeguards against another severe loss in the new Policy Period, such as the new Claims alleged for the first time against the 2017 Directors in the 2017 Wasik Claim, they did offer one feature that was apparently attractive to the Defendants: A maximization of premiums.

64.     By offering new aggregate limits of liability "with no strings attached," the Defendants were able to collect more premium from PNI than they would have if they had imposed the restrictions on available coverage that were dictated by sound underwriting practices.

65.     It is my opinion that the Defendants decided to roll the dice on renewal by offering fresh limits on the 2017 Policies while they crossed their fingers and hoped that no new **Claims** would be made.

66.     As a result, National Union, the underwriter of the 2016 and 2017 Primary Policies, was able to inflate its premium from $231,767 in 2016 to $254,943 in 2017. That represents a 10% year-over-year increase which stands in stark contrast to the average D&O premium for publicly traded companies at that time – the first quarter of 2017.   Indeed, according to the international insurance brokerage firm Aon, D&O coverage premiums, on average, decreased by 8.7% in the U.S. market.[3]

67.     Thus, in my opinion, to reap a renewal premium price increase that was roughly 18% better than the market's then-prevailing average renewal rate, National Union chose to ignore insurance industry custom and practice with

---

[3] Aon Risk Solutions, Quarterly D&O Pricing Index, Second Quarter 2018 https://www.aon.com/getmedia/368f9ea1-ac20-4f3e-839f-467df29fe710/2018-Q2-DO-Pricing-Index.aspx

respect to sound underwriting protocols in January 2017 when it offered a fresh aggregate limit of liability with no Wasik Lawsuit-specific restrictions. And, of course, the other Defendants did likewise.

## OPINION No. 2

## THE PNI TRUST'S CLAIMS AGAINST THE 2017 DIRECTORS WERE FIRST MADE IN 2017

68.     Based upon my professional experience and my understanding of insurance industry custom and practice, I strongly disagree with Mr. Kuffler's contention in his October 5, 2020 letter that, under the terms of the 2017 Primary Policy, "… we do not believe the allegations or causes of action in a single proceeding can qualify as separate Claims as a matter of the policy language and law …." Significantly, Mr. Kuffler does not attempt to support this position by citing any actual policy language.[4]

69.     Indeed, nowhere in the definition of **Claim**, as set forth in the 2017 Primary Policy, does it say that a single lawsuit that asserts claims for damages against multiple parties constitutes a single indivisible **Claim**. Had National Union

---

[4] While I am no longer a practicing attorney and do not offer any legal opinions in this report – deciding legal issues is clearly within the purview of the Court – I am aware of the decision in AT&T Corp. v. Faraday Capital Ltd., 918 A.2d 1104 (Del. 2007), in which the Delaware Supreme Court held that, "[W]e conclude that each cause of action in the *Williamson* and *Leykin* lawsuits may constitute a separate 'Claim' within the meaning of the policies at issue." *Id.* at 1108-09.

really intended for a single lawsuit to always constitute one, and only one, **Claim** regardless of the substance of any amendments, it could have easily drafted language that would have unambiguously established that concept. No such language, however, exists in the 2017 Primary Policy.

70. Accordingly, in my opinion and consistent with the custom and practice in the insurance industry, it would be within the **Insureds'** reasonable expectations to believe that a single lawsuit could contain more than one **Claim.** And, in this case, I believe that is what occurred.

71. Here, the claims against the 2017 Directors allege separate and distinct **Wrongful Acts** from the 2016 Wasik Claim, that arise from different underlying transactions and that were committed by different **Insureds** at different times after the inception of the 2017 Policies.

72. Thus, in my opinion, based upon my professional experience and my understanding of insurance industry custom and practice, the claims against the 2017 Directors were first made in 2017 as set forth, for the first time, in the 2017 Wasik Claim.

## OPINION No. 3

**THE PNI TRUST'S CLAIMS AGAINST THE 2017 DIRECTORS ARE NOT RELATED TO THE 2016 WASIK CLAIM AND ARE NOT EXCLUDED FROM COVERAGE UNDER THE 2017 POLICIES.**

73.   The 2017 Primary Policy, like many D&O policies, contains a definition of a **Related Claim**. In the 2017 Primary Policy's Section 13., DEFINITIONS, it says that a **Related Claim**:

> means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were either: (i) alleged in another **Claim** made against an **Insured**; or (ii) the subject of a **Pre-Claim Inquiry** received by an **Insured Person**.

74.   National Union, through numerous letters, including an October 5, 2020 letter written by David Kuffler of Kaufman Dolowich & Voluck, National Union's counsel, to PNI's then-counsel, also points to Section 7. NOTICE AND REPORTING, subsection (b) of the 2017 Primary Policy, which states:

> Solely for the purpose of establishing whether any subsequent **Related Claim** was first made or a **Related Pre-Claim Inquiry** was first received during the **Policy Period** or **Discovery Period** (if applicable), if during an such period:
>
> (1) a **Claim** was first made and reported in accordance with Clause 7(a) above, then any **Related Claim** that is subsequently made against an **Insured** and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time that such previously reported **Claim** was first made…

75.   Based upon these two provisions, the Defendants contend that the PNI Trust's claims against the 2017 Directors are **Related Claims** to the 2016 Wasik Claim and, hence, not eligible for coverage under the 2017 Policies.

---

76.  In my opinion and based upon my understanding of insurance industry custom and practice, there are a number of flaws with this contention and the arguments the Defendants have advanced in support of it.

77.  First, in attempting to group the claims against the 2017 Directors with the 2016 Wasik Claim as **Related Claims**, the Defendants point out that the definition of **Related Claim** applies when **Wrongful Acts** are "… alleged in another **Claim** made against an **Insured** …." However, none of the **Insureds** at issue here were accused of committing any of the **Wrongful Acts** alleged in the 2016 Wasik Claim, and Coleman, Csiszar, and Hibler were not even **Insureds** under the 2016 Policies.

78.  Second, in his October 5, 2020 letter, Mr. Kuffler, on behalf of National Union, wrongly argues:

> Any Wrongful Acts that were not alleged in prior iterations of the Claim are simply part of the overall efforts of Mr. Mariano to take money from Patriot National for his other interests, including Guarantee Insurance Group and Guarantee Insurance Company, and are alleged as part of a single course of conduct.

79.  But nowhere in the 2017 Primary Policy does it state that "a single course of conduct" will create a **Related Claim**. National Union could have used this precise language in the 2017 Primary Policy if this was its intent, and it did not.

80.   Furthermore, Mr. Kuffler ignores the fact that claims alleged against the 2017 Directors could not have been part of a "single course of conduct" because the "conduct" was carried out by different **Insureds** who allegedly committed distinct **Wrongful Acts** at different times after the inception of the 2017 Policies.

81.   Third, and most significantly, even if the claims against the 2017 Directors are **Related Claims** to the 2016 Wasik Claim under the 2017 Primary Policy—and they are not—that fact would ***not*** result in the exclusion of the 2017 Claims from coverage under the terms of the 2017 Primary Policy.

82.   Indeed, the Defendants ignore the lead-in language to Section 7(b) of the 2017 Primary Policy which, again, states: "Solely for the purpose of establishing whether any subsequent **Related Claim** was first made or a **Related Pre-Claim Inquiry** was first received during the **Policy Period** …." In other words, Section 7(b), in its entirety, applies to determine whether a subsequently reported **Related Claim** is deemed to have been made during the 2017 Policy Period.  Such a **Related Claim** is so deemed if it relates to a **Claim** that was first made in 2017. Thus, the critical question here is when were the claims against the 2017 Directors first made.  And, as discussed

above, it is my opinion that they were first made during the 2017 Policy Period.

83. Section 7(b), however, does not, as the Defendants appear to argue, provide for an exclusion of coverage for Claims first made and reported during the 2017 Policy Period to relate back to earlier policy periods. To accomplish that result, an applicable exclusion would be required.

84. The only language that would relate a new **Claim** back to a prior Policy Period under the 2017 Primary Policy is in Endorsement #35, as mentioned previously, with its broad definition of **Related Wrongful Act(s)**, but, again, that does not apply to any of the matters at issue because the Pending and Prior Litigation Date only applies to litigation filed as of June 24, 2011.

85. Thus, it is my opinion that no provisions of the 2017 Primary Policy serve to exclude coverage for the 2017 Claims against the 2017 Directors, even if such claims were appropriately characterized as **Related Claims** to the 2016 Wasik Claim under the 2017 Primary Policy. I note the fact that none of the Defendants have proffered any other grounds, other than the ones discussed above, to justify withholding coverage under the 2017 Policies.

86. It is therefore also my opinion that in this matter the Defendants are engaging in what is known in the insurance industry as "post-claim underwriting."

87.    As I pointed out previously in this report, the underwriting of the 2017 Policies was severely flawed according to insurance industry custom and practice. The Defendants, in my opinion, eschewed established underwriting protocols to maximize the renewal premiums that they would receive from PNI. I believe that they gambled, and they lost, and now they are trying to minimize their losses with unsupported coverage positions (known as "post-claim underwriting" in the insurance industry) with respect to Claims made against the 2017 Directors.

## OPINION No. 4

**THE INSURERS FAILED TO MEET MINIMAL STANDARDS OF GOOD FAITH AND FAIR DEALING WITH RESPECT TO CLAIMS HANDLING ACCORDING TO INSURANCE INDUSTRY CUSTOM AND PRACTICE BY FAILING TO FUND A SETTLEMENT FOR THE 2017 DIRECTORS.**

88.    As discussed above, I believe that the Defendants misinterpreted the 2017 Primary Policy and reached an erroneous conclusion when they decided to deny the 2017 Directors insurance coverage under the 2017 Policies for the 2017 Claims.

89.    According to insurance industry custom and practice, insurance carriers are required to try to find coverage for **Insureds** whenever reasonably possible and are expected to construe exclusionary language narrowly and coverage grants broadly.

90.    In this matter, as previously stated, I believe that the Defendants misconstrued the 2017 Primary Policy's terms and conditions as applied to the 2017 Claims and wrongfully withheld coverage from the 2017 Directors.

91.    They certainly did not give the 2017 Directors "the benefit of the doubt" when construing 2017 Primary Policy language that does not unambiguously apply to this matter.

92.    By relying upon an erroneous coverage determination and failing to fund a settlement of the 2017 Claims, it is my opinion that the Defendants failed to meet minimal standards of good faith and fair dealing with respect to claims handling according to insurance industry custom and practice.[5]

The opinions above are my own, arrived at after a review of materials provided to me and with the benefit my more than 30 years of experience in the insurance industry. I reserve the right to modify this report, if warranted, by my receipt of additional facts and information.

---

[5] I note that much, if not all, of the claim investigation was performed by outside counsel and, thus, much of the claim file information has been withheld from me as allegedly privileged. I specifically reserve the right to supplement my report should I be presented with additional relevant information.

Larry Goanos

Point Pleasant Beach, New Jersey

Date: March 11, 2022

EXHIBIT 1

# Larry Goanos

205 Trenton Avenue
Point Pleasant Beach, NJ 08742
917.716.3964
lgoanos@androsriskservices.com

---

## Founder and CEO
## Andros Risk Services, LLC
Point Pleasant Beach, NJ
November 2010 to Present

> **Founder** of insurance consulting firm specializing in all aspects of professional
> lines insurance.  Among services offered: review and analysis of insurance
> program coverage and structure; risk analysis; claims advocacy; claims and
> underwriting portfolio audits and analysis; training of underwriters, brokers and
> attorneys in various insurance products; drafting of policies and applications;
> assistance in conducting RFPs; performing reinsurance audits; conducting
> mediation and arbitration proceedings; and providing expert witness services.

## President and Chief Underwriting Officer
## APRI Group, Inc.
Red Bank, NJ
September 2015 to November 2016

> **Managed day-to-day** functions of an insurance managing general agency (MGA)
> specializing in professional lines insurance. Products underwritten included
> Lawyers Professional Liability (LPL), Fidelity Bonds and Cyber Insurance. Had
> responsibility for all aspects of the business, including negotiating underwriting
> guidelines and coverage terms with carriers, drafting insurance policy language
> and managing relationships with brokers and carriers. APRI Group was a licensed
> Lloyd's coverholder and was authorized to do business in all 50 states.

## Dean
## The CLM Claims College – School of Professional Lines
New York, NY
July 2012 to September 2015

> **Served as Dean** of an educational organization dedicated to teaching insurance
> professionals best practices in every aspect of insurance claims handling. Played
> major role in creating and refining curriculum that focused on, among other
> things, drafting optimal coverage letters, mapping resolution strategies, avoiding
> allegations of bad faith claims handling and negotiating settlements. Worked with
> senior Claims managers from leading insurance carriers to create the foremost
> claims educational organization in the insurance industry.

**President and Chief Marketing Officer**
**Professional Indemnity Agency**
**(An underwriting subsidiary of HCC Insurance Holdings/Houston Casualty)**
Mt. Kisco, NY
March 2007 to June 2009

> **Managed $350 million gross written premium (GWP) subsidiary** of HCC
> Insurance Holdings, Inc.  Primary lines of business included Directors & Officers
> Liability Insurance, Employment Practices Liability Insurance, Fidelity Bonds,
> Kidnap & Ransom coverage and over 200 classes of Miscellaneous Professional
> Liability (MPL/E&O) Insurance.  Responsible for all aspects of subsidiary, including
> underwriting, claims, human resources and other administrative/operational functions.

**Managing Director**
**Marsh USA**
New York, NY – June 2005 to March 2007
San Francisco, CA – November 1996 to November 1998

> **Financial Institutions National Practice Leader** for Marsh's FINPRO (Financial
> and Professional) unit.  Oversaw client relationships and coordinated new business
> initiatives with financial institution clients throughout the country.  Served as a
> national resource on professional lines issues for all Marsh offices.  Also worked with
> Marsh counterparts overseas on various international issues.

**Senior Vice President**
**ACE USA**
New York, NY
April 2002 to June 2005

> **Managed ACE USA's Professional Risk's** Management Liability and Financial
> Institutions Professional Liability unit on a day-to-day basis.  Insureds ranged from
> the largest Fortune 500 companies to smaller, privately-held organizations.  Grew the
> group over three years from seven underwriters and $14 million in GWP to
> approximately 35 underwriters and over $300 million in GWP.  Was told at first
> annual review: "*We gave you the keys to a jalopy, and you took it out on the highway
> and turned it into a sports car.*" Also responsible for a number of other duties,
> including drafting policy language, negotiating policy terms and conditions, training
> underwriters and working with  the Claims Department to help resolve complex
> claims.

2

**Executive Vice President**
**Chief Underwriting Officer**
**National Union Fire Insurance Company of Pittsburgh, Pa. (AIG)**
**Financial Institutions Group**
New York, NY – January 1994 to November 1996; November 1998 to April 2002

> **Number-two person** in $350 million-plus GWP Financial Institutions Group at National Union.  Duties performed included overseeing all underwriting activities, managing broker and insured relationships, reviewing, drafting and approving policy and endorsement language, developing new products, training and managing approximately 70 underwriters nationwide, working with the Claims Department to help resolve complex claims, and speaking at industry conferences throughout the country. Awarded SICO status at AIG, a prestigious designation reserved for approximately 400 of the company's 80,000 employees at the time.

**Practiced insurance law from 1989 to 1993** at law firms in New York (D'Amato & Lynch) and Boston (Parker, Coulter, Daley & White.)  Coverage and litigation matters.

## Education

**Boston College Law School**
Newton Centre, MA
Juris Doctor 1987, *Cum Laude*

**Villanova University**
Villanova, PA.
BA, Political Science, 1984; Minor in English, *Cum Laude*

## Publications

### Books

**Author, Professional Lines Insurance: An Oral History** (Wells Media: San Diego 2021; 425 pages).

**Author, D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach** (Wells Media: San Diego 2014; 214 pages). The biggest-selling book in its publisher's history, **D&O 101** provides an in-depth view of Directors and Officers Liability Insurance in a textbook-like manner that is infused with real-world war stories from the author's many years in the insurance industry.

3

**Warren Buffett** said of **D&O 101**:  "*You write prose with great skill and I imagine you do the same when you write D&O policies…Congratulations on another terrific book.*"

**Author, Claims Made & Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance** (Soho Publishing: New York 2008; 376 pages).  Translated into Japanese and released in Japan in hard-copy and e-book form in November 2011.  **Claims Made & Reported** has sold over 3,000 copies and has generated more than $85,000 in donations to five charities.

**Warren Buffett** said of **Claims Made and Reported**:  "*I enjoyed it thoroughly.  The section about 9/11 was particularly moving…I hope our insurance managers got copies as I know they would enjoy it as I did.  It deserves accolades.*"

**Risk & Insurance Magazine**, in a June 2009 review, said of **Claims Made & Reported**:  "*In the final analysis, Goanos has written a book that will matter to the professional lines community. From the industry's struggle to survive in the early days, to the launch of new products to fill the needs of evolving industries, to the lives lost nearly a decade ago on that ghastly September morning, Goanos has done his part to shed more light on the hundreds of people involved with professional lines insurance, who they are and what they do.*"

## Other

**Author of numerous articles** published in a variety of insurance industry periodicals.

**Speaker and moderator** on various panels nationwide at events sponsored by groups such as the Risk and Insurance Management Society (RIMS), the Professional Liability Underwriting Society (PLUS), the American Bankers Association (ABA), the Defense Research Institute (DRI), the CPCU Society, The Claims and Litigation Management Alliance (CLM) and the California State Bar Association.

**Formerly a licensed insurance broker** in New York and California.  Was licensed to practice law in New York, New Jersey and Massachusetts before retiring from active practice to pursue insurance career.

EXHIBIT 2

| LARRY GOANOS |
| :---: |
| **INSURANCE PUBLICATIONS AND PRIOR EXPERT TESTIMONY** |

## INSURANCE PUBLICATIONS – PRIOR TEN YEARS

### Books

Professional Lines Insurance: An Oral History (Wells Media: San Diego 2021; 425 pages).

D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach (Wells Media: San Diego 2014; 214 pages).

Claims Made & Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance (Soho Publishing: New York 2008; 376 pages).

### Articles

- "*AmWINS Insurance Q&A: Coverage Letters - What Are They and How Should They Be Handled*?" AmWINS Client Advisory, May 2013; www.amwins.com
- "*California Employers: Be Aware (and Beware!) of Employment Law Changes in 2013,*" AmWINS Client Advisory, February 2013; www.amwins.com
- "*Worth Investigating: D&O Insurance Coverage for Costs Arising from Investigations, Part 2,*" AmWINS Client Advisory, December 2012; www.amwins.com
- "*Worth Investigating: D&O Insurance Coverage for Costs Arising from Investigations,*" AmWINS Client Advisory, November 2012; www.amwins.com
- "*D&O Insurance for Healthcare Organizations: Our Prescription for Better Coverage, Part 2,*" AmWINS Client Advisory, October 2012; www.amwins.com
- "*D&O Insurance for Healthcare Organizations: Our Prescription for Better Coverage,*" AmWINS Client Advisory, September 2012; www.amwins.com
- "*D&O Policy Definitions: Don't Overlook These Critical Terms, Part 2*" AmWINS Client Advisory, July 2012; www.amwins.com
- "*D&O Policy Definitions: Don't Overlook These Critical Terms,*" AmWINS Client Advisory, June 2012; www.amwins.com
- "*Tuning Up Your Client's D&O Policy, Part 2,*" AmWINS Client Advisory, May 2012; www.amwins.com
- "Tuning Up Your Client's D&O Policy," AmWINS Client Advisory, April 2012; www.amwins.com
- "*Unlocking Dodd-Frank's Insurance Opportunities,*" AmWINS Client Advisory, February 2012; www.amwins.com
- "*Independent Directors' Liability Insurance: An Overview,*" AmWINS Client Advisory, January 2012; www.amwins.com

- "*What is Severability and Why is it Important?*" AmWINS Client Advisory, December 2011; www.amwins.com
- "*What is a Warranty Letter and Why is My Client Being Asked to Sign One*?" AmWINS Client Advisory, November 2011; www.amwins.com
- "*How to Soften the Insured vs. Insured Exclusion in Your Client's D&O Policy*," AmWINS Client Advisory, October 2011; www.amwins.com
- "*Ten Years Later*" [A September 11th Retrospective] Advisen (www.advisen.com), September 10, 2011
- "*Key Considerations for Placing E&O Coverage*," AmWINS Client Advisory, September 2011; www.amwins.com
- "*Navigating the Tricky Waters of EPL Claims Reporting,*" AmWINS Client Advisory, August 2011; www.amwins.com
- "*M&A Insurance: A Unique Solution for Helping a Client Through a Merger or Acquisition*," AmWINS Client Advisory, July 2011; www.amwins.com
- "*Important Insurance Considerations When Performing Due Diligence for Clients*," AmWINS Client Advisory, June 2011; www.amwins.com
- "*Essential Considerations When Buying D&O Run-Off Coverage*," AmWINS Client Advisory, May 2011; www.amwins.com
- "*Excess D&O Follow Form Coverage: Does It Really Follow Form*?" AmWINS Client Advisory, April 2011; www.amwins.com
- "*Dealing With Insurer Litigation Guidelines: Best Practices*," AmWINS Client Advisory, April 2011; www.amwins.com

## EXPERT TESTIMONY – PRIOR FOUR YEARS

1.  I was deposed on November 13, 2017 as an expert for the defendant in Interstate Fire & Casualty Company, Personally and as Subrogee and/or Assignee of Kluger, Peretz, Kaplan & Berlin, P.L., vs. Axis Surplus Insurance Company, Case No. 2012-35828-CA-01 (31), in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

2.  I was deposed on January 16, 2018 as an expert for three defendant insurance companies (Old Republic Insurance Company, RLI Insurance Company and Allied World Assurance Company, Inc.) in Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., RLI Insurance Company, Allied World Assurance Company (U.S.) Inc. and Berkeley Insurance Company, Case No. CIV 538248 in the Superior Court of the State of California, County of San Mateo.

3.   I was deposed on June 28, 2018 as an expert for the plaintiffs in <u>Michael I. Goldberg, not individually but as Liquidating Trustee of the Rothstein Rosenfeldt Adler, P.A. Liquidating Trust, Robert C. Furr, not individually but as Chapter 7 Trustee of the estate of Banyon 1030-32, LLC and as the Chapter 7 Trustee of the Estate of Banyon Income Fund, LP v. Aon Risk Services Northeast, Inc.,</u>  Case No.: 1:13-cv-21653-KMW in the United States District Court for the Southern District of Florida (Miami Division).

4.   I testified at trial on August 30, 2018 as an expert for three defendant insurance companies (Old Republic Insurance Company, RLI Insurance Company and Allied World Assurance Company, Inc.) in <u>Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., RLI Insurance Company, Allied World Assurance Company (U.S.) Inc. and Berkeley Insurance Company,</u> Case No. CIV 538248 in the Superior Court of the State of California, County of San Mateo.

5.   I was deposed on October 31, 2018 as an expert for the defendant/counterclaim plaintiff in <u>Allied World Surplus Lines Insurance Company v. Richard J. Goettle, Inc.,</u> Civil Action No. 1:17-cv-00670S-JD in the United States District Court for the Southern District of Ohio, Western Division.

6.   I was deposed on January 7, 2019 as an expert for the plaintiff/counterclaim defendant in <u>Scottsdale Insurance Company v. CSC Agility Platform, Inc., fka ServiceMesh, Inc., Computer Sciences Corporation and Eric Pulier,</u> Case No.: 2:17-cv-07762-PSG (GJSx) in the United States District Court for the Central District of California, Western Division.

7.   I was deposed on January 18, 2019 as an expert for the claimant in the arbitration styled as <u>Wind Point Partners VII-A, LP, as assignee of Performance Optics, LCC v. Lexington Insurance Company,</u> AAA Case No. 01-17-0005-4347 (Hearing locale: New York, New York).

8.   I was deposed on February 1, 2019 as an expert for the plaintiff in <u>Axis Surplus Insurance Company v. Aletheia Research and Management, Inc. and Does 1 Through 10, Inclusive</u>, Case No. BC485198 in the Superior Court of the State of California, County of Los Angeles.

9.   I testified at an arbitration on March 20, 2019 as an expert for the claimant in the arbitration styled as <u>Wind Point Partners VII-A, LP, as assignee of Performance Optics, LCC v. Lexington Insurance Company</u>, AAA Case No. 01-17-0005-4347 (Hearing locale: New York, New York).

10.  I was deposed on April 25, 2019 as an expert for the defendant in <u>Allied World Specialty Insurance Company F/K/A Darwin National Assurance Company v. Independence Blue Cross, LLC</u>, Civil Action No. 2:17-cv-01463-JS in the United States District Court for the Eastern District of Pennsylvania.

11.  I was deposed on May 3, 2019 as an expert for the plaintiff in <u>Pharmacia Corporation N/K/A Pfizer Inc. v. Arch Specialty Insurance Company, Twin City Fire Insurance Company and Liberty Mutual Insurance Company</u>, Civil Action No. 2:18-cv-00510-ES-MAH in the United States District Court for the District of New Jersey.

12.  I testified at trial on July 2, 2019 as an expert for the plaintiff in <u>Galena Biopharma, Inc. v. Aon Risk Insurance Services West, Inc</u>., Case No. 16CV33844, in the Circuit Court for the State of Oregon for the County of Multnomah.

13. I testified before the Irish Tax Appeals Commission in Dublin, Ireland on February 10, 2020 in a matter concerning Directors and Officers Liability Insurance, Employment Practices Liability Insurance and other lines of commercial insurance in the United States. I am subject to a confidentiality agreement and cannot reveal the client's identity.

14. I was deposed on April 6, 2020 as an expert witness for the plaintiff in <u>Bedivere</u> <u>Insurance Company, F/K/A One Beacon Insurance Company v. Axis Insurance</u> <u>Company</u>, Case No. 17-L-009747, in the Circuit Court of Cook County, Illinois County Department, Law Division.

15. I was deposed on August 20, 2020 as an expert witness for the defendant in <u>Great</u> <u>American Insurance Company v. Regen, Benz & MacKenzie, CPAs, PC</u>, Civil Action No. 19-CV-2592 (GBD/OTW), in the United States District Court for the Southern District of New York.

16. I was deposed on October 8, 2020 as an expert witness for the plaintiff in <u>Northrop Grumman Innovation Systems, Inc. v. Zurich American Insurance</u> <u>Company, et al.</u>, Civil Action No. N18C-09-210 PRW CCLD, in the Superior Court of the State of Delaware.

17. I was deposed on October 22, 2020 as an expert for the defendant in <u>NBH Capital</u> <u>Finance v. Scottsdale Indemnity Company</u>, Civil Action No. 1:19-cv-02153, in the United States District Court for the District of Colorado.

18. I was deposed on December 1, 2020 as an expert witness for the plaintiff in <u>Northrop Grumman Innovation Systems, Inc. v. Zurich American Insurance</u> <u>Company, et al.</u>, Civil Action No. N18C-09-210 PRW CCLD, in the Superior Court for the State of Delaware.

19. I was deposed on February 23, 2021 as an expert witness for the defendants in <u>Merck & Co., Inc. and International Indemnity Ltd. v. ACE American Insurance</u> <u>Company, et. al.</u>, Docket No. UNN-L-002682-18 in the Superior Court of New Jersey, Law Division: Union County.

20. I was deposed on May 11, 2021 as an expert witness for the plaintiffs in <u>Sycamore Partners Management, L.P. (F/K/A Sycamore Partners Management,</u> <u>L.L.C.), et al. v. Endurance American Insurance Company, et al.</u>, Civil Action No. N18C-09-211 AML CCLD, in the Superior Court for the State of Delaware.

5

21. I was deposed on June 22, 2021 as an expert witness for the Petitioner in the JAMS Alternative Dispute Resolution proceeding styled as The Toronto-Dominion Bank v. U.S. Specialty Insurance Company, Reference No. 1425029818.

22. I was deposed on June 25, 2021 as an expert witness for the Defendant in Ignacio Perez v. Indian Harbor Insurance Company and Does 1 Through 50, Case No. 4:19-cv-07288-YGR in the United States District Court for the Northern District of California.

23. I testified at trial on July 19 and 20, 2021 as an expert witness for the Plaintiff in Fox Paine & Company, LLC and Saul A. Fox v. Equity Risk Partners, Inc. and HUB International Insurance Services, Inc., Index No. 52607/2014, in the Supreme Court of the State of New York, County of Westchester.

24. I testified on September 22, 2021 as an expert witness for the Petitioner in the JAMS Alternative Dispute Resolution proceeding styled as The Toronto-Dominion Bank v. U.S. Specialty Insurance Company, Reference No. 1425029818.

25. I was deposed on September 30, 2019 as an expert for the defendant in the matter styled as Homeland Insurance Company of New York v. Health Care Service Corporation, D/B/A Blue Cross Blue Shield of Illinois, Blue Cross Blue Shield of New Mexico, Blue Cross Blue Shield of Oklahoma, and Blue Cross Blue Shield of Texas, Civil Action No. 18-cv-6306, pending in the United States District Court for the Northern District of Illinois, Eastern Division.

## Exhibit 3 to Expert Report of Larry Goanos

*Documents and Filings in PNI Litigation Trust v. National Union,* et al., Case No. 1:21-cv-21416-DPG:

DE 1 Notice of Removal and Exhibits 1 and 2 Thereto (including Complaint and all exhibits).
DE 38 Answer and Affirmative Defenses of Argonaut
DE 39 Answer and Affirmative Defenses of National Union
DE 40 Answer and Affirmative Defenses of RSUI
DE 82 Motion to Compel
DE 84 Defendants' Response to Motion to Compel

Case Documents:

| Bates Numbers |
| --- |
| PNI-National Union_ 000001-001124 |
| PNI-National Union_001125-001553 |
| PNI-National Union_001554-001883 |
| PNI-National Union_001884-005185 |
| ARG000001-006984 |
| ARG006985-007096 |
| ARG007097-014068 |
| RSUI000199-007605 |
| RSUI0009249-009896 |
| RSUI009897-028450 |
| RSUI028451-028455 |
| PNI_Litigation_Trust_0000000-175160 |

Other Documents:

National Union's Privilege Log