**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 21-21416-Civ-GAYLES/TORRES

PNI LITIGATION TRUST,
the duly authorized successor to
PATRIOT NATIONAL, INC.,

     *Plaintiff*,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA., and
RSUI INDEMNITY COMPANY,

     *Defendants.*

_____/

**REPORT AND RECOMMENDATION**
**ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

     This matter is before the Court on Plaintiff PNI Litigation Trust's (the "Trust")

Motion for Partial Summary Judgment ("Plaintiff's Motion") [D.E. 107], and

Defendants National Union Fire Insurance's ("National Union") and RSUI Indemnity

Company's ("RSUI") (collectively, "Defendants" or the "Insurers") Cross Motion for

Summary Judgment ("Defendants' Motion") [D.E. 112].  The parties filed timely

responses [D.E. 118, 121] and replies [D.E. 128, 131] to each motion, therefore, the

motions are now ripe for disposition.[1]  After careful consideration of the briefing

materials, the evidence of record, the relevant authorities, and for the reasons

_____

[1] On April 29, 2021, the Honorable Darrin P. Gayles referred all pre-trial
non-dispositive and dispositive matters to the undersigned for disposition.  [D.E. 29].

discussed below, we hereby RECOMMEND that Defendants' Motion be GRANTED, Plaintiff's Motion be DENIED, and the case be dismissed with prejudice.

## I.  BACKGROUND[2]

This action is an insurance coverage dispute relating to two Directors and Officers ("D&Os") liability insurance policies issued by National Union and RSUI to Patriot National Union, Inc. ("PNI" or the "Company") in 2017.  The Plaintiff in this action is a Trust created during PNI's bankruptcy proceedings in 2018, who inherited a preexisting shareholder derivative lawsuit against the Company and its D&Os for alleged misconduct that took place between 2015 and 2017.

The Trust's interest in the enforcement of the relevant policies arises from a settlement agreement reached between the Trust and some of the D&Os in 2020, whereby these directors assigned to the Trust all causes actions they had against the Insurers in exchange for a release from all liability.  In Florida, this type of settlement agreement is known as a *Coblentz* Agreement.[3]  The PNI directors that participated in the *Coblentz* agreement were Michael Purcell ("Purcell"), Jeffrey Rohr ("Rohr"), Ernst Csiszar ("Csiszar"), Terry Coleman ("Coleman"), and Glenn Hibler ("Hibler") (collectively, the "Coblentz directors"), all of which joint the Company in 2017.

According to the Trust, the Insurers wrongfully denied coverage under their 2017 policies for claims made against the *Coblentz* directors in a 2019 and 2020

---

[2] The relevant undisputed facts are taken form Plaintiff's Statements of Material Facts in Support of its Motion for Partial Summary Judgment [D.E. 108, 117], and Defendants' Statements of Fact in Support for their Motion for Summary Judgment [D.E. 111, 132].

[3] *See Coblentz v. Am. Sur. Co. of New York*, 416 F.2d 1059 (5th Cir. 1969).

lawsuit filed by the Trust in state court.  The Insures disagree, alleging that the Trust's 2019 lawsuit—which it deems one of multiple iterations dating back a few years—did not trigger coverage under the 2017 Polices because the claims alleged therein relate back to claims first made in a 2016 lawsuit and are thus excluded from coverage by operation of the policy's plain language.

### A. *The Insurance Policies*

In 2016, National Union issued a primary policy, and together with certain excess policies (co-Defendant RSUI was one of the excess insurers), provided $60 million in aggregate coverage for claims made against PNI's directors and officers (the "2016 Policies").  National Union's primary policy provided the first $10 million in coverage, and each of the remaining 2016 Policies provided $10 million in excess coverage.  The policy period for the 2016 Policies began on January 16, 2016, and ended on January 16, 2017 (the "2016 Policy Period").

In 2017, National Union issued a new primary policy, and together with most of the same excess insurers involved in 2016, provided $70 million in aggregate coverage for claims made against PNI's directors and officers (the "2017 Policies").  National Union's primary policy provided the first $10 million in coverage, and each of the remaining 2017 Policies provided $10 million in excess coverage.  Co-Defendant RSUI issued the first excess policy (the "2017 RSUI Policy").  The 2017 Policies had an initial policy period of January 16, 2017, to January 16, 2018, but were extended until May 16, 2018 (the "2017 Policy Period").

Both the 2016 and 2017 polices were "claims-made" polices, with the RSUI's excess policies following form to the terms and conditions of National Union's primary polices.  The relevant 2017 Policy language is as follows:

> 1. INSURING AGREEMENTS
> All coverage granted for Loss under this policy is provided solely with respect to: (i) Claims first made against an Insured, . . . during the Policy Period[.]
> . . . .
>
> 7. NOTICE AND REPORTING
> . . . .
>
> (b) Relation Back to the First Reported Claim or Pre-Claim Inquiry[:] Solely for the purpose of establishing whether any subsequent Related Claim was first made . . . during the Policy Period or Discovery Period (if applicable), if during any such period:
> > (1) a Claim was first made and reported in accordance with Clause 7(a) above, then any Related Claim that is subsequently made against an Insured . . . shall be deemed to have been first made at the time that such previously reported Claim was first made;
> > . . . .
>
> Claims actually first made or deemed first made prior to the inception date of this policy . . . are not covered under this policy.
> . . . .
>
> 13. DEFENTIONS
> . . . .
> Claim means:
> . . . .
>
> > (2) a civil, criminal, administrative, regularity or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar proceeding;
> . . . .
>
> Related Claim means[:]
> > a Claim alleging, arising out of, based upon or attributable to any facts or Wrongful Acts that are the same as or related to those that were either: (i) alleged in another Claim made against an Insured[.]
> . . . .

Wrongful Act means:
> (1) Any actual or alleged breach of duty, neglect, error, misstatement,
> misleading statement, omission or act . . . (i) with respect to any
> Executive of an Organization, by such Executive in his or her
> capacity as such . . . .

[D.E. 108-3 at 9, 14–15, 25, 32, 34].

### B.    *The Lawsuits*

On November 30, 2016, Henry Wasik, a PNI shareholder, filed a class action suit in Delaware against PNI and several of its directors and officers (the "Wasik Initial Complaint"). The lawsuit alleged that Steven Mariano ("Mariano"), the Company's founder, Chairman, President, and CEO, was using the Company as his personal piggybank to entrench and unjustly enrich himself at the expense of the minority stockholders and PNI's interests. [D.E. 108-6 ¶ 1]. According to that Complaint, Mariano was able to assert his dominance over PNI and loot the Company by manipulating and controlling the board of directors (the "Board"), which consistently gave a green light to Mariano's recurring self-interested transactions. Based on these alleged self-interested transactions, the complaint asserted claims for breach of fiduciary duties against Mariano and seven directors.

On March 1, 2017, Wasik amended his pleading and filed an amended complaint reasserting his class action and asserting new shareholder derivative claims against PNI and its D&Os (the "Wasik FAC"). The Wasik FAC added three new individual defendants to the claim, as well as several Mariano-controlled corporate defendants. [D.E. 108-8 ¶¶ 8–15, 19–21]. The FAC condemned Mariano's "unlawful conduct . . . to entrench control of and loot 'his' publicly traded company"

with the knowledge and acquiescence of "his beholden management team, a rubberstamp interested board of directors [], and a group of knowing abettors[.]" [*Id.* ¶ 1]. Accordingly, the FAC alleged derivative counts for breach of fiduciary duty and corporate waste against the D&Os predicated on defendants' adoption and approval of the self-interested transactions listed in the initial complaint.

On August 21, 2017, Wasik amended his pleading once more and filed a Second Amended Complaint (the "Wasik SAC"). The SAC took issue with Marino's "unlawful conduct . . . to remain in control of and loot 'his' publicly traded company" with the help of "his beholden management team, a rubberstamp interested board of directors [], and a group of knowing abettors[]." [D.E. 108-9 ¶ 1]. The SAC accused Mariano and several D&Os for their involvement in the transactions listed in the FAC and the initial complaint. Unlike the prior complaints, however, Wasik's SAC alleged additional acts of self-dealing and looting by Mariano and the Board that took place exclusively between February and August 2017. Based on these new alleged acts of corporate malfeasance, the SAC raised allegations, for the first time, against three *Coblentz* directors (Hibler, Csiszar, and Coleman) for breach of fiduciary duty and corporate waste. [*Id.* ¶¶ 535–540, 658–660, 669–670].

After Wasik filed the Initial Complaint and then the FAC, the Insurers accepted coverage of the claims against PNI and the D&Os under the 2016 Policies and agreed to advance defense costs for those claims. But after Wasik's SAC, Hibler, Csiszar, Coleman, and other D&Os sent a demand for coverage to National Union on September 28, 2017, requesting that the Insurers also extend coverage and fund

potential settlements under the 2017 Policies.   The Insurers responded to this demand letter on October 13, 2017, denying coverage under the 2017 Policies on the basis that the allegations made in the Wasik SAC related back to claims first made in 2016 and, as such, were excluded from 2017 coverage under Section 7(b) of that policy.

PNI declared bankruptcy in January 2018.  Pursuant to PNI's reorganization plan, the Trust was created and the derivative claims asserted in the Wasik actions became the property of Plaintiff.  On August 21, 2019, Plaintiff filed a motion with the Delaware court requesting that the derivate claims be severed from the Wasik action and that leave be granted to file a new complaint.  The state court granted the Trust's motion to sever and on November 20, 2019, and the Trust filed a new complaint asserting the derivate claims (the "Trust's Severed Action").

The Severed Action named twenty individual defendants, including all five of the Coblentz directors.[4]  The Severed Action alleged that "Defendants knowingly abdicat[ed] [their] duties, leaving Mariano . . . free to manipulate PNI's capital to wrongfully enrich himself and his friends, . . . for the purpose of maximizing his own holdings and squeezing as much money from PNI as possible[.]"  [D.E. 108-16 ¶¶ 1, 4].  Like the Wasik SAC, the Trust's Severed Action pleaded multiple 2017 predicate acts upon which the Trust based its allegations for breach of fiduciary duty and corporate waste against the Coblentz directors.  On June 23, 2020, the Trust filed an

---

[4] The Severed Action added six new defendants to the action: (i) officers Joyce Predmesky ("Predmesky"), David Quigley ("Quigley"), John Rearer ("Rearer"), and Elvis Rivera ("Rivera"), and (ii) Coblentz directors Rohr and Purcell.

amended complaint (the "Severed Amended Complaint") that was identical in substance to the initial complaint. The Severed Amended Complaint did not include four defendants, with whom the Trust reached a settlement in May 2020. [D.E. 108-18].

On June 29, 2020, the Trust entered into another settlement with ten of the D&Os named in the Severed Amended Complaint. The Coblentz directors were not part of this settlement. Instead, on September 25, 2020, the Coblentz directors tendered upon the Insurers another demand for coverage under the 2017 Polices, but the Insurers denied any 2017 coverage. After attending mediation, the Trust and the Coblentz directors reached a $30 million settlement agreement in December 2020 and executed the *Coblentz* Agreement that Plaintiff now seeks to enforce against Defendants.

Based on these undisputed facts, both the Trust and the 2017 Insurers have filed cross-motions for summary judgment. As explained further below, we find that the undisputed facts warrant dismissal of the Trust's complaint because, as a matter of law, the claims for which it seeks damages under the 2017 Polices are excluded from coverage by the plain language of the insurance agreement.[5] Accordingly, Defendants' motion for summary judgment [D.E. 112] should be GRANTED, Plaintiff's motion for partial summary judgment [D.E. 107] should be DENIED, and the case should be dismissed with prejudice.

---

[5] Because Defendants are entitled to judgment as a matter of law on their coverage argument and this defense is dispositive of the case, we do not address any of the remaining arguments in Defendants' motion.

8

## II.   APPLICABLE PRINCIPLES AND LAW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  In making this determination, the Court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III.   ANALYSIS

The parties' cross-motions for summary judgment are opposite faces of the same coin: they both contend that the undisputed facts entitle them to judgment on the first two prongs of this *Coblentz* enforcement action.[6]   According to the Trust, its 2019 and 2020 severed claims against Purcell, Rohr, Coleman, Csiszar, and Hibler— the Coblentz directors—are  covered by the 2017 Polices; therefore, the Insurers' refusals to defend and fund settlements under these policies were wrongful and unlawful.  In essence, the Trust's argument for coverage is twofold: (1) it asserts that the plain language of the Relating Back provisions found in Section 7(b) cannot be read to exclude claims from coverage; and (2) even if Section 7(b) allows for the exclusion of certain claims, the claims against the Coblentz directors are not related to any claims made prior to 2017.  [D.E. 107 at 12–23; 118 at 5–8].

Defendants National Union and RSUI, on the other hand, disclaim coverage under the 2017 Policies, primarily on two grounds.  First, Defendants argue that the plain language of Section 7(b) unambiguously excludes certain claims from coverage, and that the Trust's reading deliberately ignores material terms in the applicable policy language.  Second, the Insurers assert that, under binding Florida precedent, the Trust's 2019 and 2020 claims against the Coblentz directors relate back to the

---

[6] A party seeking to enforce a *Coblentz* agreement against an insurer must establish: (1) that the claims under which it seeks damages are covered by the policy; (2) that the insurer wrongly refused to defend the insured party; (3) that the terms of the settlement agreement between the injured party and the insured are reasonable; and (4) that the settlement was made in good faith.  *See Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So. 3d 174, 180 (Fla. Dist. Ct. App. 2015); *Wrangen v. Pennsylvania Lumbermans Mut. Ins. Co.*, 593 F. Supp. 2d 1273, 1278 (S.D. Fla. 2008).

Wasik Initial Claim of 2016 and, as such, are excluded from coverage under the 2017 Policies by operation of Section 7(b).  In doing so, the Insurers note that Plaintiff cites to inapposite case law involving materially different policy language and applies a claim-dependence theory that is different from the casual or logical standard used under Florida law to determine relatedness for the purposes of insurance coverage. [D.E. 112 at 9–14; 121 at 4–12].  We address each of these arguments below.

A. ***The Plain Language of Section 7(b) Dictates Exclusion of Claims First Made Prior to the Policy's Inception***

The interpretation of insurance policies is generally a question of law. *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995).  When interpreting an insurance policy, Florida courts "start with the plain language of the policy, as bargained for by the parties." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) (quoting *Auto–Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)).  "If the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as written." *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004); *see also Steinberg*, 393 F.3d at 1230 (explaining that the court must read the policy as a whole and give every provision its full meaning and operative effect).  This maxim applies to exclusions as well; if an exclusionary provision is unambiguous, the Court must apply the exclusion as it is written. *See Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1139 (Fla. 1998) (A court "cannot place limitations upon the plain language of a policy exclusion."); *Steinberg*, 393 F.3d at 1230 ("If [the policy] language is

unambiguous, it governs."). Further, "a true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner." *Travelers Indem. Co. of Connecticut v. Richard Mckenzie & Sons, Inc.*, 10 F.4th 1255, 1264 (11th Cir. 2021) (quoting *Lambert v. Berkley S. Condo. Ass'n, Inc.,* 680 So. 2d 588, 590 (Fla. Dist. Ct. App. 1996)); *see also Culbreath Isle Property Owners Ass'n Inc. v. Travelers Cas. & Sur. Co. of Am.*, 982 F. Supp. 2d 1298, 1303 (M.D. Fla. 2013) (internal quotations and citations omitted). "Finally, although case law may generally be informative for determination of a coverage issue, 'the language of the policy is the most important factor' in such a determination." *Acosta, Inc. v. Nat'l Union Fire Ins. Co.*, 39 So. 3d 565, 573–574 (Fla. 2010).

The Insurers allege that the Trust's claims against the Coblentz directors are excluded from coverage under the 2017 Policies by operation of Section 7(b)'s Related Claim provision.[7] According to the Trust, however, "the Related Claim provision in Section 7(b) cannot be used to exclude coverage." [D.E. 107 at 3]. This is so because, in Plaintiff's view, "that provision applies only when an insured affirmatively seeks coverage under that contract" but never when an insurer seeks to exclude coverage. *Id.* at 3, 19–20. Yet, we find Plaintiff's reading of Section 7(b) untenable because it conflicts with and ignores the plain text of the provision. And it also suffers from the absence of binding authority that supports that sweeping proposition.

---

[7] "'[R]elated claims' provisions serve the following purposes: (a) to allow insurers to confine related wrongful acts to a single policy period and, thereby, a single liability limit, and (b) to allow an insured to buy a new policy, despite facing additional liability exposure from its past acts, by having future related claims covered by the prior policy." *Gidney v. Axis Surplus Ins. Co.*, 140 So. 3d 609, 612 (Fla. Dist. Ct. App. 2014).

As noted above, the 2017 Policies provide that "[a]ll coverage granted for Loss under this policy is provided solely with respect to: (i) Claims *first made* against an Insured, . . . *during* the Policy Period[.]  [D.E. 108-3 at 9] (emphasis added).  Section 7(b), in turn, set out the steps for determining when a Related Claim is "first made". *Id.* at 15.  For present purposes, that provision provides two clear directives; first, it clearly indicates that if "a Claim was first made and reported in accordance with Clause 7(a) above, then any Related Claim that is subsequently made against an Insured . . . shall be deemed to have been first made at the time that such previously reported Claim was first made[.]  *Id.*  Second, this provision expressly states that "Claims actually *first made or deemed first* made prior to the inception date of this policy, . . . *are not covered by this policy*."  *Id.* (emphasis added).

In light of the plain text of this provision, we cannot agree with the Trust's suggestion that "Section 7(b) cannot be used to exclude coverage."  [D.E. 107 at 3].  It only takes reading the *entire* provision to realize that its plain language clearly and unambiguously excludes from coverage claims first made, or deemed first made, pre-inception.  Indeed, as Defendants rightly point out, Plaintiff's reading of this section is only possible if one ignores, as Plaintiff's briefs do, the material portions of language in Section 7 that expressly disclaim coverage of claims first made prior to the policy's inception date.  In essence, Plaintiff's argument invites this court to disregard the plain language of this provision and re-write the last portion of its text providing that the claims at issue "are not covered under this policy."  This we cannot do.  *See People's Tr. Ins. Co. v. Progressive Express Ins. Co.*, 336 So. 3d 1207, 1210

(Fla. Dist. Ct. App. 2021) (rejecting invitation "to ignore the plain language of the relevant exclusion [provision]"); *Principal Life Ins. Co. v. Halstead*, 310 So. 3d 500, 503 (Fla. Dist. Ct. App. 2020) (courts cannot "ignore[] the plain reading of the language in an insurance policy.").

Relatedly, we find the Trust's reliance on *Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, PA, 517 F. Supp. 3d 458, 459 (D. Md. 2021) misplaced. The Trust's briefs rely heavily on *Perdue*, a case under Maryland law where the court found that a 2016 National Union insurance policy with Perdue did not allow for the exclusion of claims under its related claims provision. That finding, however, was predicated on the fact that "the *plain language* of the Related Claims Provision" in Perdue's policy suggested that the provision "was only implicated when an insured seeks to affirmatively bring a claim under the 2016 Policy" but not when exclusion of a claim was sought. *Perdue Farms*, 517 F. Supp. 3d at 462 (emphasis added). Unlike the policy in *Perdue*, however, our 2017 insurance agreements not only suggest, but expressly dictate, that pre-inception related claims "*are not covered by this policy.*" [D.E. 108-3 at 9]. A side-by-side reading of the two policies reveals that their related claims provisions differ in material ways. Indeed, the 2016 Perdue policy construed by the Maryland court did *not* include any language disclaiming coverage of related claims under its related claims provision. *Compare* [D.E. 131-1 at 8 (Section 6(b))] *with* [D.E. 108-3 at 9 (Section 7(b))].

Accordingly, Perdue's holding is inapposite here, for Plaintiff is not bound by the terms of Perdue's policy but by those governing the policy PNI bargained for with

Defendants in 2017.  And we certainly cannot rely on this inapposite case to support the theory that, notwithstanding this unambiguous provision, it can never be applied to exclude coverage.  No Florida case has been cited to us for that proposition, and we found none.  To the contrary, there are legions of Florida insurance cases with unambiguous policy provisions that were relied upon to exclude coverage.  So we are loathe to say that this provision has some magic powers previously unknown to Florida law.  A straightforward application of Florida law yields only one possible conclusion that runs counter to the Trust's position.

In sum, we reject the Trust's construction of Section 7(b) because its reading ignores the plain language of this provision.  As noted, Section 7(b) clearly indicates that a subsequent Related Claim is deemed first made at the time that the earlier Claim was made, hence claims deemed first made prior to the inception of the policy are excluded from coverage.  To find otherwise would require us to simply ignore the plain text of the 2017 Policy, which Florida law precludes us from doing.

### B.   *The Trust's 2019 and 2020 Claims Against the Coblentz Directors Relate Back to the Claims in Wasik's Initial Suit*

Next, we turn to the heart of the parties' dispute: whether the Trust's claims against the Coblentz directors are related to the claims made in Wasik's first lawsuit, thereby being first made in 2016 and, thus, not covered by the 2017 Policies.  Based on the undisputed facts on record, we find that they are.  Therefore, by virtue of the plain text of Section 7(b), the Trust's claims are not covered under the 2017 Policies and the Insurers are entitled to judgment as a matter of law on this Coblentz enforcement action.

As noted above, under the 2017 policy a subsequent Related Claim is deemed first made at the time that the earlier Related Claim was made, and the policy expressly disclaims coverage of claims deemed first made prior to the policy's inception date.  [D.E. 108-3 at 15].  The policy defines Claim as any "civil, criminal, administrative, regulatory or arbitration proceeding . . . which is commenced by: (i) service of a complaint or similar pleading."  [*Id.* at 25].  Further, the policy defines Related Claim as a "Claim alleging, arising out of, based upon or attributable to **any facts** or Wrongful Acts that are the same as **or related to** those . . . alleged in another Claim made against an Insured."  [*Id.* at 32].  In turn, Wrongful Act is defended as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act . . . by [an] Executive in his or her capacity as such[.]"  [*Id.* at 34].

The crux of the Trust's argument against relatedness is that the breach of fiduciary duty and corporate waste claims it made against the Coblentz directors in 2019 and 2020 are not related to Wasik's initial claims because the former were predicated on Board actions that took place exclusively in 2017.  This argument is flawed for two reasons.  First, it oversimplifies what is an otherwise highly-fact specific inquiry that looks beyond labels and focuses on whether the allegations in the underlying pleadings have "a logical or casual connection" in any "meaningful sense of the word."  *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262–63 (11th Cir. 2000) ("The plain meaning of the word 'relate' is 'to show or establish a logical or causal connection between.'").  Second, the Trust's theory depends on a claim-dependence

standard under which claims can only be deemed related if they are interdependent. This is not the standard that governs under applicable Florida law.

A thorough review of the factual allegations in the relevant pleadings (*i.e.*, the Wasik Initial Suit, the Wasik FAC, the Wasik SAC, the Trust's Severed Action, and the Trust's Severed Amended Complaint), reveals that the Trust's 2019 and 2020 claims are related to the claims originally made by Wasik in his 2016 initial complaint. Indeed, these pleadings make clear that all of the allegations in the Trust's 2019 and 2020 complaints are *directly* linked to Mariano's scheme to perpetuate his control over the Company and loot its purse for his financial benefit and that of his cronies. Once this factual backdrop is fully appreciated, one can only conclude that the Trust's alleged breaches are but mere variations, repetitions, and, in some instances, direct continuations of the same underlying course of conduct denounced in Wasik's initial complaint.[8]

As noted earlier, on November 30, 2016, Wasik filed his initial class-action complaint against PNI and its directors. The lawsuit alleged that Mariano was using the Company as his personal piggybank to entrench and unjustly enrich himself at the expense of the minority stockholders and PNI's interests. [D.E. 108-6 ¶ 1]. According to that complaint, Mariano was able to assert his dominance over PNI and loot its purse by manipulating, controlling, and coercing the board of directors into consistently approving Mariano's recurring self-interested and self-dealing

---

[8] And thus "alleging, arising out of, based upon or attributable to any facts or Wrongful Acts that are the same as or related to those" in the Wasik Initial Suit. [D.E. 108-3 at 32].

transactions. [*Id*. ¶¶ 2–3, 8, 60, 64, 67, 80, 100, 121]. Specifically, the Initial Complaint asserted claims for breach of fiduciary duty against Mariano and the directors[9] for their approval and execution of multiple PNI transactions between 2015 and late-2016; namely, (1) approval of a stock sale to private fund investors (the "PIPE transaction"); (2) approval of a new credit facility agreement (the "New Credit Agreement"); (3) approval of a dividend (together with the New Credit Agreement, the "Recapitalization"); (4) approval of a stock repurchase program (the "Repurchase Program"); and (5) rejection of an acquisition offer (the "Ebix Offer"). [*Id*. ¶¶ 39, 64, 67, 77, 101]. According to the Wasik Initial Claim, these acts were "entrenchment mechanisms" key to Mariano's scheme to dominate and loot the Company. [*Id*. ¶ 60]. While the Initial Complaint reads like a rushed pleading that sought urgent injunctive relief against a handful of Board approved transactions, its allegations are certainly focused on an overarching scheme by Mariano to dominate and loot PNI. Significantly, the complaint expressly addressed Marino's self-dealings with Guarantee Insurance, as well as his encroachment upon the Company's Special Committee's review processes. The initial complaint indicated that an amended version would follow. [*Id*. ¶¶ 29–30, 102–106].

On March 1, 2017, Wasik filed the FAC reasserting his class action and asserting new shareholder derivative claims. The FAC added three new individual

---

[9] The named defendants were: (i) PNI, (ii) Mariano, (iii) directors Charles Walsh ("Walsh"), Quentin Smith ("Smith"), John Del Pizzo ("Del Pizzo"), James O'Brien ("O'Brien") and Sean Bidic ("Bidic"), and (iv) former director Austin Shanfelter ("Shanfelter"). [D.E. 108-6 ¶¶ 19–26].

defendants,[10] as well as several Mariano-controlled corporate defendants, including Guarantee Insurance.  [D.E. 108-8 ¶¶ 8–15, 19–21].  Much like the Initial Complaint, the Wasik FAC was premised on Mariano's "unlawful conduct . . . to entrench control of and loot 'his' publicly traded company" with the knowledge and acquiescence of "his beholden management team, a rubberstamp interested board of directors [], and a group of knowing abettors[.]"   [*Id.* ¶ 1].   Indeed, the FAC expanded upon all the transactions listed in the Initial Complaint, providing more color as to how these specific transactions operated as individual means that furthered Mariano's overall goal of controlling and looting PNI for his personal benefit and that of his associates. [*Id.* ¶¶ 60–70 (explaining that the PIPE Transaction was a means for Mariano to funnel PNI capital into his entities Guarantee Insurance and GIG); ¶¶ 82–96 (noting that the Repurchase Program was a means for Mariano to inflate stock price and retain control of his majority ownership); ¶¶ 134–224 (articulating the different means through which Mariano controlled the decision making at the Board and Special Committee); ¶¶ 226–372 (explaining that the New Credit Agreement, Recapitalization, and Dividend were aimed at providing Mariano and his loyalists with cash that they could then use to displace minority shareholders); ¶¶ 376–379 (noting that the Board enriched Mariano and his cronies with a transactional bonus)]. This myriad of allegations in the FAC revealed with specific examples the patterns of governance deficiencies alluded to in the Initial Complaint, which allowed Mariano and his cronies "to run rampant without Board oversight or limitation," enabling

---

[10] (i) General Counsel Christopher Pesch ("Pesch"), (ii) CFO Thomas Shields ("Shields"), and (iii) Executive VP Todd Wilson ("Wilson").

them to engage in "related party transaction[s]" that "advance[d] Mariano's personal interests and entrench his control of Patriot National." [*Id.* ¶¶ 417, 486]. The FAC alleged derivative counts for breach of fiduciary duty and corporate waste against the D&Os predicated on defendants' adoption and approval of these self-interested transactions.

On August 21, 2017, Wasik filed the SAC. Like the two-prior versions, the SAC, too, was premised on Marino's "unlawful conduct . . . to remain in control of and loot 'his' publicly traded company" with the help of "his beholden management team, a rubberstamp interested board of directors [], and a group of knowing abettors[]." [D.E. 108-9 ¶ 1]. A review of the pleading shows that the SAC echoed the allegations contained within the Initial Claim and the FAC, providing yet more detail about Mariano's machinations to enrich himself and his associates at the expense of PNI through the execution of self-dealing transactions. [*Id.* ¶¶ 53–115 (Mariano uses PNI funds, including those obtained through the PIPE transaction, to finance his own companies and execute self-interested acquisitions); ¶¶ 116–175 (the Repurchase Program was aimed at raising stock price and entrenching Mariano as controller of PNI); ¶¶ 311–432 (Mariano gets the Board and Special Committee to approve his plans for a New Credit Agreement, Recapitalization, Dividend distribution, and Repurchase Program); ¶¶ 433–442 (the Board rubberstamped a transactional bonus for Mariano and his cronies)].

But unlike the earlier complaints, the SAC alleged additional acts of self-dealing and looting by Mariano that took place exclusively in 2017 and further

drained PNI resources: (i) the funneling of PNI funds into Guarantee Insurance (the "GIC Bailout"); (ii) the Board's approval of Mariano's new employment contract; (iii) the Board's approval of Mariano's severance package; (iv) the Board's approval of Pesch's separation agreement; and (v) the Board's award of shares to Wilson. [*Id.* ¶¶ 470–540]. These new allegations, which took place between February and August 2017, are significant because they form the predicate acts upon which the SAC—and later the Trust's Severed Action—raised allegations against the Coblentz directors (Hibler, Csiszar, and Coleman),[11] for breach of fiduciary duty and corporate waste. [*Id.* ¶¶ 535–540, 658–660, 669–670].

Following PNI's 2018 bankruptcy and the assignment of the derivate claims to the Trust, Plaintiff filed the Severed Action on November 20, 2019. The Trust's suit named twenty individual defendants, including all five of the Coblentz directors.[12] Like the prior iterations of the derivate claims, the Severed Action alleged that "Defendants knowingly abdicat[ed] [their] duties, leaving Mariano . . . free to manipulate PNI's capital to wrongfully enrich himself and his friends," through the approval of self-interested transactions—"all for the purpose of maximizing his own holdings and squeezing as much money from PNI as possible[.]" [D.E. 108-16 ¶¶ 1, 4; ¶¶ 44–75 (Mariano uses PNI funds to engage in self-interested acquisitions aimed at entrenching and enriching himself and his associates); ¶¶ 76–96 (Mariano uses

---

[11] Purcell and Rohr were members of the Board from January to April 2017, and Hibler, Coleman, and Csiszar joint the Board in late-April 2017.

[12] The Severed Action added six new defendants to the action: (i) officers Joyce Predmesky ("Predmesky"), David Quigley ("Quigley"), John Rearer ("Rearer"), and Elvis Rivera ("Rivera"), and (ii) Coblentz directors Rohr and Purcell.

PNI funds, including PIPE transaction money, to finance self-interested transactions, including funding Guarantee Insurance); ¶¶97–126 (the PIPE Transaction, New Credit Agreement, Repurchase Program, and Dividend distribution allowed Mariano to hold on to his majority ownership in PNI)].

Further, like the Wasik SAC, the Trust's Severed Action re-pleaded the new Board decisions that took place exclusively between February and August 2017, and that allowed Mariano to further loot PNI's resources.  These 2017 Board decisions are the  predicate acts upon which the Trust based its allegations for breach of fiduciary duty and corporate waste against the Coblentz directors. [*Id*. ¶¶ 127–148 (the GIC Bailout); ¶¶ 149–159 (the Board's approval of Mariano's new employment contract); ¶¶ 154–159 (the Board's approval of severance packages for Mariano and his cronies Shields and Pesch); ¶¶ 160–165 (Mariano's looting of $1.5m from PNI for the benefit of his company Old Guard)].

On June 23, 2020, the Trust filed an amended complaint (the "Severed Amended Complaint") that was identical in substance to the initial complaint.  The Severed Amended Complaint did not include four defendants, with whom the Trust reached a settlement in May 2020.  [D.E. 108-18].

Based upon our review of the relevant pleadings, we disagree with the Trust's argument that its 2019 and 2020 claims against the Coblentz directors are not related to Wasik's initial claims because the former are predicated on Board actions that took place exclusive in 2017.  Given our record and the factual allegations in all these pleadings, the Trust's proposition is contrary to Eleventh Circuit precedent holding

that even "different types of acts" that "resulted in a number of different harms to different persons, who may have different types of causes of action against [Defendant] [do] not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of [coverage]" when "they comprise a single course of conduct designed to promote a [specific goal]." *Cont'l Cas. Co.*, 205 F.3d at 1264 (rejecting claim that the term "related wrongful acts" is ambiguous and holding that a subsequent lawsuit alleging related acts was excluded from coverage under similarly worded insurance provision).

The Trust, nevertheless, suggests that, even if factually or logically connected, its 2019 and 2020 claims against the Coblentz directors cannot relate back to those in the Wasik Initial Suit because none of its causes of action are dependent on the claims asserted by Wasik in 2016. This interdependency theory, however, defies the policies' plain language, and is inconsistent with the standard applied by courts under Florida law when determining relatedness in the insurance coverage context. *See, e.g.*, *Gidney v. Axis Surplus Ins. Co.*, 140 So. 3d 609, 615 (Fla. Dist. Ct. App. 2014) (finding relatedness where "the Revitz claim and the [subsequent] class claim [were] based on the same course of conduct by [the company], particularly its alleged failure to conduct due diligence, maintain proper accounting, and detect and report prior encumbrances on the properties which provided collateral for the loans."); *Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 751 (11th Cir. 2018) (holding that different parties and different chronologies did not negate relatedness between the lawsuits where "all the underlying complaints described" a "continuing

pattern or practice of behavior."); *Zodiac Grp., Inc. v. Axis Surplus Ins. Co.*, 542 F. App'x 844, 849 (11th Cir. 2013) (rejecting claim that the addition of new defendants yielded a "new Wrongful Act", and finding relatedness where lawsuits claimed wrongful acts "related to [the company's] alleged efforts to falsely imply that [former partner] endorsed or was associated with its psychic services").

Much like this line of binding precedent, all of the allegations in the Trust's 2019 and 2020 complaints are directly linked to Mariano's scheme to perpetuate his control over the Company to unjustly enrich himself and his cronies at the expense of PNI's interests. Rather than describing a brand-new scheme, the Trust's 2019 allegations against the Coblentz directors merely constitute variations of the same course of conduct—or pattern of behavior—through which Mariano and his rubberstamp Board carried out his plans.

To be sure, the Trust's complaints do not even assert different kinds of allegations for different kinds of behaviors against any of the Coblentz directors, nor do they attribute liability to any of them for acts that can be said to fall outside the pattern of corporate misconduct described in Wasik's 2016 lawsuit—or the 2017 FAC which expanded upon and provided color to the 2016 allegations. *See supra* at 17–19. The Trust instead hangs its hat on the purported novelty of Mariano's and the Board's acts in 2017, including approval of cash infusions to Guarantee Insurance and Old Guard, Mariano's encroachment on the Board and special committees, and the approval of extraordinary compensation to Mariano and his loyalists. Yet, all of these purportedly new and unrelated acts of maleficence find logical and factual

precedents in the allegations embodied in Wasik's initial complaint.  [D.E. 108-6 ¶¶ 28–30; 108-8 ¶¶ 60–70] (addressing Mariano's interests in Guarantee Insurance and Old Guard and explaining that Mariano used PNI funds to finance Guarantee Insurance); [D.E. 108-6 ¶¶ 28–30; 108-8 ¶¶ 134–224] (noting Mariano's encroachment upon the Company's Special Committee's review and articulating how he controlled the decision-making process); [D.E. 108-6 ¶¶ 60–100; 108-8 ¶¶ 226–372] (explaining that the New Credit Agreement, Recapitalization, and unprecedented Dividend were aimed at providing Mariano and his loyalists with cash); [108-8 ¶¶ 376–379] (noting that the Board enriched Mariano and his cronies with a Recapitalization transactional bonus)].[13]

The Trust's reliance on cases suggesting a lack of relatedness is unavailing.  As noted earlier, *Perdue* is inapposite here because that case applied Maryland law and dealt with a policy language that differed in material respects from PNI's policies. Furthermore, the court's ruling finding that two lawsuits against Perdue, one premised on wage suppression claims and one supported by price manipulation, were not related was based on readily distinguishable fact.  *See Perdue*, 517 F. Supp. 3d at 463.  Unlike here, the *Perdue* plaintiffs claimed "vastly differing alleged methods for carrying out the distinct wage suppression and broiler price inflation schemes," and these "markedly different" means of carrying out the two schemes, as well as the absence of "similar anticompetitive conduct" alleged in the pleadings, led the court to

---

[13] Even the Board's 2017 approval of Snow's equity compensation is part of Mariano's scheme to control and loot PNI, for these were "shares that Mariano had agreed to give to Wilson in October 2016 as part of Wilson's 'reward' for serving as Mariano's lackey and helping him loot the Company."  [D.E. 108-9 ¶ 536].

find that, "there is no common scheme, transaction, or lawsuit tying the Purchaser and Grower Actions together." *Id.* at 463-64, 466.

The Trust's claims, however, were premised on the allegation that "Defendants knowingly abdicat[ed] [their] duties, leaving Mariano . . . free to manipulate PNI's capital to wrongfully enrich himself and his friends," through the approval of self-interested transactions—"all for the purpose of maximizing his own holdings and squeezing as much money from PNI as possible[.]" [D.E. 108-16 ¶¶ 1, 4]. Furthermore, and as noted above, the Trust's allegation against the Coblentz directors are logically and factually connected to Mariano's scheme to control the Company and loot its purse to enrich himself and his cronies. Thus, the Trust's claims clearly "comprise a single course of conduct designed to promote a [specific goal]," *Cont'l Cas. Co.*, 205 F.3d at 1264, that is marked by a "continuing pattern or practice of behavior." *Health First, Inc.*, 747 F. App'x at 751. In other words, the Trust's alleged breaches are but mere variations, repetitions, and, in some instances, direct continuations of the same underlying course of conduct denounced in Wasik's initial complaint. *See, e.g., Worthington Fed. Bank v. Everest Nat. Ins. Co.*, 110 F. Supp. 3d 1211, 1237 (N.D. Ala. 2015) ("the allegations of fraud at the June 2013 shareholder meeting are but a variation on the same riff playing out of the preceding shareholders meeting" and claims of incompetence and polarization were "the very crux of both lawsuits."). Therefore, the Trust's claims against the Coblentz directors related back to the claims first made by Wasik in 2016 and are excluded from coverage by the plain text of the 2017 Policies.

In sum, having found no genuine issues of material fact, we hold that National Union and RSUI are entitled to judgment as a matter of law on this *Coblentz* enforcement action because the claims for which the Trust seeks damages are not covered by the 2017 Policies.  Summary judgment should be entered in their favor.

## IV.  CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment on their coverage argument [D.E. 112] be **GRANTED**, and that Plaintiff's cross Motion for Partial Summary Judgment [D.E. 107] be **DENIED.**   Judgment should be entered for Defendants and the case CLOSED.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 14th day of

February, 2023.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge